**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROSS DUTCHER and NICOLE CANNON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NEW RESIDENTIAL INVESTMENT CORPORATION, NEW RESIDENTIAL MORTGAGE LLC, NRM ACQUISITION LLC, NRM ACQUISITION II LLC, SHELLPOINT PARTNERS LLC, and NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING,<br><br>Defendants. | CASE NO. 1:20-cv-10853<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Ross Dutcher and Nicole Cannon (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, makes the following allegations upon information and belief, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge.

## **NATURE OF THE ACTION**

1.     Defendant New Residential Investment Corporation ("NRZ") is a publicly traded real estate investment trust ("REIT") primarily focused on servicing residential mortgages.

2.     On July 3, 2018,  NRZ's wholly-owned subsidiary, New Residential Mortgage LLC ("NRM") acquired the mortgage servicing rights of Shellpoint Partners LLC ("Shellpoint"), the parent company of NewRez LLC d/b/a Shellpoint Mortgage Servicing ("NewRez").

3.      Following the consummation of the Shellpoint acquisition, NRZ began an aggressive campaign to increase its mortgage servicing portfolio: which duplicated in size in less than a year.[1] NRZ's staff also increased from 3 part-time employees to 3,387, 3,384 of which are directly employed by Shellpoint.[2] From its acquisition of Ditech Financial LLC ("Ditech") alone, NRZ increased its servicing portfolio by approximately one million mortgages.[3]

4.      Being ill-equipped to handle such a dramatic increase in its mortgage servicing portfolio, NRZ failed to implement servicing policies and procedures in complete disregard of state and federal laws and regulations; as per their own admission:

> "We have **limited experience** acquiring MSRs [mortgage servicing rights] and operating a servicer. Although ownership of MSRs and the operation of a servicer includes many of the same risks as our other target assets and business activities…**there can be no assurance that we will be able to successfully operate a servicer subsidiary** and integrate MSR investments into our business operations."[4]

5.      Specific to this Complaint, Defendants have engaged in unlawful and deceptive acts in connection with the ownership and servicing of residential mortgage loans, including, but not limited to, (i) failing to identify and honor pre-existing modification and forbearance agreements; (ii) failing to recognize payments made to prior servicers during servicing transfer periods; (iii) charging its borrowers late fees for timely payments made to prior servicers during those transfer periods; (iv) charging excessive and unreasonable property inspection fees in violation of Fannie Mae's standard mortgage agreements and industry guidelines and regulations; (v) failing to conduct adequate escrow analysis during the pendency of borrowers'

---

[1] New Residential Investment Corp., Annual Report (Form 10-K) at 73 (Feb 20, 2020).
[2] *Id.*, at 13.
[3] New Residential Investment Corp., Quarterly Report (Form 10-Q) at 75 (October 29, 2020).
[4] *Id.*, at 153.

bankruptcy proceeding resulting in escrow shortages and payment shocks; (vi) failing to implement proper policies and procedures and/or knowingly using incorrect loan data from its predecessors servicers in order to profiteer from previously waived and/or illegal fees; and (vii) charging its borrowers illegal payment processing fees for online or over the phone payments. In addition, Defendants violated RESPA, 12 U.S.C. § 2605(e) by failing to timely and adequately respond to Plaintiffs and the proposed class members' Qualified Written Requests concerning the above violations and otherwise failing to take any corrective actions.

6.      As is set forth more particularly below, Plaintiffs and the proposed class members are individuals who are or were borrowers subject to NRZ's predatory mortgage servicing practices. The Consumer Financial Protection Bureau and Better Business Bureau have received thousands of complaints from homeowners nationwide concerning the improper loan servicing practices of Defendants. Plaintiffs seek to vindicate their rights.

## THE PARTIES

7.      Plaintiff Ross Dutcher ("Plaintiff Dutcher") is a natural person residing in Los Angeles, California who has a mortgage serviced by NewRez, LLC.

8.      Plaintiff Nicole Cannon ("Plaintiff Cannon") is a natural person residing in Aston, Pennsylvania who has a mortgage serviced by NewRez, LLC.

9.      NewRez, LLC is a limited liability company organized under the laws of the state of Delaware. NewRez, LLC's sole member is Shellpoint Partners, LLC. NewRez, LLC has its principal place of business in South Carolina.

10.     Shellpoint Partners, LLC is a limited liability company organized under the laws of the state of Delaware. Shellpoint Partners, LLC has two members: NRM Acquisition, LLC

and NRM Acquisition II, LLC. Shellpoint Partners, LLC has its principal place of business in New York, New York.

11.    NRM Acquisition, LLC is a limited liability company organized under the laws of the state of Delaware. NRM Acquisition, LLC has one member: New Residential Mortgage, LLC. NRM Acquisition, LLC has its principal place of business in New York, New York.

12.    NRM Acquisition II, LLC is a limited liability company organized under the laws of the state of Delaware. NRM Acquisition II, LLC has one member: New Residential Mortgage, LLC. NRM Acquisition II, LLC has its principal place of business in New York, New York.

13.    New Residential Mortgage, LLC is a limited liability company organized under the laws of the state of Delaware. New Residential Mortgage, LLC has one member New Residential Investment Corporation. New Residential Mortgage, LLC has its principal place of business in New York, New York.

14.    New Residential Investment Corporation is a publicly traded real estate investment trust (NYSE:NRZ) that is organized under the laws of the State of Delaware and has its principal place of business located in New York, New York.

15.    Because Defendants form a single economic enterprise in connection to their mortgage servicing practices,[5] they are jointly and severally liable for each one of the violations

---

[5] NRZ performs its mortgage servicing through Shellpoint Mortgage Servicing which it classifies as a "special servicing *division*" through which NRZ operates its "servicing business." New Residential Investment Corp., Annual Report (Form 10-K) at 3 (Feb 20, 2020) (emphasis added). All of NRZ employees are also employees of Shellpoint. *See id.*, at 13 ("As of December 31, 2019, we have 3,387 employees of which 3,384 are employees of our wholly owned subsidiary Shellpoint Partners LLC."). Further, all of NRZ's office spaces are leased by Shellpoint. *See id.*, at 214. Further, NRZ conducts all of its business operations, including those of Shellpoint, through FIG LLC—a managing entity which provides "a management team and other professionals who are responsible for implementing New Residential's business strategy." *See id.*, at 138. FIG LLC is subject to the supervision of NRZ's board of directors. *Id.* Further, all of NRZ's officers are also employees of FIG LLC. *See id.*, at 13. In sum, NRZ, either directly or through FIG LLC, has

under laid out in this Complaint under both alter ego and agency theories of vicarious liability. As such, the below factual allegations refer to Defendants, collectively, in connection to the violations mentioned therein.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because this action arises out of three federal statutes: the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA") and the Real Estate Settlement and Procedures Act, 12 U.S.C. § 2605, *et seq.* (RESPA). This court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class members is a citizen of a different state than Defendant; there are more than 100 members of the Class; and upon information and belief the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs

17.    The Court also has supplemental jurisdiction over any state law claims under 28 U.S.C. § 1367, because these claims are so related to the federal FDCPA and RESPA claims that they form part of the same case or controversy under Article III of the United States Constitution.  The federal and state claims in this action share a common nucleus of operative facts, as set forth herein.

---

unfettered discretion over the election and assignment of Shellpoint's employees and executive personnel, as well as its operational policies. In addition, Shellpoint is a taxable REIT subsidiary ("TRS") of NRZ. As a TRS, Shellpoint functions as a single purpose shell entity formed solely for federal income tax purposes. *Id.*, at 215 ("New Residential…has made certain investments, particularly its investments in MSRs…through taxable REIT subsidiaries.") After paying income taxes, Shellpoint then passes all its income to NRZ which, as a REIT, is not subject to corporate income taxes as long as it passes at least 90% of its taxable income as dividends to its investors. As a result, Shellpoint functions as a mere department of NRZ, enjoying neither managerial nor financial autonomy. That fact is further corroborated by NRZ's treatment of Shellpoint's income as part of its general portfolio. *Id.*, at 71-78.

18.     Venue is proper in the United States District Court in and for the Southern District of New York because Defendants corporate headquarters are located in this district.

## FACTUAL ALLEGATIONS

19.     Plaintiff Cannon resides in Aston, Pennsylvania. Plaintiff Cannon's mortgage is a Fannie Mae/Freddie Mac Uniform Instrument ("Uniform Mortgage").

20.     On May 12, 2017, Plaintiff Cannon entered into a forbearance agreement with her prior loan servicer, Kirkland Investors LLC. Pursuant to that Agreement, Plaintiff Cannon was required to make six payments of $1,089.16 dollars per month. Following these payments, Kirkland was required to "defer the remaining arrearages, bring the account current" and modify the loan according to the terms listed in the Agreement pursuant to Section 3(c) and Section 4 of the Agreement (the "Modification Agreement"). A copy of the Modification Agreement is attached as Exhibit A.

21.     Plaintiff Cannon made all six payments pursuant to the Forbearance Agreement on time and in full.

22.     On February 15, 2018, Defendants acquired the servicing rights to Plaintiff Cannon's mortgage. Defendants then began a ruthless and predatory debt collection campaign against Plaintiff Cannon in contravention of her contractual and statutory rights.

23.     On February 26, 2018, Defendants sent Plaintiff Cannon a letter informing her that it had acquired the servicing rights to her loan from Kirkland (the "Hello Letter"). A copy of the Hello Letter is attached as Exhibit B.

24.     In the Hello Letter, Defendants requested that Plaintiff Cannon make her February 1, 2018 payment to them for $1,089.16—the amount that she owed pursuant to the Modification

Agreement. *Id.* at 3. In that letter, Defendants also identified themselves as a "debt collector" in "an attempt to collect a debt." *Id.* at 6.

25.     At the time that Defendants' sent the Hello Letter to Plaintiff Cannon, however, she had already paid her February 1, 2018 periodic mortgage obligation to Kirkland on January 26, 2018 for an amount of $1127.50. Plaintiff Cannon had also paid her January 1, 2018 periodic mortgage obligation to Kirkland on January 5, 2018 for an amount of $1099.16. A copy of Plaintiff Cannon's January bank account statement is attached as Exhibit C. Plaintiff Cannon paid above and beyond what was required by her Modification Agreement in order to gradually reduce the principal on her mortgage.

26.     On March 2, 2018, Defendants sent Plaintiff Cannon a "Validation of Debt Notice…required by the Fair Debt Collection Practices Act" in an attempt to collect an escrow advance of $3,332.10—directly contravening the covenant found in Section 4 of the Modification Agreement to  "defer the remaining arrearages." A copy of the Validation of Debt Notice is attached as Exhibit D.

27.     On March 18, 2018, Defendants sent Plaintiff Cannon a mortgage statement indicating that she was two months delinquent on her loan, though they failed to specify for which months exactly (the "March 2018 Statement"). A copy of the March 2018 Statement is attached as Exhibit E.

28.     In the March 2018 Statement, Defendants charged Plaintiff Cannon the first, of many, property inspection fees for an amount of $13.00. *Id.* Defendants were fully aware that Plaintiff Cannon was currently occupying her home: one of their representatives had spoken with her at, or about, March 1, 2018. They also knew that she was current on her mortgage as per her phone conversation with them.

29.     Finally, Defendants' March 2018 Statement indicated that Plaintiff Cannon had a delinquent escrow balance of $4,639.67, with a contractual due date of February 1, 2018. *Id.* In it, they also described themselves as a "debt collector" in "an attempt to collect a debt." *Id.*, at 2.

30.     On March 16, 2018, Plaintiff Cannon sent an email to Defendants identifying the error on her account and attached the receipt of her January 2018 and February 2018 mortgage payments (the "Qualified Written Request"). A copy of that Qualified Written Request is attached as Exhibit F.

31.     On March 20, 2018, Plaintiff Cannon made her March 1, 2018 payment to Defendants; but Defendants applied the payment to her February 1, 2018 periodic mortgage obligation despite her Qualified Written Request. A copy of Plaintiff Cannon's payment history is attached as Exhibit G.

32.     That same day, Defendants sent Plaintiff Cannon an annual escrow analysis (the "March 2018 Escrow Analysis). A copy of the March 2018 Escrow Analysis is attached as Exhibit H.  In it, Defendants indicated their intent to raise Plaintiff Cannon's monthly escrow payments to $522.42 dollars, beginning May 2018: $30.12 dollars more than the amount permitted under Section 3(c) of the Modification Agreement. *Id.* In addition, Defendants misrepresented to Plaintiff Cannon that she had an escrow shortage of $4,889.27 dollars, which they indicated that they had the right to collect "over a period of 12 months or more." *Id.*, at 2. Defendants, however, elected to spread the shortage over the next 60 months, resulting in an additional shortage installment of $81.49 dollars; this brought Plaintiff Cannon's total monthly escrow payments to $633.90 dollars—$111.69 dollars more than the amount permitted under Section 3(c) of the Modification Agreement. *Id.*

33.     Plaintiff Cannon made multiple attempts to contact Defendants to correct the error on her account, but her calls and emails fell on deaf ears.

34.     On or about April 1, 2018, Plaintiff Cannon reached out again to Defendants in order to rectify the error in her account; she was directed to Defendants' foreclosure department where she was informed that Defendants would no longer accept her periodic mortgage payments until she spoke with Defendants' loss mitigation department. During that conversation, the phone call dropped. Plaintiff Cannon made multiple subsequent attempts to contact Defendants, but Defendants never replied to her messages.

35.     On April 16, 2018, Defendants sent Plaintiff Cannon a notice of default and intent to accelerate her loan (the "Notice of Default"). A copy of the Notice of Default is attached as Exhibit I. The Notice of Default indicated that Plaintiff Cannon had a delinquent balance of $2191.32—the two alleged missed periodic payments plus the previously assessed $13.00 property inspection fee—and threatened to accelerate her mortgage if she failed to pay the balance within 45 days after her receipt of the notice. *Id.*

36.     Plaintiff Cannon was devasted. As a result of Defendants callous actions, she began experiencing extreme emotional distress and financial hardship. Left with no other options, she reached out to a lawyer who advised her to file for bankruptcy in order to attain a payment plan that would conform to her budget.

37.     On June 14, 2018, Plaintiff Cannon file a petition for Chapter 13 of the U.S. Bankruptcy Code. Despite the automatic stay stemming from Plaintiff Cannon's Chapter 13 Bankruptcy petition, however, Defendants continued to send her mortgage statements demanding past-due amounts through September of 2018 in violation of 11 U.S.C. § 362(a)(3).

38.     On September 18, 2018, during the course of her bankruptcy, Defendants sent Plaintiff Cannon a letter refusing her request to execute a short sale or deed-in-lieu of foreclosure due to their inability to access her property to conduct an appraisal; she never submitted the purported request; they also charged her a property inspection fee three days later. A copy of the short sale or deed-in-lieu of foreclosure is attached as Exhibit J.

39.     On September 24, 2018, Plaintiff Cannon's Chapter 13 Bankruptcy was dismissed due to her attorney's failure to file requisite paperwork.

40.      On October 3, 2018, Plaintiff Cannon re-filed her Chapter 13 Bankruptcy petition and was granted an extension to her automatic stay.

41.     On January 31, 2019, the Court approved Plaintiff Cannon's Chapter 13 Plan.

42.     Due to a miscommunication with her lawyer, Plaintiff Cannon was unable to pay her February 2019 petition payment.

43.     On March 18, 2019, Defendants filed a motion for relief from the automatic stay. The Court granted Defendants' motion April 9, 2019.

44.     On May 28, 2019, Defendants initiated a foreclosure proceeding against Plaintiff Cannon acting under a Limited Power of Attorney on behalf of U.S. Bank Trust National Association, as Trustee for CVI LCF Mortgage Loan Trust I ("U.S. Bank").

45.     Since then, Plaintiff Cannon's mortgage has been sold twice (on 9/30/19 and 11/13/2020.) Ex. G at 2, 4.

46.     Defendants nonetheless put a payment stop on Plaintiff Cannon's account and continued pursuing the foreclosure action on behalf of U.S. Bank even though they no longer have standing to do so. In so doing, Defendants kept racking up fees on Plaintiff Cannon's account.

47.    For instance, Defendants have systematically, and unrelentingly, charged Plaintiff Cannon property inspection fees: 30 times to be exact. *Id.*, at 2-6.

48.    Aside from being unreasonable, Defendants have assessed property inspections fees on Plaintiff Cannon's account without even conducting the purported property inspections that they charged her for.

49.    Further, Defendants have been derelict in how they handled Plaintiff Cannon's account. For example, assuming *arguendo* that Defendants had the right to re-adjust Plaintiff Cannon's escrow payments, they failed to properly factor in the impact that Plaintiff Cannon's Bankruptcy would have on her insurance premiums or taxes. Specifically, on October 8, 2018, Defendants sent Plaintiff Cannon an erroneous escrow analysis which resulted in an additional shortage of $1,148.47 during the pendency of her Bankruptcy:

|     | Transaction Date | Description | Anticipated | Actual |
| --- | --- | --- | --- | --- |
| a. | January 2019 | Hazard | $2,400.04 | $3,439.24 |
| b. | March 2019 | Tow Tax | $724.53 | $848.26 |
| c. | April 2019 | County Tax | $583.04 | $568.58 |

 A copy of those escrow analyses are attached as Exhibits K and L.

50.    Finally, Defendants have collected or attempted to collect payment processing fees of at least $20 dollars from Plaintiff Cannon since they acquired the mortgage servicing rights to her loan. Plaintiff Cannon's Uniform Mortgage does not expressly provide for or authorize charging processing fees for making payments online or over the phone. Furthermore, such processing fees are not permitted by any specific state or federal law.

**Plaintiff Dutcher**

51.    Plaintiff Dutcher resides in West Hills, California. Plaintiff Dutcher's mortgage is a Fannie Mae/Freddie Mac Uniform Instrument ("Uniform Mortgage").

52.    Plaintiff Dutcher's prior mortgage servicer was Ditech Financial LLC ("Ditech") f/k/a Green Tree Servicing LLC.

53.    On November 8, 2018, a devastating wildfire (the "Woolsey Fire") swept through Los Angeles, razing everything to the ground. Like many others, Plaintiff Dutcher was adversely impacted by the fire and unable to pay his mortgage that month.

54.     On or about December 1, 2018, Plaintiff Dutcher called Ditech to make his loan current. Ditech, however, insisted that Plaintiff Dutcher forbear his November payment; instead, suggesting that he make increased payments through April of 2019 to make up the missed payment.

55.    Plaintiff Dutcher began making the increased payments as per his agreement with Ditech.

56.    On April 1, 2019, Plaintiff Dutcher's interest rate was re-adjusted to a higher rate. Ditech, however, failed to account for the increase in calculating Plaintiff Dutcher's forbearance payment plan. As a result, Ditech rejected Plaintiff Dutcher's final forbearance payment that was due on April 1, 2019, and retroactively charged him a late fee for every monthly payment since the commencement of the forbearance agreement. Ditech also charged Plaintiff Dutcher a property inspection fee of $15.00 dollars for that month.

57.    In shock and confused, Plaintiff Dutcher called Ditech at or around May 1, 2019 to complain about their unfair assessment of the anachronistic fees. A representative from Ditech apologized to Plaintiff Dutcher and told him that Ditech would waive the fees. Notwithstanding

their representation to the contrary, however, Ditech continued to impose arbitrary and illegal fees on Plaintiff Dutcher's account.

58.    On October 1, 2019, Defendants acquired Ditech's mortgage servicing rights and liabilities, including the right to service Plaintiff Dutcher's mortgage.[6]

59.    Pursuant Regulation X, 12 C.F.R. §1024, *et seq*, ("Regulation X") promulgated under the Real Estate Settlement Procedures Act ("RESPA"), Defendants are required to maintain policies and procedures to ensure that they are able to identify and obtain "necessary documents or information that may not have been transferred by a transferor servicer  receive accurate documents and loan data information from prior servicers." 12 C.F.R. § 1024.38(b)(4)(ii).

60.    Further, pursuant to Regulation X, Defendants are required to create a servicing file which contains, *inter alia*, "[a] schedule of all transactions credited or debited to the mortgage loan account; and "[a]ny notes created by servicer personnel reflecting communications with the borrower about the mortgage loan account." 12 C.F.R. § 1024.38(c)(2).

61.    In reckless disregard of their obligation to verify the accuracy of Ditech's servicing documents and loan data information pursuant to Regulation X, however, Defendants buried their head in the sand in order to collect ill-gotten profits from Plaintiff Dutcher and the proposed class members.

62.     During the term of his loan with Ditech, for example, Plaintiff Dutcher was assessed late fees that were charged: (1) prior to the expiration of the 15 day grace period provided under his Uniform Mortgage (i.e., the 17th of the month); (2) retroactively for failing to pay a single installment in his forbearance agreement; (3) despite a representation that the fees

---

[6] New Residential Investment Corp., Annual Report (Form 10-K) at 69 (Feb 20, 2020).

would be waived; (4) a month or more after the payment was due; and (5) multiple times for the same missed payment. As of November 30, 2020, Defendants loan history of Plaintiff Dutcher's account indicates that Ditech charged him the following late fees:

|   | Transaction Date | Due Date | Description | Amount |
|---|---|---|---|---|
| b. | 7/**16**/19 | **5/1/19** | Late Charge Asses | -$54.84 |
| b. | 6/17/19 | **5/1/19** | Late Charge Assess | -$54.84 |
| c. | 5/**16**/19 | 4/1/19 | Late Charge Assess | -$54.84 |
| d. | **4**/**16**/19 | 3/1/19 | Late Charge Assess | -$52.96 |
| e. | 1/**16**/19 | 12/1/19 | Late Charge Assess | -$52.96 |
| a. | 12/17/18 | 11/1/18 | Late Charge Assess | -$52.96 |
| b. | 10/**16**/18 | 10/1/18 | Late Charge Assess | -$52.96 |

A copy of Plaintiff Dutcher's payment history is attached as Exhibit M.

63. Similarly, during the term of his loan with Ditech, Plaintiff Dutcher was assessed property inspection fees that were charged: (1) prior to the expiration of the 15 day grace period provided under his Uniform Mortgage (i.e., the 17th of the month); (2) despite a representation that the fees would be waived; and (3) despite being in direct contact with Plaintiff Dutcher. As per the same loan history provided by Defendants, Ditech charged Plaintiff Dutcher the following property inspection fees:

|   | Transaction Date | Due Date | Description | Amount |
|---|---|---|---|---|
| b. | 7/12/19 | 7/1/19 | Property Inspection Assess | -$15.00 |
| b. | 5/8/19 | 5/1/19 | Property Inspection Assess | -$15.00 |
| c. | 4/8/19 | 4/1/19 | Property Inspection Assess | -$15.00 |

*Id.*, at 4.

64.    Despite the glaring errors on Plaintiff Dutcher's account, Defendants made no efforts to obtain the servicer notes created by Ditech's personnel which contained, among other things, the waiver of the late fees and property inspection fees stemming from Plaintiff Dutcher's April 1, 2019 payment.

65.    Similarly, instead of rectifying Plaintiff Dutcher's loan data information, Defendants fabricated line items to fill in missing gaps in Plaintiff Dutcher's loan history:

| | Transaction Date | Due Date | Description | Amount |
|---|---|---|---|---|
| a. | 1/13/20 | 1/1/20 | Property Inspection Pmt | $30 |
| b. | 1/13/20 | 1/1/20 | Prior Servicer Cost Pmt | -$30 |
| c. | 7/29/19 | 8/1/19 | Prior Servicer Cost Assess | $30 |

*Id.*, at 2-3.

66.    To compound the problem, on January 16, 2020, Defendants' sent Plaintiff Dutcher a mortgage where they misrepresented to him that his loan had a $15 dollars overdue payment (the "January 2020 Statement"). A copy of the January 2020 Statement is attached as Exhibit N. Defendants attempt to charge Plaintiff Dutcher the $15 dollars overdue payment on the January 2020 Statement occurred three days after Defendants had credited a $30 dollars "Property Inspection Pmt" on his account. Ex. M at 2. Like Plaintiff Cannon's mortgage statements, the January 2020 Statement indicated that Defendants were a "debt collector" in an "attempt to collect a debt." Ex. N at 2.

67.    When Plaintiff Dutcher called Defendants to inquire about the charge, one of Defendants' representatives told him that it was a property inspection fee from his prior servicer; Plaintiff Dutcher offered to pay-off the fee, but the representative told him that he need not worry about it because the fee would eventually "fall off."

68.    Despite their representation to the contrary, Defendants' continued to send Plaintiff Dutcher periodic mortgage statements with the $15 dollars overdue payment.

69.    In addition, Defendants' purposely prevented Plaintiff's Dutcher from paying off the $15 dollars fee by not allowing him to include it as part of his periodic payments over the phone or online.

70.    On or about September 2020, Plaintiff Dutcher was forced to mail-in his mortgage payment to Defendants. In so doing, he added a $1 dollar extra payment to see what would happen to his account: Defendants' applied it to the lingering property inspection fee—despite their contractual obligation to apply it first to the outstanding late charge for that month. *See* CALIFORNIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005 1/01 at 4, ¶ 2 (indicating that any excess cash in a periodic payment "shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note."). A copy of the Uniform Fannie Mae/Freddie Mac Uniform Mortgage is attached as Exhibit O.

71.    Finally, Defendants have collected or attempted to collect payment processing fees of at least $10 dollars from Plaintiff Dutcher since they acquired the mortgage servicing rights to her loan. Plaintiff Dutcher's Uniform Mortgage does not expressly provide for or authorize charging processing fees for making payments online or over the phone. Furthermore, such processing fees are not permitted by any specific state or federal law.

**Common Refusal to Honor In-Flight Modification Agreements**

72.    Since at least January 2018, Defendants acquired mortgage servicing rights for multiple loans that were subject to forbearance and/or modification agreements ("In-Flight Modification Agreements").

73.     In disregard of their servicing duties, however, Defendants often failed to identify and/or honor the loans that were subject to those In-Flight Modification Agreements.

74.     As a result, Defendants impermissibly increased the monthly mortgage payments that they charged Plaintiff Cannon and the proposed class members.

75.     Like Plaintiff Cannon, borrowers who could not afford Defendants' unexpected and illicit increase of their monthly mortgage payments were forced to seek drastic options to avoid foreclosure, such as deeds in lieu of foreclosure, short sales or bankruptcy. When even those alternatives were not viable options, Defendant foreclosed on the affected borrowers.

**Common Failure to Incorporate Payments During Transfer Period**

76.     Pursuant to § 1024.33(c)(1) of Regulation X and § 2605(d) of RESPA, Defendants are not permitted to treat any payments made to a transferor servicer as "late for any purpose" during a 60-day period beginning on the date of the servicer transfer. 12 C.F.R. § 1024.33(c)(1); 12 USCS § 2605(d).

77.     Notwithstanding the forgoing, Defendants frequently failed to incorporate payments made to prior servicers during such servicer transfer periods. As a result, Plaintiff Cannon and the proposed class members' loan were marked as delinquent, while Defendants attempted to collect the same monthly payment twice.

78.     In so doing, Defendants also charged Plaintiff Cannon and the proposed class members with late fees and property inspection fees in violation of § 1024.33(c)(1) of Regulation X and § 2605(d) of RESPA. Ex. G at 6 (charging Plaintiff Cannon a $28.34 late charge due to Defendants failure to incorporate the payments made to her prior servicer within the 60-day grace period under RESPA).

**Common Failure to Conduct Proper Escrow Analysis Scheme**

79.    Pursuant to § 1024.17 of Regulation X, Defendants are required to perform annual escrow account analyses on all loans for which it manages an escrow account. 12 CFR § 1024.17(g)-(i)

80.    When performing an escrow analysis, Defendant must estimate a borrower's future homeowner's insurance premium and tax obligations, and then calculate the monthly amounts the borrower should be charged to ensure that the escrow account has sufficient funds to make required tax and insurance payments for the year. *See id.*

81.    Servicers must also accurately compute the borrower's monthly payment obligation to determine whether any surplus, shortage, or deficiency exists in the escrow account. *See id.*

82.    Despite being exempted from providing annual escrow statements to borrowers that have declared bankruptcy, the servicer's obligation to perform the escrow analysis remains. This analysis enables the servicer to understand if and how a borrower's tax and insurance obligations have changed during the pendency of a borrower's bankruptcy: which may result in a surplus, shortage, or deficiency in their escrow account. *See id.*

83.    Defendants did not perform annual escrow analyses during the pendency of Plaintiff Cannon or the proposed class members bankruptcy proceedings. As a result, Defendants collected monthly escrow amounts from Plaintiff Cannon and the proposed class members that were too low to cover the increase in their insurance premiums and/or taxes which resulted from their bankruptcy proceedings.

84.    Defendants' failure to perform the required escrow analyses caused Plaintiff Cannon and the proposed class members to experience large payment shocks when they emerged

from bankruptcy and discovered that Defendants intended to collect escrow shortages which they had not previously identified, and which Plaintiff Cannon and the proposed class members otherwise had no way of anticipating.

**Common Unlawful Property Inspection Fee Scheme:**

85.     Under Plaintiff Cannon and the proposed class members' Uniform Mortgages, Defendants have the right to conduct property inspection fees for delinquent loans, provided that doing so is "reasonable or appropriate." Ex. O at 8, ¶ 9.

86.     As a loan servicer, Defendants are required to follow the servicing guidelines of Fannie Mae. The Fannie Mae servicing guidelines clarify what is "reasonable or appropriate" under the Uniform Mortgages. Failure to comply with these guidelines is probative of a failure to comply with state consumer protection laws.

87.     Under Section D2-2-10 of the 2019 Fannie Mae Servicing Guidelines, a servicer is not required to conduct a property inspection until after the 60th day that a property is delinquent.[7] Similarly, pursuant Section D2-2-10 a servicer does not have to conduct property inspections if it has established contact (i.e., Quality Right Party Contact ("QRPC")) with the borrower within the last 30 days. *Id.*, at 313. Further, Section D-2-10 provides that "[i]f the servicer has not established QRPC while the mortgage loan remains delinquent, the servicer must continue attempts to achieve QRPC with the borrower [pursuant to Section D-2-01.]" *Id.*, at 314. Section D-2-01 requires servicers to conduct outbound contact attempts to establish QRPC every

---

[7]  https://servicing-guide.fanniemae.com/THE-SERVICING-GUIDE/Part-D-Providing-Solutions-to-a-Borrower/Subpart-D2-Assisting-a-Borrower-Who-is-Facing-Default-or/Chapter-D2-2-Requirements-for-Contacting-a-Borrower/D2-2-10-Requirements-for-Performing-Property-Inspections/1042371021/D2-2-10-Requirements-for-Performing-Property-Inspections-04-10-2019.htm?searchtype=sf (last retrieved on December 15, 2020).

7 days. *Id.*, at 298-299. Finally, servicers may ask Fannie Mae to reimburse them for property inspection costs provided that they submitted the required documentation. *Id.*, at 314.

88.    Section D2-2-10 of the Fannie Mae Servicing Guidelines is necessary to ensure the property is occupied when a loan servicer has been unable to establish contact with the borrower and loan payments have not been received. But Section D2-2-10 does not authorize or permit inspections when the loan servicer is in contact with the borrower and knows the property to be inhabited, such as when the borrower provides a notice of occupancy to the loan servicer, or after the borrower has come current.

89.    On a similar vein, the United States Department of Housing and Urban Development ("HUD") imposes a limitation on loan servicers' ability to order property inspections and charge them to borrowers. Specifically, 24 C.F.R. § 203.377 provides, in pertinent part:

> The mortgagee, upon learning that a property subject to a mortgage insured under this part is vacant or abandoned, shall be responsible for the inspection of such property at least monthly, if the loan thereon is in default. When a mortgage is in default and a payment thereon is not received within 45 days of the due date, *and efforts to reach the mortgagor by telephone within that period have been unsuccessful*, the mortgagee shall be responsible for a visual inspection of the security property to determine whether the property is vacant.

24 C.F.R. § 203.377 (emphasis added).

90.    As interpreted by the HUD, this regulation prohibits the lender from charging a property inspection fee:

> If there is evidence that *the mortgagee knew the mortgagor was still in occupancy*, such as documented communication with the mortgagor, counseling agency, the mortgagor's attorney or the local HUD office, *such charges are inappropriate and must not be charged to the mortgagor* or included on a claim for insurance benefits.

HUD Handbook 4330.1 REV-5 9-9(A)(c)(2)(d) (emphasis added).

91.     As detailed herein, Defendants had either established QRPC with Plaintiff

Cannon and the proposed class members or failed to conduct any attempts to do so as required

under the Fannie Mae Servicing Guidelines. Yet, Defendants ordered property inspections

anyways, which were charged to Plaintiff Cannon and the proposed class members' mortgage

accounts, without a legitimate basis, solely to generate unreasonable and unnecessary fees.

92.     Upon information and belief, Defendants utilize a software-based servicing

system which automatically orders property inspections, and charges the borrower's account for

the inspections, if a borrower is in default. The only criteria for the inspection to be ordered and

charged is that the loan has been in default for a certain number of days. The inspection is

ordered and charged regardless of whether there is a lawful and reasonable basis for ordering the

inspection or whether the borrower may be legally charged for the inspection. Further, the

property inspections are often charged even when no property inspection took place. Finally,

Defendants have charged property inspection fees to borrowers despite having been reimbursed

for them by Fannie Mae and/or the residential mortgage-backed securities trusts for which they

act as servicers.[8]

93.     Defendants also conveniently own the company which they use to conduct

appraisal and valuation services on their loans, thus increasing their profit margin for those

services.[9]

---

[8] New Residential Investment Corp., Annual Report (Form 10-K) at 4-5 (Feb 20, 2020).
[9] *Id.*, at 3 ("Our subsidiary eStreet Appraisal Management LLC ("eStreet") is an appraisal management company that performs appraisal and valuation services.").

**Common Failure to Verify Infected Loan Data from Ditech**

94.      Pursuant § 1024.38(b)(4)(ii) of Regulation X, Defendants are required to maintain proper policies and procedures to ensure that they are able to identify and obtain "necessary documents or information that may not have been transferred by a transferor servicer" to ensure that they received accurate documents and loan data information from those transferor servicers. 12 C.F.R. § 1024.38(b)(4)(ii).

95.       Further, pursuant to § 1024.38(c)(2) of Regulation X, Defendants are required to create a servicing file which contains, *inter alia*, "[a] schedule of all transactions credited or debited to the mortgage loan account; and "[a]ny notes created by servicer personnel reflecting communications with the borrower about the mortgage loan account." 12 C.F.R. § 1024.38(c)(2).

96.      On October 1, 2019, Defendants completed their acquisition of Ditech. Pursuant to the agreement, Defendants acquired Ditech's MSR with an aggregate unpaid principal balance of approximately $61.9 billion dollars.[10]

97.      A former nationwide mortgage servicer, Ditech filed for Chapter 11 Bankruptcy in the United States Bankruptcy Court for the Southern District of New York (Case No. 19-10412). Before filing for bankruptcy protection, Ditech was well known to have utilized incorrect and unreliable mortgage data related to the residential loans it serviced. In addition to Plaintiff Dutcher's personal experience, Ditech's ill-equipped servicing practices is evidenced by the Complaint and Consent Order filed by the Federal Trade Commission in the United States District Court for the for the District of Minnesota. *See FTC v. Green Tree Servicing LLC*, No. 15-cv-2064 (SRN/SER).

---

[10] *Id.*, at 69.

98.     In an attempt to circumvent the well-documented servicing errors and illicit loan charges assessed by Ditech, Defendants petitioned the Court in Ditech's Bankruptcy to permit them to purchase Ditech's assets "free and clear" of any liability: the Court flatly rejected their request. *In re Ditech Holding Corp.*, 606 B.R. 544, 550 (Bankr. S.D.N.Y. 2019).

99.     As part of their unrelenting effort to profit from Ditech's ill-gotten fruit, however, Defendants chose to bury their head in the sand instead of verifying the accuracy of Ditech's servicing documents and loan data pursuant to Regulation X. 12 C.F.R. § 1024.38, *et seq.*

100.    Upon information and belief, Defendants do not possess the mortgage statements nor servicer personnel notes from transferor servicers as required under § 1024.38 of Regulation X." 12 C.F.R. § 1024.38(b)(4)(ii). Nor do they maintain adequate servicing files as required under § 1024.38(c)(2) of Regulation X. 12 C.F.R. § 1024.38(c)(2).

**Misrepresentations and Active Frustration to Generate Ancillary Fees**

101.    Defendants actively frustrate their borrowers' ability to pay-off ancillary fees on their accounts by misrepresenting to them that the fees have been waived.

102.    Further, Defendants prevent their borrowers from paying off the ancillary fees on their account by not allowing them to include those fees when they make a payment online or over the phone.

103.    In so doing, Defendants ensure that their borrowers do not dispute the ancillary fees: which they then collect from surplus periodic payments, foreclosure sales, and/or Fannie Mae or the residential mortgage-backed securities trusts which they service. As per Defendants advertising on their website:

> A mortgage servicing right (MSR) provides a mortgage servicer with the right to
> service a pool of residential mortgage loans…Advances are required capital
> outlays by the servicer to fund missed payments from delinquent borrowers and
> foreclosure-related expenses. **The servicer has limited risk of not being**

**reimbursed for advances**, because advances are almost always "top of the waterfall" in the event of a property sale. [11]

**Common Unlawful Processing Fees Scheme**

104.    Since they began servicing loans, Defendants have collected, attempted to collect and/or acquired (as part of their Ditech acquisition) illegal payment processing fees from their borrowers use of online or over the phone payment systems. Those fees have ranged over time from $10.00 dollars to $20.00 dollars for each payment made online, over the phone via an automated system, and/or with a customer service representative (the "Processing Fees").

105.    The usual cost that a loan servicer pays a third-party payment processor for the above payments is $0.50 or less for each transaction. Therefore, the actual cost for Defendants to process those payments is well below the amounts charged to borrowers, and Defendants illegally pocket the difference as profit.

106.    Plaintiffs Uniform Mortgages do not authorize Defendants or their predecessors to charge Processing Fees. In fact, the Processing Fees violate multiple provisions of the Uniform Mortgages.

107.    Plaintiffs' Uniform Mortgage Agreements, like the Uniform Mortgages of the proposed class members, incorporate standard language from Fannie Mae model mortgages. And like other Fannie Mae mortgages, the Unform Mortgages state that the servicer "may not charge fees that are expressly prohibited by this Security Instrument, or by Applicable Law." Ex. O at 11, ¶ 14.

108.    "Applicable Law" is defined as "all controlling applicable federal, state and local

---

[11] https://www.newresi.com/about-us (last retrieved on December 15, 2020).

statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions." Ex. O at 2, ¶ (I).

109.    The Uniform Mortgages further state that they are "governed by federal law and the law of the jurisdiction in which the Property is located," i.e., California and Pennsylvania. Ex. O at 12, ¶ 16.

110.    Charging Processing Fees are not expressly authorized by the Uniform Mortgages and violate the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*, the Pennsylvania Fair Credit Extension Uniformity Act, 73 Pa. Stat. Ann. § 2270.1, *et seq*, Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201, *et seq.*, the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §§ 1788 *et seq.*, and California's Unfair Competition Law Cal. Bus. & Prof. Code § 17200, *et seq.*

111.    Even if Defendants were somehow permitted to collect a fee under the auspice that it is a default related fee, under Paragraph 9 of the Uniform Mortgages, Defendants demand for the payment of Processing Fees was and is a direct breach of that paragraph, too.

112.    Paragraph 9 of the Mortgage Agreement states that only "amounts *disbursed* by Lender under this Section 9 shall become an additional debt of Borrower secured by this Security Instrument." See Ex. O at 8, ¶ 9 (emphasis added).

113.    Defendants collected more than the amount they disbursed in connection with the Processing Fees.

**Common Failure to Respond to Qualified Written Requests**

114.    Like Plaintiff Cannon, other borrowers sent Defendants Qualified Written Requests ("QWR") demanding that Defendants correct the erroneous charges that they imposed on their accounts when they took over as the servicer for their loans. Like Plaintiff Cannon's

QWR, however, their QWRs fell on deaf ears. The following is an excerpt of a complaint filed

by a borrower against Defendants with the Consumer Financial Protection Bureau on April 29,

2020:

> On XX/XX/2020 I received a letter from NewRez mortgage company stating that they had purchased my account and payment was due XX/XX/2020. I had automatic payments made to my previous mortgage company XXXX Mortgage. **I immediately sent an email to no avail.** Then I was told they would get the payment from XXXX in fifteen days. However, to date they have not credited my account the {$1200.00} per month I paid and were deducting what should have gone to my principal from my account. I sent them a letter, as well as XXXX. They have threatened me with credit reporting ( until covid ). **I do not feel I am required to pay a mortgage twice.** It is their responsibility to collect all monies when they purchase the account.[12]

## CLASS ACTION ALLEGATIONS

115.    Plaintiffs bring this action on behalf of themselves and all other similarly situated

persons as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and

(b)(3).

116.    The class periods shall be defined from the date of the filing of this complaint, back

to any such time the court deems appropriate.

117.    Plaintiffs seek to represent the following Nationwide Classes:

**Nationwide In-Flight Modification Class:**

All persons (1) who have or had mortgage loans serviced by Defendants, (2) who had existing loan modifications or forbearance agreements with a prior servicer, and (3) whose mortgage payments were unilaterally altered by Defendants in contravention of those agreements.

**Nationwide Missing Payment Class:**

All persons (1) who have or had mortgage loans serviced by Defendants, (2) who

---

[12] https://www.consumerfinance.gov/data-research/consumer-complaints/search/detail/3501347 (last retrieved on December 15, 2020).

paid any amount to their prior servicer which Defendants failed to recognize after acquiring the servicing rights to their loans.

**Nationwide Late Fee Class:**

All persons (1) who have or had mortgage loans serviced by Defendants, (2) who paid any amount to their prior servicer which Defendants failed to recognize after acquiring the servicing rights to their loans, and (3) who were charged any fees by Defendants as a result of that missing payment within the 60-day period beginning on the date that Defendants acquired the servicing rights to their loans.

**Nationwide Escrow Class:**

All persons (1) who have or had mortgage loans serviced by Defendants, (2) who filed for bankruptcy, (3) whose projected escrow expenses remained unaltered by Defendants despite such bankruptcy, and (4) who were subsequently charged an inflated escrow shortage as a result of Defendants' improper escrow analysis.

**Nationwide Property Inspection Fee Class:**

All persons (1) who have or had mortgage loans serviced by Defendants, (2) who were charged an inspection fee despite being in contact with Defendants, or (3) who were charged a property inspection fee for  a property inspection that never took place.

**Nationwide Infected Loan Class:**

All persons (1) who have or had mortgage loans serviced by Defendants, (2) who were charged any amounts by Defendants, (3) which were not due or owing in their last mortgage statement prior to Defendants acquisition of the servicing rights to their loans from Ditech.

**Nationwide Processing Fee Class:**

All persons (1) who have or had mortgage loans serviced by Defendants, (2) who were charged, or subject to, any Processing Fees for making a mortgage payment online, over the phone via an automated system, and/or with a customer service representative.

**Nationwide RESPA Class**

All persons (1) who have or had mortgage loans serviced by Defendants, (2) who paid any amount to their prior servicer which Defendants failed to recognize after acquiring the servicing rights to their loans;, (3) who provided written notice to Defendants evidencing such error on their account, and (4) who's account was not

corrected by Defendants within 30 days of such notice.

118.    Plaintiff Cannon also seeks to represent the following Sub-Classes (collectively, the "Pennsylvania Sub-Class"):

**Pennsylvania In-Flight Modification Class:**

All persons (1) who have or had mortgage loans serviced by Defendants in Pennsylvania, (2) who had existing loan modifications or forbearance agreements with a prior servicer, and (3) whose mortgage payments were unilaterally altered by Defendants in contravention of those agreements.

**Pennsylvania Missing Payment Class:**

All persons (1) who have or had mortgage loans serviced by Defendants in Pennsylvania, (2) who paid any amount to their prior servicer which Defendants failed to recognize after acquiring the servicing rights to their loans.

**Pennsylvania Late Fee Class:**

All persons (1) who have or had mortgage loans serviced by Defendants in Pennsylvania, (2) who paid any amount to their prior servicer which Defendants failed to recognize after acquiring the servicing rights to their loans, and (3) who were charged any fees by Defendants as a result of that missing payment within the 60-day period beginning on the date that Defendants acquired the servicing rights to their loans.

**Pennsylvania Escrow Class:**

All persons (1) who have or had mortgage loans serviced by Defendants in Pennsylvania, (2) who filed for bankruptcy, (3) whose projected escrow expenses remained unaltered by Defendants despite such bankruptcy, and (4) who were subsequently charged an inflated escrow shortage as a result of Defendants' improper escrow analysis.

**Pennsylvania Property Inspection Fee Class:**

All person (1) who have or had mortgage loans serviced by Defendants in Pennsylvania, (2) who were charged an inspection fee despite being in contact with Defendants, or (3) who were charged a property inspection fee for  a property inspection that never took place.

**Pennsylvania Processing Fee Class:**

All persons (1) who have or had mortgage loans serviced by Defendants in

Pennsylvania, (2) who were charged, or subject to, any Processing Fees for making a mortgage payment online, over the phone via an automated system, and/or with a customer service representative.

119.    Plaintiff Dutcher also seeks to represent the following Sub-Classes (collectively, the "California Sub-Class"):

**California Infected Loan Class:**

All persons (1) who have or had mortgage loans serviced by Defendants in California, (2) who were charged any amounts by Defendants, (3) which were not due or owing in their last mortgage statement prior to Defendants acquisition of the servicing rights to their loans from Ditech.

**California Processing Fee Class:**

All persons (1) who have or had mortgage loans serviced by Defendants in California, (2) who were charged, or subject to, any Processing Fees for making a mortgage payment online, over the phone via an automated system, and/or with a customer service representative.

120.    The Classes do not include (1) Defendants, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge's staff.

121.    Plaintiffs reserve the right to amend the above class definitions and to add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

122.    ***Community of Interest***: There is a well-defined community of interest among members of the Classes, and the disposition of the claims of these members of the Classes in a single action will provide substantial benefits to all parties and to the Court.

123.    ***Numerosity***: While the exact number of members of the Classes is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Classes is ascertainable based upon the records maintained by the Defendants. At this time, Plaintiffs are informed and believe that the Classes include thousands of members. Therefore, the

Classes are sufficiently numerous that joinder of all members of the Classes in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be to the benefit to the parties and the Court.

124.    *Ascertainability*: Names and addresses of members of the Classes are available from Defendants' records. Notice can be provided to the members of the Classes through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under state law and federal law.

125.    *Typicality:* Plaintiffs claims are typical of the claims of the other members of the Classes which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs and each member of the Classes has been subjected to the same deceptive and improper practices and has been damaged in the same manner thereby.

126.    *Adequacy*: Plaintiffs will fairly and adequately represent and protect the interests of the Classes as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Classes because they have no interests which are adverse to the interests of the members of the Classes. Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained skilled and experience counsel, and by making a pre-suit demand on behalf of class members to protect the interests of the class.

127.    *Superiority:* A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a) The expense and burden of individual litigation makes it economically unfeasible for members of the Classes to seek to redress their claims other than through the procedure of a class action;

(b) If separate actions were brought by individual members of the Classes, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

(c) Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

128.    Common questions of law and fact exist as to the members of the Classes, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Classes within the meaning of Federal Rule of Civil Procedure 23(b)(3). Such questions include, but are not limited to, the following:

(a)    whether Defendants increased mortgage payments unilaterally in violation of in-flight modification or forbearance agreements;

(b)    whether Defendants failed to recognize payments made to transferor servicers within the servicing transfer period;

(c)    whether Defendants charged any fees in connection to missing payments made to transferor servicers within the 60-day period following the servicing transfer;

(d)    whether Defendants failed to conduct proper escrow analysis after a borrower petitioned for bankruptcy;

(e)    whether Defendants charged unreasonable property inspection fees in violation of the Uniform Mortgages and Fannie Mae industry guidelines;

(f)    whether Defendants charged amounts that were not marked as delinquent in the last mortgage statement issued by Ditech prior to Defendants acquisition of Ditech's servicing rights;

(g)    whether Defendants employed the proper policy and procedures to ensure that it received accurate loan data and missing documents from transferor servicers;

(h)    whether Defendants maintain adequate mortgage files;

(i)    whether Defendants assessed illegal Processing Fees in contravention of the Uniform Mortgages and state and federal laws;

(j)    whether Defendants failed to adequately respond to and/or address servicing errors outlined in Qualified Written Requests;

(k)    whether Plaintiffs and the Classes have suffered damages as a result of Defendants' actions and the amount thereof;

(l)    whether Plaintiffs and the Classes are entitled to statutory damages;

(m)    whether Plaintiffs and the Classes are entitled to restitution;

(n)    whether Plaintiffs and the Classes are entitled to injunctive relief to enjoin Defendants from further engaging in these wrongful practices; and

(o)    whether Plaintiffs and the Classes are entitled to attorney's fees and costs.

## FRAUDULENT CONCEALMENT TOLLING-

129.    All applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action. Plaintiffs and the proposed class members did not and could not have known about the facts giving rise to the causes of action at any point during Defendants' inadequate escrow analyses or their wrongful assessment of the property inspection fees, the Processing Fees, or any other fraudulent or illegal fees whose illegality could have only been discovered based on Defendants internal policies and procedures and/or servicing files. Plaintiffs and the proposed class members could not have discovered the facts that would disclose Defendants' fraudulent practices despite exercising reasonable care and diligence in seeking to learn them. Defendants fraudulently concealed the truth from its borrowers and, accordingly, the

relevant statutes of limitation should be equitably tolled until Plaintiffs filed this action at the earliest.

130.    Instead of disclosing that Defendants collects a massive profit from charging the fees subject to this Complaint, Defendants represented to Plaintiffs and the proposed class members that the fees would be waived and/or were otherwise mandatory and authorized by either the Uniform Mortgages or existing statutory law. Defendants also never revealed that they did not pass the entire fees subject to this Complaint to third-party vendors, and that it instead retains a considerable portion thereof as additional profit. Defendants also never revealed to Plaintiffs and the proposed class members that they charged fees for services that were never rendered. Finally, Plaintiffs and the proposed class members submitted Qualified Written Requests which Defendants purposefully ignored. As a result thereof, Defendants actively and successfully concealed Plaintiffs and the proposed class members' causes of action by fraudulent means.

## CAUSES OF ACTION

### COUNT I
**(Violation of the Fair Debt Collection Practices Act)**
**15 U.S.C. § 1692 *et seq*. (FDCPA)**
**(On behalf of Plaintiffs and the Nationwide Processing Fee Class members)**

131.    Plaintiffs repeat and reallege each preceding paragraph of the Complaint as if fully set forth herein.

132.    Plaintiffs and the Nationwide Processing Fee Class members are natural persons who "were obligated or allegedly obligated" to pay the debts at issue in this Complaint, and are, therefore, "consumers" as defined under the FDCPA, 15 U.S.C. § 1692a(3).

133.    Plaintiffs Uniform Mortgage and the Uniform Mortgages of the Nationwide Processing Fee Class and  members "arose out of a transaction" for "personal, family, or

household purposes" and are therefore "debts" as defined under the FDCPA, 15 U.S.C. § 1692a(5).

134.    At all times material, Defendants were and are each a "debt collector" under the FDCPA because they regularly collect debts owed to others (i.e., the owners of the mortgages which they service) and acquired Plaintiff Dutcher, Plaintiff Cannon, and the mortgages of the Nationwide Processing Fee Class members when those mortgages were marked as being in default (i.e., having past-due amounts as reflected on Defendants books and records.) 15 U.S.C. § 1692a(6). Defendants themselves admitted, and continue to admit, that they are a "debt collector" in an "attempt to collect a debt" pursuant to the FDCPA. They did so when they acquired Plaintiff Cannon's loan and continue to do so in every mortgage statement that they have sent to Plaintiffs and the Nationwide Processing Fee Class members since. *See e.g.*, Exs. D and N at 2.

135.    Further, Defendants were and are each a "debt collector" because they use a false name—"Shellpoint"—to collect Plaintiffs mortgage payments and the mortgage payments of the Nationwide Processing Fee Class members, although the companies that are licensed to service the mortgage loans of Plaintiffs and those of the Nationwide Processing Fee Class members are named New Residential Mortgage LLC and/or NewRez LLC.[13] The names of these companies

---

[13] New Residential Investment Corp., Annual Report (Form 10-K) at 138 (Feb 20, 2020) ("New Residential, through its wholly-owned subsidiaries New Residential Mortgage LLC ("NRM") and NewRez LLC ("NewRez"), is licensed or otherwise eligible to service residential mortgage loans in all states within the United States and the District of Columbia. Each of NRM and NewRez is also approved to service mortgage loans on behalf of investors, including the Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, Government Sponsored Enterprises or "GSEs") and, solely in the case of NewRez, Government National Mortgage Association ("Ginnie Mae"). NewRez is also eligible to perform servicing on behalf of other servicers (subservicing).").

dot not resemble the name 'Shellpoint' and would cause a least sophisticated consumer to have the false impression that a different company was collecting their mortgage payments.

136.    Finally, to the extent that NRZ's subsidiaries are not found to be its alter-ego, NRZ is nonetheless a "debt collector" because it controlled the debt collection activities of its subsidiaries[14] and, as such, *indirectly* engaged in debt collection activities.  15 U.S.C. § 1692a(6) ("The term "debt collector" means any person…who regularly collects or attempts to collect, directly or *indirectly*, debts owed or due or asserted to be owed or due another.") (emphasis added).

137.    The FDCPA prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt [including]…[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

138.    The Processing Fees that Defendants collected or attempted to collect from Plaintiffs and the Nationwide Processing Fee Class members are "amounts" as defined under 15 U.S.C. § 1692f(1). In addition, the Processing Fees that Defendants collected or attempted to collect form Plaintiffs and the Nationwide Processing Fee Class members are expenses which are incidental to their mortgage obligations.

139.    The Uniform Mortgage of Plaintiffs and the Nationwide Processing Fee Class members do not expressly authorize expressly authorize Defendants to collect the Processing Fees.

---

[14] *See supra* footnote 5.

140.    No state or federal laws permits Defendants to collect the Processing Fees from Plaintiffs or the Nationwide Processing Fee Class members.

141.    Although the Uniform Mortgage Agreements do not expressly authorize collection of the Processing Fees and no state or federal law otherwise confers Defendants the right to do so, Defendants nonetheless collected or attempted to collect the Processing Fees from Plaintiffs and the Processing Fee Class members—i.e., to the extent that Defendants did not collect Processing Fees from Plaintiffs or any member of the Nationwide Processing Fee Class, they attempted to do so by directing them, through their mortgage statements, to the methods of payment which would incur those Fees.

142.    In so doing, Defendants violated 15 U.S.C. § 1692f(1).

143.    The FDCPA also prohibits debt collectors from misrepresenting "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(a).

144.    A violation of 15 U.S.C. § 1692f(1) constitutes a *per se* violation of 15 U.S.C. § 1692e(2)(a).

145.    Defendants intentionally, frequently, and persistently collected or attempted to collect the Processing Fees from Plaintiffs and the Nationwide Processing Fee Class members.

146.    Plaintiffs and the Nationwide Processing Fee Class members were harmed as a result of Defendants' conduct.

147.    As a result of each and every violation of the FDCPA, Plaintiffs and the Nationwide Processing Fee Class members are entitled to actual damages under 15 U.S.C. § 1692k(a)(1); statutory damages under 15 U.S.C. § 1692k(a)(2)(A) to the full extent provided by law; and reasonable attorneys' fees and costs under 15 U.S.C. § 1692k(a)(3) from Defendants.

## COUNT II
### (Violations of The Fair Debt Collection Practices Act)
### 15 U.S.C. § 1692, *et seq.* (FDCPA)
### (On Behalf of Plaintiff Cannon, the Nationwide In-Flight Modification Class, the Nationwide Missed Payment Class, the Nationwide Late Fee Class, the Nationwide Escrow Class, and the Nationwide Property Inspection Fee Class)

148.    Plaintiff Cannon repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

149.    Plaintiff Cannon, the Nationwide In-Flight Modification Class, the Nationwide Missed Payment Class, the Nationwide Late Fee Class, the Nationwide Escrow Class, and the Nationwide Property Inspection Fee Class members (collectively, the "Count II Class") are natural persons who "were obligated or allegedly obligated" to pay " to pay the debts at issue in this Complaint, and are, therefore, "consumers" as defined under the FDCPA, 15 U.S.C. § 1692a(3).

150.    Plaintiff Cannon's mortgage and the mortgages of the Count II Class members "arose out of a transaction" for "personal, family, or household purposes" and are therefore "debts" as defined under the FDCPA, 15 U.S.C. § 1692a(5).

151.    At all times material, Defendants were and are each a "debt collector" under the FDCPA in connection to the Count II Class members for the same reasons set forth under Count I. 15 U.S.C. § 1692a(6).

152.    The FDCPA makes it illegal to use "false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e.

153.    Without limiting the foregoing, the FDCPA prohibits debt collectors from misrepresenting "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(a).

154.    Defendants wantonly or recklessly failed to identify and/or honor Plaintiff Cannon and the Nationwide In-Flight Modification Class members modification and/or

forbearance agreements (the "In-Flight Modification Agreements"), despite Plaintiff Cannon and the Nationwide In-Flight Modification Class members' compliance with the terms of such Agreements.

155.    As a result, Defendants misrepresented to Plaintiff Cannon and the Nationwide In-Flight Modification Class members that Defendants possessed the *legal authority* to charge mortgage payments in excess of what was permitted by the In-Flight Modification Agreements.

156.    In so doing, Defendants violated 15 U.S.C. § 1692e(2)(a).

157.    Similarly, Defendants misrepresented to Plaintiff Cannon and the Nationwide In-Flight Modification Class members that the *amount* that they owed pursuant to their monthly mortgage payment obligation was higher than what was contractually owed or due.

158.    In so doing, Defendants violated 15 U.S.C. § 1692e(2)(a).

159.    Further, Defendants wantonly or recklessly failed to integrate the payments that Plaintiff Cannon and the Nationwide Missed Payment Class members made to their prior servicers during the servicer transfer period in violation of their servicing obligations under § 1024.38(b) of Regulation X. 12 C.F.R. § 1024.38(b).

160.    As a result, Defendants misrepresented to Plaintiff Cannon and the Nationwide Missed Payment Class members that Defendants possessed the *legal authority* to charge mortgage payments that had already been paid to prior servicers.

161.    In so doing, Defendants violated 15 U.S.C. § 1692e(2)(a).

162.    Similarly, Defendants misrepresented to Plaintiff Cannon and the Nationwide Missed Payment Class members that the *amount* that they owed to make their mortgages current were higher than what was contractually due.

163.    In so doing, Defendants violated 15 U.S.C. § 1692e(2)(a).

164.    Further, Defendants impermissibly charged Plaintiff Cannon and the Nationwide Late Fee Class Members late fees and property inspection fees within the 60-day servicer transfer period provided under§ 1024.33(c)(1) of Regulation X and § 2605(d) of RESPA, despite Plaintiff Cannon and the Nationwide Late Fee Class members' timely payment or their mortgage obligations to their prior servicer during that time period. 12 C.F.R. § 1024.33(c)(1); 12 USCS § 2605(d) (prohibiting servicers from treating any treat any payments made to a transferor servicer as "late for any purpose" during a 60-day period beginning on the date of the servicer transfer.)

165.    As a result, Defendants misrepresented to Plaintiff Cannon and the Nationwide Late Fee Class members that Defendants possessed the *legal authority* to charge those fees despite being prohibited by federal law from doing so.

166.    In so doing, Defendants violated 15 U.S.C. § 1692e(2)(a).

167.    Section 17 of Regulation X requires Defendants to conduct escrow analyses for its borrowers. 12 C.F.R. § 1024.17(c)(3) and (f)(1).

168.    When performing an escrow analysis, Defendant must estimate a borrower's future homeowner's insurance premium and tax obligations, then calculate the monthly amounts the borrower should be charged to ensure the escrow account has sufficient funds to make required tax and insurance payments for the year. *See id.* Servicers must also accurately compute the borrower's monthly payment obligation to determine whether any surplus, shortage, or deficiency exists in the escrow account. *See id.*

169.    In conducting an escrow analysis, Defendants were required to consider how Plaintiff Cannon and the Escrow Class Members' bankruptcy proceedings would affect their projected insurance premiums or taxes yet failed to do so as a matter of general policy.

170.    As a result, Defendant mischaracterized the *amount* of projected escrow payments that Plaintiff Cannon and the Escrow Class Members were responsible for had they complied with Section 17 of Regulation X. 12 C.F.R. § 1024.17(c)(3) and (f)(1).

171.    In so doing, Defendants violated 15 U.S.C. § 1692e(2)(a).

172.    Further, Defendants misrepresented to Plaintiff Cannon and the Nationwide Property Inspection Fee Class members that Defendants had the *legal authority* to charge them unreasonable property inspection fees despite having established Quality Right Party Contact ("QRPC") or never attempting to do so in contravention  of Section D-2-10 of the 2019 Fannie Mae Servicing Guidelines.  Further, Defendants systematically charged the Property Inspection Fees prior to the 60-day grace period provided under Section D-2-10 of the Fannie Mae Servicing Guidelines, and, often, without ever performing the purported property inspection. Further, Defendants often sought to collect those Fees from their borrowers despite having already been reimbursed for those Fees by Fannie Mae or the residential mortgage-backed securities trusts which they serviced. For the foregoing reasons, Defendants imposition of the at issue property inspection fees fell outside the scope of the "reasonableness" limitation imposed under Paragraph 9 of the Uniform Mortgages. Ex. O at 8, ¶ 9. Defendants, therefore, lacked the *legal authority* to charge those Fees, but did so anyways.

173.    In so doing, Defendants violated 15 U.S.C. § 1692e(2)(a).

174.    Similarly, by charging Plaintiff Cannon and the Nationwide Property Inspection Fee Class members for property inspections that were never performed or already reimbursed, Defendants misrepresented the *character* of those Fees.

175.    In so doing, Defendants violated 15 U.S.C. § 1692e(2)(a).

176.    Finally, by charging Plaintiff Cannon and the Nationwide Property Inspection Fee Class members for property inspections whose costs were significantly lower than what Defendants collected or attempted collect, Defendants misrepresented the *amount* of those fees.

177.    In so doing, Defendants violated 15 U.S.C. § 1692e(2)(a).

178.    The FDCPA prohibits debt collectors from "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8).

179.    Defendants knew, or ought to have known, that the Nationwide Missed Payment Class Members were non delinquent on their loans based on their obligations to maintain proper policies and procedures under Regulation X to facilitate "the transfer of information during servicing transfers" 12 C.F.R. § 1024.38(b)(4).

180.    Despite the foregoing, Defendants communicated false credit information to credit agencies regarding Plaintiff Cannon and the Nationwide Missed Payment Class members' indebtedness due to their own malfeasance. Defendants false reports have caused substantial injury to the credit worthiness of Plaintiff Cannon and the Nationwide Missed Payment Class members.

181.    In so doing, Defendants violated 15 U.S.C. § 1692e(8).

182.    The FDCPA prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt [including]…[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

183.    As set forth above, Defendants did not possess the contractual authority nor legal authority to charge Plaintiff Cannon and the Count II Class members the amounts set forth in this Complaint, but did so anyways.

184.    In so doing, Defendants violated 15 U.S.C. § 1692f(1).

185.    As a result of each and every violation of the FDCPA, Plaintiff Cannon and the Count II Class members are entitled to actual damages under 15 U.S.C. § 1692k(a)(1); statutory damages under 15 U.S.C. § 1692k(a)(2)(A) to the full extent provided by law; and reasonable attorneys' fees and costs under 15 U.S.C. § 1692k(a)(3) from Defendants.

**COUNT III**
**(Violations of The Pennsylvania Fair Credit Extension Uniformity Act)**
**73 Pa. Stat. Ann. § 2270.1, *et seq.*  (FCEUA)**
**(On behalf of Plaintiff Cannon and the Pennsylvania Sub-Class)**

186.    Plaintiff Cannon repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

187.     The FCEUA's definitions of the terms "consumer" "debt" and "debt collector" mirror those provided under the FDCPA. 73 Pa. Stat. Ann. § 2270.3.

188.    Defendants are therefore debt collectors subject to the FCEUA for the same reasons that they are subject to the FDCPA under Count I.

189.    The FCEUA makes it illegal for any debt collector subject to the FCEUA to violate the FDCPA. 73 Pa. Stat. Ann. § 2270.4(a).

190.    By violating the FDCPA, as set forth above, Defendants violated the FCEUA. 73 Pa. Stat. Ann. § 2270.4(a).

191.    Further, the FCEUA applies to creditors with the same force that it does to debt collectors.

192.    Pursuant to the FCEUA, the term "creditor" means "[a] person, including agents, servants or employees conducting business under the name of a creditor and within this Commonwealth, to whom a debt is owed or alleged to be owed." 73 Pa. Stat. Ann. § 2270.3.

193.    To the extent that Defendants do not qualify as debt collectors under the FCEUA, they are creditors as defined by the FCEUA because they either own or act as agents for the owners of the mortgage notes of Plaintiff Cannon and the Pennsylvania Sub-Class members. *See id.*

194.    The FCEUA's prohibition on creditors mirror the prohibitions of the FDCPA §§ 1692e-f. 73 Pa. Stat. Ann. § 2270.4(b)(5)-(6).

195.    By violating the FDCPA, as set forth above, Defendants violated 73 Pa. Stat. Ann. § 2270.4(b).

196.    The FCEUA provides that "If a debt collector or creditor engages in an unfair or deceptive debt collection act or practice under this act, it shall constitute a violation of the act of December 17, 1968 (P.L. 1224, No. 387), known as the Unfair Trade Practices and Consumer Protection Law (UTPCPL)." 73 Pa. Stat. Ann. § 2270.5.

197.    Each of Defendants violations of the FCEUA as set forth above constitute unfair and deceptive practices.

198.    By violating the FCEUA, therefore, Defendants also violated the UTPCPL 73 P.S. § 201, *et seq.*

199.    As a result of each and every violation of the UTPCPL, Plaintiff Cannon and the Pennsylvania Sub-Class members are entitled to actual damages; statutory damages to the full extent provided by law; and reasonable attorneys' fees and costs under 73 P.S. § 201-9.2(a) from Defendants.

## COUNT IV
### (Violations of The Fair Debt Collection Practices Act)
### 15 U.S.C. § 1692, *et seq.* (FDCPA)
### (On Behalf of Plaintiff Dutcher and the Nationwide Infected Loan Class)

200.    Plaintiff Dutcher repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

201.    Plaintiff Dutcher and the Nationwide Infected Loan Class members are natural persons who "were obligated or allegedly obligated" to pay the debts at issue in this Complaint, and are, therefore, "consumers" as defined under the FDCPA, 15 U.S.C. § 1692a(3).

202.    Plaintiff Dutcher's mortgage and the mortgages of the Nationwide Infected Loan Class members "arose out of a transaction" for "personal, family, or household purposes" and are therefore "debts" as defined under the FDCPA, 15 U.S.C. § 1692a(5).

203.    At all times material, Defendants were and are each a "debt collector" under the FDCPA in connection to Plaintiff Dutcher and the Nationwide Infected Class members for the same reasons set forth under Count I. 15 U.S.C. § 1692a(6).

204.    The FDCPA makes it illegal to use "false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e.

205.    Without limiting the foregoing, the FDCPA prohibits debt collectors from misrepresenting "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(a).

206.    Pursuant to § 1024.38(b)(4)(ii) of Regulation X, Defendants were required to maintain policies and procedures to enable them to identify and obtain "necessary documents or information that may not have been transferred by a transferor servicer" in order to facilitate "the transfer of information during servicing transfers" 12 C.F.R. § 1024.38(b)(4)(ii).

207.    Further, pursuant to § 1024.38(c)(2) of Regulation X,  Defendants were required to create a servicing file which contained, *inter alia*, "[a] schedule of all transactions credited or debited to the mortgage loan account"; and "[a]ny notes created by servicer personnel reflecting communications with the borrower about the mortgage loan account." 12 C.F.R. § 1024.38(c)(2).

208.    The purpose of § 1024.38 of Regulation X is to ensure that servicers possess "accurate and current information and documents" for the mortgage loans that they service. 12 C.F.R. § 1024.38(b).

209.    Defendants failed to implement the safeguards instituted by Regulation X to prevent transferor servicers from relying on erroneous loan data.

210.    Specifically, Defendants failed to request from Ditech the mortgage statements and servicing notes created by Ditech's personnel in connection to the mortgages of Plaintiff Dutcher and the Nationwide Infected Loan Class members.

211.    Further, instead of rectifying the loan data errors on the mortgage files of Plaintiff Dutcher and those of the Nationwide Infected Loan Class members, Defendants created fraudulent charges which they dubbed, for example, "Prior Servicer Cost Assess." Ex. M at 2-3.

212.    In so doing, Defendants deceptively charged Plaintiff Dutcher and the Nationwide Infected Loan Class members fees which were not being collected by Ditech either because those fees were already paid, waived, or otherwise removed due to their illegality (the "Ditech Fees").

213.    As a result, Defendants misrepresented the *legality* of the Ditech Fees to Plaintiff Dutcher and the Nationwide Infected Class members in contravention of 15 U.S.C. § 1692a(6).

214.    Further, Defendants misrepresented the *character* of the Ditech Fees by creating fictious names for them—such as "Prior Servicer Cost Assess." Ex. M at 2-3.

215.    In so doing, Defendants violated 15 U.S.C. § 1692a(6).

216.    Similarly, Defendants misrepresented the *character* of the Ditech Fees by lumping them together with past due Periodic Payments in their mortgage statements. *See e.g.*, Ex. N.

217.    Defendants may only accelerate or foreclose on a mortgage loan if a borrower fails to make a periodic payment (i.e., principal, interests and escrow payments.) By failing to itemize the and/or separate the Ditech Fees from delinquent periodic payments, Defendants deprived Plaintiff Dutcher and the Nationwide Infect Loan Class members  from a meaningful opportunity to determine what delinquent payments were necessary to make their mortgage loans current in order to avoid acceleration of their mortgage and or foreclosure proceedings.

218.    In so doing, Defendants violated 15 U.S.C. § 1692a(6).

219.    The FDCPA prohibits debt collectors from using "any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(10).

220.    Defendants *falsely represented* to Plaintiff Dutcher and the Nationwide Infected Loan Class members that they would waive the Ditech Fees yet failed to do so. Pursuant to § 1024.38(c)(2) of Regulation X, Defendants have, or ought to have, those communications logged in as part of their servicing files. 12 C.F.R. § 1024.38(c)(2).

221.    In so doing, Defendants violated 15 U.S.C. § 1692e(10).

222.    Further, Defendants used *deceptive, unfair, and unconscionable means* to collect the Ditech Fees from Plaintiff Dutcher and the Nationwide Infected Loan Class members by preventing them for paying-off those fees through Defendants online portal or over the phone payment systems. Instead, Defendants deceptively collected the Ditech Fees by applying

periodic payment surpluses to those Fees rather than other delinquent periodic payments and/or late charges, as provided under the Uniform Mortgage. Ex. O at 4, ¶ 2.

223.    In so doing, Defendants violated  the general prohibitions laid out under 15 U.S.C. §§ 1692e-f

224.    The FDCPA prohibits debt collectors from "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8).

225.    Defendants knew, or ought to have known, that the Ditech Fees were illegal based on (1) their representations to Plaintiff Dutcher and the Nationwide Infected Loan Class members; and (2) their duty to maintain "accurate and current information and documents" pursuant to 12 C.F.R. § 1024.38(b).

226.    Despite the foregoing, Defendants communicated false credit information to credit agencies regarding Plaintiff Dutcher and the Nationwide Infected Loan Class members' indebtedness due to their own malfeasance. Defendants false reports have caused substantial injury to the credit worthiness of Plaintiff Dutcher and the Nationwide Infected Loan Class members.

227.    In so doing, Defendants violated 15 U.S.C. § 1692e(8).

228.    As a result of each and every violation of the FDCPA, Plaintiff Dutcher and the Nationwide Infected Loan Class members are entitled to actual damages under 15 U.S.C. § 1692k(a)(1); statutory damages under 15 U.S.C. § 1692k(a)(2)(A) to the full extent provided by law; and reasonable attorneys' fees and costs under 15 U.S.C. § 1692k(a)(3) from Defendants.

## COUNT V
**(Violation of the Rosenthal Fair Debt Collection Practices Act)**
**Cal. Civ. Code § 1788 *et seq.* (Rosenthal Act)**
**(On behalf of Plaintiff Dutcher and the California Sub-Class)**

229.     Plaintiff Dutcher repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

230.     At all times material, Defendants were and are each a "debt collector" under the Rosenthal Act because they regularly engage in debt collection as defined by the statute. Cal. Civ. Code § 1788.2(c).

231.     Plaintiff Dutcher's mortgages and the mortgages of the California Sub-Class are "consumer debts" as defined under the Rosenthal Act. Cal. Civ. Code § 1788.2(f).

232.     Plaintiff Dutcher and the California Sub-Class members are "natural persons" with "mortgage debts"—which constitutes a "consumer debt"— who were subject to Defendants collection practices and are therefore "debtors" as defined under the Rosenthal Act. Cal. Civ. Code § 1788.2(h).

233.     The Rosenthal Act makes it illegal for any entity covered by the Rosenthal Act to violate the federal FDCPA. Cal. Civ. Code § 1788.17.

234.     By violating the FDCPA, as set forth above, Defendants violated the Rosenthal Act.

235.     Plaintiff Dutcher and the California Sub-Class members were harmed when Defendants violated the Rosenthal Act through the above-described conduct.

236.     As a result of each and every violation of the Rosenthal Act, Plaintiff Dutcher and the California Sub-Class members are entitled to, among other forms of relief deemed appropriate by the court, reasonable attorneys' fees and costs under Cal. Civ. Code § 1788.30(c).

## COUNT VI
### (Violations of California's Unfair Competition Law)
### Cal. Bus. & Prof. Code § 17200, *et seq.* (UCL)
### (On behalf of Plaintiff Dutcher and the California Sub-Class)

237.    Plaintiff Dutcher repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

238.    The California Unfair Competition Law defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

*The Unlawful Prong*

239.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

240.    As set forth above, Defendants' conduct towards Plaintiff Dutcher and the California Sub-Class members violates the Rosenthal Act and the FDCPA. These violations are sufficient to support Plaintiff Dutcher and the California Sub-Class members' claims under the unlawful prong of the UCL.

241.    Through its unlawful acts and practices, Defendants has improperly obtained money from Plaintiff Dutcher and the California Sub-Class members. As such, Plaintiff Dutcher requests that the Court enjoin Defendants from continuing to violate the FDCPA, the Rosenthal Act and the UCL. Plaintiff Dutcher's mortgage continues to be serviced by Defendants, and he intends to make mortgage payments over the phone or online for all current, past-due charges and ancillary fees without incurring a fee in doing so. Absent an injunction, Plaintiff Dutcher and the California Sub-Class members may be irreparably harmed and/or denied an effective and complete remedy.

*The Unfair Prong*

242.    In addition, a business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

243.    Defendants' actions constitute "unfair" business practices for the same underlying reasons that they constitute deceptive practices under §§ 1692e-f of the FDCPA, as set forth above. 15 U.S.C. §§ 1692e-f.

244.    As a result of Defendants illegal conduct, Plaintiff Dutcher and the California Sub-Class members have suffered an economic injury, and Defendants have been unjustly enriched at the expense Plaintiff Dutcher and the California Sub-Class members. Defendants have been unjustly enriched by obtaining revenues and profits that they would not have obtained otherwise absent their unlawful conduct.

**COUNT VII**
**(Breach of Contract)**
**(On behalf of Plaintiffs and the Nationwide Classes)**

245.    Plaintiffs repeat and reallege each preceding paragraph of the Complaint as if fully set forth herein.

246.    Plaintiffs and the Nationwide Class members have executed the Uniform Mortgage.  Like other borrowers whose mortgages are serviced by Defendants, Plaintiffs' Uniform Mortgages incorporate standard language from Fannie Mae model mortgages. And like other Fannie Mae mortgages, the Uniform Mortgages state that the servicer "may not charge fees that are expressly prohibited by this Security Instrument, or by Applicable Law." Ex. O at 11, ¶ 14.

247.    Applicable Law" is defined as "all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions." Ex. O at 2, ¶ (I).

248.    The Uniform Mortgages further state that they are "governed by federal law and the law of the jurisdiction in which the Property is located," i.e., California and Pennsylvania. Ex. O at 12, ¶ 16.

249.     Defendants have breached Paragraph 14 of the Uniform Mortgages by collecting or attempting to collect from Plaintiffs and the Nationwide Class members the illegal loan charges set forth in Counts I-VI in violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*, the Pennsylvania Fair Credit Extension Uniformity Act, 73 Pa. Stat. Ann. § 2270.1, *et seq*, Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201, *et seq.*, the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §§ 1788 *et seq.*, and California's Unfair Competition Law Cal. Bus. & Prof. Code § 17200, *et seq.* Ex. O at 11, ¶ 14

250.    Further, Defendants violated Paragraph 9 of the Uniform Mortgage by charging Plaintiff Cannon and the Nationwide Property Inspection Fee Class members unreasonable property inspection fees as set forth under Counts II and III. Ex. O at 8, ¶ 9.

251.    Defendants also violated Paragraph 9 of the Uniform Mortgages by charging Plaintiff Cannon, Plaintiff Dutcher, the Nationwide Property Inspection Fee Class and the Nationwide Processing Fee Class members property inspection fees and Processing Fees (assuming that either were legal) in excess of the costs that they incurred for either of those services. Ex. O at 8, ¶ 9 ("[only] amounts *disbursed* by Lender under this Section 9 shall become an additional debt of Borrower secured by this Security Instrument." (emphasis added).

252.    Plaintiffs and the Nationwide Class members have been damaged as a direct

result of Defendants' breaches. Those damages comprise the wrongful charges added to their mortgage account balances, whether paid voluntarily or ultimately obtained by Defendants through foreclosure proceedings. The application of unlawful charges to Plaintiffs' loan balances necessarily increased the total balances, and the accumulation of debts may reduce equity, affect credit ratings, limit borrowing capacity, or otherwise cause a concrete injury to Plaintiffs and Class members, even if Plaintiffs or Class members never actually pay the debts that accumulated, perhaps due to foreclosure or bankruptcy.

<u>**COUNT VIII**</u>
**(Violations of The Real Estate Settlement and Procedures Act)**
**12 U.S.C. § 2605, *et seq.* (RESPA)**
**(On behalf of Plaintiff Cannon, the Nationwide Late Fee Class and the Nationwide RESPA Class)**

253.    Plaintiff Cannon repeats and realleges each preceding paragraph of the Complaint as if fully set forth herein.

254.    Defendants are servicers of a federally related mortgage loans, including Plaintiff Cannon's Fannie Mae Uniform Mortgage. As such, they are subject to RESPA 12 U.S.C § 2605.

255.    Pursuant to § 2605(d) of RESPA, Defendants are not permitted to treat any payments made to a transferor servicer as "late for any purpose" during a 60-day period beginning on the date of the servicer transfer. 12 USCS § 2605(d).

256.    Despite this prohibition, however, Defendants treated Plaintiff Cannon's mortgage and those of the Nationwide Late Fee Class as delinquent despite their timely payments to their prior servicers within the 60-day grace period provided under RESPA. As a result, Defendants charged Plaintiff Cannon and the Nationwide Late Fee Class members late fees and property inspection fees, resulting from their purported delinquency, within the 60-day grace period provided under RESPA.

257.    In so doing, Defendants violated 12 USCS § 2605(d).

258.    Pursuant to 12 U.S.C. § 2605(e) of RESPA "if any servicer of a federally related mortgage loan receives a qualified written request [QWR] from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period."

259.    Under 12 U.S.C. § 2605(e), in relevant part, a QWR shall be a written correspondence that "(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B).

260.    After receiving a QWR, a servicer must, not later than 30 days after receipt of the QWR, take certain action, including "mak[ing] appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction…"). 12 U.S.C. § 2605(e)(2)(A).

261.    Plaintiff Cannon and the RESPA Class members sent Defendants QWRs pursuant to 12 U.S.C. § 2605(e)(1)(B).

262.    Defendants, however, failed to acknowledge receipt of their QWRs within 5 days. They also failed to correct the error on their account within 30 days, forcing Plaintiff Cannon and other members of the RESPA Class into bankruptcy and/or foreclosure.

263.    In so doing, Defendants violated 12 U.S.C. § 2605(e).

264.    As a result of each and every violation of the RESPA, Plaintiff Cannon the Nationwide Late Fee Class and the RESPA Class members are entitled to actual damages under

12 U.S.C. § 2605(f)(2)(A); statutory damages under 12 U.S.C. § 2605(f)(2)(B) to the full extent

provided by law; and reasonable attorneys' fees and costs under 12 U.S.C. § 2605(f)(3) from

Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek

judgment against Defendant, as follows:

(a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure;

naming Plaintiff Dutcher as representatives of the Classes; and naming Plaintiffs' attorney as

Class Counsel to represent the Classes;

(b)    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(c)    For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

(d)    For prejudgment interest on all amounts awarded;

(e)    For an order of restitution and all other forms of equitable monetary relief;

(f)    For injunctive relief as pleaded or as the Court may deem proper; and

(g)    For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses

and costs of suit.

## **DEMAND FOR TRIAL BY JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any

and all issues in this action so triable as of right.


Dated: December 22, 2020                    Respectfully submitted,

**GUCOVSCHI LAW, PLLC.**

By:    _/s/ Adrian Gucovschi_
              Adrian Gucovschi, Esq.

Adrian Gucovschi, Esq.

630 Fifth Avenue, Suite 2000
New York, NY 10111
Telephone: (332) 334-9202
Facsimile: (332) 777-1200
E-Mail: adrian@gucovschi-law.com

*Attorney for Plaintiffs*

EXHIBIT A

# FORBEARANCE AGREEMENT

**Kirkland Investors Loan Number: 13032222**
**Property Address: 58 Green LN, Aston, PA 19014**

THIS FORBEARANCE AGREEMENT (the "Agreement") is made and entered into this **12th day of May 2017** by and among **Kirkland Investors LLC** (the "Lender") and **Nicole Sheeky Cannon** (the "Borrower")

## RECITALS

**Whereas**; the Lender is the holder by endorsement of that certain Note (hereinafter the "Note"), dated June 03, 2004, in the original principal amount of One hundred forty-eight thousand dollars ($148,000.00); the aforementioned Note with the following terms: a yearly Rate of Interest of 6.9400%, and a maturity date of July 01, 2034; and

**Whereas**; the Borrower(s) are the owners of the property located at 58 Green Lane, Aston, PA 19014 (hereinafter the "Property") upon which Kirkland Investors LLC, is the secured holder of that certain Deed of Trust (hereinafter, the "Mortgage") via an Assignment of Mortgage that was recorded on May 08, 2013, under Instrument Number 2013029731, RD Book 05320-0996 of the Public Records of Delaware County, Pennsylvania.

**Whereas**; Lender has acquired all right, title and interest in and to the Note and is now currently the beneficiary in interest as created by the subject Mortgage, and any and all subsequent assignments thereof; and

**Whereas**; the Borrowers, acknowledge, understand, and agree that the Note identified above is in default for the November 1, 2016 payment and all subsequent payments thereafter; and

**Whereas**; the Borrowers have requested that the Lender forbear from pursuing further action on foreclosure proceedings, except that the Lender may hold the proceedings thereon open, until such time that the Mortgage hereto is restored to a non-delinquent status either through a full reinstatement of the Note or by mutual written agreement of the parties thereto, subsequent to the forbearance term.

**Whereas**; the Borrowers and Lender acknowledge, understand, and agree that the Lender is in no way required to issue a forbearance agreement, nor any other agreement pursuant to the delinquency identified above. And likewise the Borrowers are not obligated to accept a forbearance agreement nor any other agreement pursuant to the delinquency identified above.

**Whereas**; the Borrowers and Lender wish to voluntarily enter into an agreement wherein the Lender is willing to accept a payment other than that called for in the Note and the Borrowers are willing to make a payment other than what is called for in the Note, in the interests of stopping the foreclosure process for a limited period of time, during the term of such agreement. In spite of any payment agreement the original terms of the Note shall remain in effect up until the time, if it occurs, that a permanent agreement is reached, and agreed to by all parties thereto, that modifies or changes such original terms.

**Whereas**; the Borrowers and Lender acknowledge, understand, and agree for the purposes of this Agreement, section headings are for convenience only and are not to be used in construing this Agreement. When context so requires, reference to any specific gender shall include all other genders and the singular verb tense.

Now, therefore, pursuant to the above recitals, and for good and valuable consideration, the adequacy and receipt of which is hereby acknowledged, Borrowers and Lender agree as follows:

1. **Status of Loan.** As of May 12, 2017 the status of the loan evidenced by the Note and Mortgage (hereinafter the "Loan") is as follows, unpaid balance of $142,991.34:

| | |
|---|---|
| Unpaid Principal and Interest from 11/01/16 to 05/31/17 | $7,037.80 |
| Unpaid Taxes & Insurance (Escrows): | $3,656.03 |
| Unpaid Tax Advances | $3,244.65 |
| Unpaid Late Charges: | $521.86 |
| Unpaid NSF Fees: | $30.00 |
| Unpaid Legal Fees: | Pending Receipt |
| **Total Amount Necessary to Reinstate as of 5/5/17** | Pending |

2. **Forbearance.** From and after the date of execution of this Agreement, during the term hereof, so long as Borrowers do not default in any performance required by this Agreement and do not default in any performance required by the original subject Note, the Lender herein agrees to forbear from proceeding further on the foreclosure process;

3. **Duties of Borrowers.** Borrowers acknowledge, understand, and agree that they shall comply with the following obligation pursuant to this agreement:

All payments made under this Agreement shall be made to Kirkland Investors LLC. pursuant to this Agreement shall be in the form of a certified instrument (cashier's check, certified check, or money order), tendered in the form of United States Dollars (US$) and made payable to Kirkland Investors and remitted pursuant to the terms of

this Agreement. **The payments for the Forbearance agreement are in accordance with the Modification to be executed upon completion of this agreement.**

a.  Thereafter performance under Section 3(a) herein, Borrowers shall make the following six (6) payments, beginning June 1, 2017 and continuing through November 1, 2017 (hereinafter known as the "Forbearance Period"), as follows:

| Payment Due Date | Payment Amount | Applied To: |
|---|---|---|
| June 1, 2017 | $1,089.16 | Escrows - $522.29<br>Suspense - $566.87 |
| July 1, 2017 | $1,089.16 | Escrows - $522.29<br>Suspense - $566.87 |
| August 1, 2017 | $1,089.16 | Escrows - $522.29<br>Suspense - $566.87 |
| September 1, 2017 | $1,089.16 | Escrows - $522.29<br>Suspense - $566.87 |
| October 1, 2017 | $1,089.16 | Escrows - $522.29<br>Suspense - $566.87 |
| November 1, 2017 | $1,089.16 | Escrows - $522.29<br>Suspense - $566.87 |
| **Total:** | **$6,534.96** | |

b.  **"TIME IS OF THE ESSENCE". Payments must be received by Lender no later than the 15th of the month in which the payment is due during the "forbearance period". Each payment under this plan must be tendered pursuant to Section 3 (b.) of this agreement. The borrowers clearly acknowledge, understand, and agree, that "THERE IS NO GRACE PERIOD" for payments pursuant to this plan.**

Regular Payments received on this Agreement shall be credited to above referenced arrearage account, thereby reducing the amount of the overall arrearage related to the application of such funds to such account. Upon completion of this agreement, all remaining proceeds will be applied to legal fees, escrow advances, accrued late charges, and principal and interest upon completion of this agreement.

**Kirkland Investors LLC Loan #13032222**
**Property: 58 Green Ln, Aston, PA 19014**

Page **3** of 9

Borrowers Initials:

**c.** Upon completion of the Forbearance Agreement, Kirkland Investors LLC will prepare a modification on your loan, bringing your account current. The term, rate, and payment information will be as follows once the loan has been modified:

| Years | Payment | Payment |
|-------|---------|---------|
| 1-2 years<br>3.65% per annum | 1,089.16 | Escrows - $522.29<br>P&I    - $566.87 |
| 3-4years<br>4.65% per annum | 1,175.68 | Escrows - $522.29<br>P&I    - $653.39 |
| 4-5 years<br>5.65% per annum | 1,266.03 | Escrows - $522.29<br>P&I    - $743.74 |
| 5-40 years<br>6.65% per annum | 1,359.53 | Escrows - $522.29<br>P&I    - $837.24 |

**d.** Escrow Payments received on this Agreement shall be credited to the escrow account.

**4.** **THIS TERM WILL NOT REINSTATE THE DEFAULT. Upon 100% completion of this forbearance agreement, Kirkland Financial LLC agrees to defer the remaining arrearages, bring the account current, with a next due date of 12/1/2017.**

**5.** **Effect of Default.** The Borrowers acknowledge, understand, and agree, that failure to meet any of the terms or provisions of this agreement, or to perform any other act required by this Agreement, or should any representation or warranty given by Borrowers be untrue or shall become no longer true, or the Borrowers herein file Bankruptcy in any U.S. Court, this agreement shall be deemed breached as of no further effect as if it had never existed. Under such circumstance, the Lender, within its sole discretion, shall have the right to pursue any and all remedies available to it under the Note and/or Mortgage.

**6.** **Borrowers' Representation and Warranties.** To induce Lender to forbear from enforcing its rights under the terms of the Note and/or, Mortgage, Borrowers herein make the following representations, warranties and covenants:

Kirkland Investors LLC Loan #13032222
Property: 58 Green Ln, Aston, PA 19014

Page 4 of 9

Borrowers Initials: ___

a.  The amounts set forth in Section 1 hereof are accurate and Borrowers acknowledges their default under the terms of the Note and Mortgage (as identified herein) and in executing this Agreement is seeking to preserve their rights as owner of the Property; and

b.  Borrowers have no claim, offset, counterclaim or other basis for disputing the amounts due and owing described in Section 1 of this Agreement; and

c.  Borrowers have no other claim, cause of action or other basis for asserting any charge against Lender, whether arising out of the Loan or any other relationship between Borrowers and/or, Lender; and

d.  Borrowers hereby confirm that this Agreement, the Note, the Mortgage and any other documents or instruments evidencing the Loan are fully enforceable in accordance with their respective terms; and

e.  Borrowers have full authority to execute and deliver this Agreement; and

f.  Prior to execution of this Agreement, Borrowers confirm their receipt prior to such execution, and have sought the advice of attorneys, counsel, or other experts as Borrowers deem appropriate, to the extent they independently deemed appropriate and satisfactory to them jointly and as individuals. Borrowers are aware of the requirements contained in this Agreement and understand the performance required of Borrowers by this Agreement; and

g.  The execution and delivery of this Agreement shall not constitute a waiver or release of Borrowers with respect to any promise, covenant or representation contained in this Agreement, the Note (except as modified by this Agreement); and

h.  Borrowers have not been coerced, threatened or otherwise induced to execute this Agreement except by the consideration furnished by the Lender as set forth herein; and

i.  Borrowers acknowledge that the Lender is entering into this Agreement in reliance upon the representations, covenants and warranties made by Borrowers.

7.  **Release by Borrowers.**  Borrowers hereby waive, releases, disclaims, denounces and acquits any claim, charge, counterclaim, chose in action or other basis for asserting any defense, offset or requirements of this Agreement, the Note, or the Mortgage, which Borrowers may have against Lender whether at law or in equity and covenants hereby that Borrowers shall not initiate any action or assert any defense seeking to defeat Lender or offset any amount required to be paid by the Borrowers pursuant to this Agreement, the

Note and/or Mortgage. Furthermore, Borrowers release, discharges and covenants not to sue Lender, any owners of the loan, and any of their predecessors, successors, and assigns, agents, affiliates, officers, directors, employees, subsidiaries, and parent corporations from any and all claims, causes of action, and defenses, whether known or unknown, which Borrowers had, now has, or may hereinafter acquire, which relate to, or are in any way connected with, the Loan or the acts or omissions of any of the related parties.

8. **Effect of Release by Borrowers.** Borrowers acknowledge that if any facts concerning the claims released by this Agreement should be found hereinafter to be other than or different from the facts now believed to be true, Borrowers expressly accept and assumes the risk of such possible difference in facts and agrees that the releases in this Agreement will remain effective as long as Lender is not otherwise in breach hereof.

9. **Effect of Agreement.** Except as specifically modified by this Agreement, all other terms of the Note shall remain unchanged from the original terms and no part of the Note is modified by this Agreement.

10. **Further Assurances.** Borrowers shall take such actions and execute and deliver such other instruments in form and substance satisfactory to Lender as Lender may reasonably require to protect and preserve Lender's rights under this Agreement, the Note, and Mortgage.

11. **Indemnification.** Borrowers agree to indemnify Lender and its directors, officers, employees, agents, consultants and advisors from and against any liability, claim, cost or expense (including attorney fees, cost of collection, court costs and other expenses) arising out of or in connection with the execution of this Agreement or the performance of any act required by this Agreement, any default by Borrowers under this Agreement or any misrepresentation or breach of covenant or warranty by Borrowers, whether pursuant to this Agreement, Note, or Mortgage.

12. **Choice of Law, Jurisdiction and Venue.** This Agreement shall be constructed in accordance with the laws of the State of Illinois.

13. **The Entire Agreement** The Parties hereto, acknowledge, understand and agree that this agreement, shall be deemed integrated, and as such shall represent the entire agreement

Between the Lender and the Borrowers with regard to the subject matter contained herein, and no other representations, whether written or verbal, by either party, will be binding upon this agreement, unless such representation is agreed to in writing and signed by both party's hereto, and such writings refer back to this agreement.

14. **Counter Parts** This Agreement may be signed in one or more counterparts, each of which, when taken together with all other counterparts, shall constitute one single, binding and integrated agreement.

15. **Legal Description** Exhibit A on the subsequent page.

**BORROWERS:**

By: _Nicole Sheeky-Cannon_
Nicole Sheeky Cannon, as Borrower

Commonwealth of Pennsylvania
Notarial Seal
LEANNA I. JONES – Notary Public
CITY OF CHESTER, DELAWARE COUNTY
My Commission Expires Apr 7, 2021

_Leanna I. Jones_   5-21-17

**LENDER**
**KIRKLAND INVESTORS LLC**

By: _____
Mark A. Davis, Vice President

Kirkland Investors LLC Loan #13032222
Property: 58 Green Ln, Aston, PA 19014

Borrowers Initials: _____

UNIFORM FORM CERTIFICATATE OF ACKNOWLEDGEMENT BY THE BORROWER

STATE OF Pennsylvania )
COUNTY OF Delaware ) ss.:

On the 21 day of May in the year 2017 before me, the undersigned, personally appeared Nicole Sheckyl Cannon, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/he/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Signature and Office of Individual
Taking Acknowledgement

Commonwealth of Pennsylvania

Notarial Seal
LEANNA L JONES – Notary Public
CITY OF CHESTER, DELAWARE COUNTY
My Commission Expires Apr 7, 2021

My commission expires: Apr. 7, 2021

Kirkland Investors LLC Loan #13032222
Property: 58 Green Ln, Aston, PA 19014

Page 8 of 9

Borrowers Initials: _____

UNIFORM FORM CERTIFICATATE OF ACKNOWLEDGEMENT BY THE LENDER

STATE OF ___TENNESSEE)
COUNTY OF _Sumner___ ) ss.:

On the _30th_ day of _May_ in the year _2017_ before me, the undersigned, personally appeared _MARK A DAVIS_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/he/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and Office of Individual
Taking Acknowledgement

My commission expires: _11/18/19_____

Kirkland Investors LLC Loan #13032222
Property: 58 Green Ln, Aston, PA 19014

Page 9 of 9

Borrowers Initials: _____

# EXHIBIT B

# Shellpoint
## Mortgage Servicing



P.O. Box 10826
Greenville, SC 29603-0826

Phone: 800-365-7107
Fax: 866-467-1137
www.shellpointmtg.com

Hours of operation
Mon – Thur: 8:00AM-10:00PM
Fri: 8:00AM-10:00PM
Sat: 8:00AM-3:00PM

February 26, 2018

TROY CANNON
NICOLE SHEEKY
58 Green Ln
Aston PA 19014

Loan Number:      0578273033
Principal Balance: $142,716.12
Property Address: 58 GREEN LN
                 ASTON, PA 19014

Dear Borrowers,

Shellpoint Mortgage Servicing ("Shellpoint") would like to welcome and inform you that effective 02/15/2018, the servicing of your loan has transferred or will transfer from Kirkland Financial LLC to Shellpoint. We believe trust, integrity, and sound practices are the cornerstones of relationships. We are committed to providing you with quality service and an exceptional experience.

We want to provide you with tools and options to make managing your loan simple and easy. To get started, you can visit our website at www.shellpointmtg.com where you can find additional information and ways to manage your account. Once you create a profile, you will have online access to view statements, make payments, and even chat with a Customer Care representative to address any questions you may have.

Please call us at 800-365-7107 if you have any questions regarding your mortgage loan. Our Customer Care Team is available between the hours of 8:00AM-10:00PM Monday through Thursday, 8:00AM-10:00PM Friday, and 8:00AM-3:00PM on Saturday Eastern Standard Time.

On and after 02/15/2018, your payments should be made payable to Shellpoint Mortgage Servicing. Your previous servicer will cease to accept any payments it receives after 02/15/2018 and will forward them to Shellpoint.

Please feel free to use the included payment coupon to send us your first payment. You will receive a billing statement each month, which will also include a coupon. We also offer several other convenient payment options, including:

- Free ACH (automatic payment drafting from your checking or savings account)
- Online payment at www.shellpointmtg.com
- Phone (either with our automated system or a live Customer Care representative)

✂  Detach Temporary Payment Coupon And Return With Payment  ✂

## PAYMENT COUPON

P.O. BOX 51850
LIVONIA MI 48151-5850
RETURN SERVICE REQUESTED



| | |
|---|---|
| Loan Number | 0578273033 |
| First Payment Due Date: | 02/01/2018 |
| Monthly Payment Amount | $ 1,089.16 |
| Amount Enclosed: | $ |

S-SFRECS20  L-10-M  R-101
P803FU00200145 - 539979738 I01722

TROY CANNON
NICOLE SHEEKY
58 GREEN LN
ASTON PA 19014-2003

**Please mail your payment and this coupon to:**

SHELLPOINT MORTGAGE SERVICING
P.O. BOX 740039
CINCINNATI, OH 45274-0039

**SEE REVERSE SIDE OR ATTACHED FOR AN IMPORTANT STATEMENT OF YOUR RIGHTS.**

ACH information did not transfer to us from your prior servicer.  Please call our office at 800-365-7107 or visit www.shellpointmtg.com if you wish to establish automatic payment drafting with Shellpoint.

Important note: If you entered into an approved loss mitigation plan with your prior loan servicer or if you had a loss mitigation application in process with your prior servicer, please contact your Single Point of Contact, Shelly Lewers, directly at 866-316-4861 ext. 4965 to confirm that the loss mitigation plan information, or application and documentation, were properly transferred to Shellpoint. We will follow up with your prior servicer to receive the documents you provided them or they provided you in response.

Shellpoint welcomes you and is excited to have you as our valued customer.

Si usted no entiende el contenido de esta carta, por favor contacte a uno de nuestros representantes que hablan espanol al numero 800-365-7107.

Sincerely,

Shellpoint Mortgage Servicing



# Helping You Manage Your Mortgage

Please review the following important information regarding your loan payments. Our records indicate that your 02/01/2018 payment is due. As of the date of this letter, the principal balance is $142,716.12 and your escrow balance is $-3,332.10. You will receive a billing statement from Shellpoint each month. Effective 02/15/2018, please begin sending your mortgage payments to Shellpoint using one of the options below.

## Easy Ways to Pay

**FREE Automatic Draft (ACH):** Sign up online at www.shellpointmtg.com. Our ACH options are:
- **Monthly** – Choose your date (1st - 15th)
- **Bi-weekly** – Draft half every other Monday

**Online:** You can make one-time payments when you sign up at www.shellpointmtg.com.

**Mail:**

Shellpoint Mortgage Servicing
P.O. Box 740039
Cincinnati, OH 45274-0039

**Phone:** Payments can be made over the phone through our automated system or with a Customer Care representative at 800-365-7107.

## Loan Information

To help simplify the management of your mortgage, we have provided the following breakdown to use as an easy reference.

| Terms of Your Mortgage | |
|---|---|
| Loan Number | 0578273033 |
| Loan Origination Date | 06/03/2004 |
| Original Loan Amount | $148,000.00 |
| Current Interest Rate | 3.65% |
| Term | 360 months |
| Maturity Date | 06/01/2035 |

| Current Balances | |
|---|---|
| Principal Balance | $142,716.12 |
| Escrow Balance | $-3,332.10 |

| Payment Details | |
|---|---|
| Contractual Due Date | 02/01/2018 |
| Principal and Interest | $566.87 |
| Escrow | $522.29 |
| Total Monthly Payment | $1,089.16 |

## *Reach Out to Us*


Call
800-365-7107


Live Chat
www.shellpointmtg.com


Secure Email
www.shellpointmtg.com

029660207Q0000

# *FAQs*



| | |
|---|---|
| **Will my previous servicer still accept my payments?** | The date that your previous servicer will stop accepting payments from you is 2/14/2018. We will begin accepting payments from you on 02/15/2018. Please send all payments due on or after that date. |
| **What if I make a payment to my previous servicer?** | Your previous servicer will forward your payment to us and it will be applied towards the date due. |
| **I previously had ACH, will it transfer over?** | No. You will need to set up a new ACH by creating an account on www.shellpointmtg.com or calling our Customer Care Team. |
| **How can I make payments to you?** | Payments can be made by check, online, with a Customer Care representative, through our automated IVR, wire transfer, or by setting up a monthly or bi-weekly ACH. |
| **What if my payment is due during this transfer?** | You should continue to make your payments in the first 60 days of transfer. During the first 60 days we will not treat your payments as late and will not apply a late fee. |
| **Will the terms of my mortgage loan be affected by this servicing transfer?** | No. The terms of your mortgage are not affected by this transfer, other than those directly related to the servicing of your loan. |
| **What if I have more than one loan?** | This letter refers only to loan number 0578273033. If more than one loan is transferring to Shellpoint, we will send you a Welcome Letter and information for each loan. When making payments, please send the correct loan amounts separately, referencing each account. |

Except in limited circumstances, the law requires your present servicer to send notice at least 15 days before the effective date of transfer or at closing. Your new servicer must also send you this notice no later than 15 days after the effective date or transfer date or at closing. The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage, other than the terms directly related to the servicing of your loan (e.g. payments and inquiries).

If you pay by check, you are authorizing Shellpoint Mortgage Servicing to use the check information to make a one-time electronic debit for each check presented from the account at the financial institution designated on the check. This electronic debit will be for the exact amount indicated on the check.

By January 31 of each year, Shellpoint Mortgage Servicing provides an Annual Tax and Interest Statement for IRS reporting on the portion of the previous year that Shellpoint Mortgage Servicing serviced your loan. If your loan is currently escrowed for taxes and/or insurance, Shellpoint Mortgage Servicing is required by law to analyze your loan. Shellpoint Mortgage Servicing will notify you in writing if your payment amount changes.

Premiums for mortgage life, accidental death or disability insurance will not be transferred from your previous servicer. You may contact your carrier for arrangements to maintain your coverage through direct billing. Please contact your previous servicer if you are unsure of your carrier's name.

You should also be aware of the following information, which is set out in more detail in Section 6 and Section 12 of the Real Estate Settlement Procedures Act (RESPA) (12 USC 2605, 12 CFR Sections 1024.35 and 1024.36).

Section 6 and Section 12 of the Real Estate Settlement Procedures Act (RESPA) (12 USC 2605, 12 CFR Sections 1024.35 and 1024.36) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within five (5) business days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer; which includes your name, account number and reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to Shellpoint Mortgage Servicing, P.O. Box 10826, Greenville, SC 29603-0826 or you can call 800-365-7107.

No later than sixty 60 days (not including weekends and legal public holidays) after receiving your request, your servicer must make any appropriate corrections to your account and must provide you with a written clarification regarding any

dispute. During this 60-day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

A business day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section.  You should seek legal advice if you believe your rights have been violated.

If you have any questions for your previous servicer, Kirkland Financial LLC, about your mortgage loan or this transfer, please contact them using the following information:

Kirkland Financial LLC
3000 Business Park Circle Suite 500
Goodlettsville, TN 37070
(615) 8594837

**Please read the following important notices as they may affect your rights.**

This is an attempt to collect a debt and any information obtained will be used for that purpose. This communication is from a debt collector.

If you are a customer in bankruptcy or a customer who has received a bankruptcy discharge of this debt: please be advised that this notice is to advise you of the status of your mortgage loan. This notice constitutes neither a demand for payment nor a notice of personal liability to any recipient hereof, who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code. However, it may be a notice of possible enforcement of the lien against the collateral property, which has not been discharged in your bankruptcy.

**Attention Servicemembers and Dependents:** The federal Servicemembers Civil Relief Act and certain state laws provide important protections for you, including interest rate protections and prohibiting foreclosure under most circumstances during and twelve months after the servicemember's military or other service. Counseling for covered servicemembers is available from Military OneSource (800-342-9647) and the United States Armed Forces Legal Assistance or other similar agencies. For more information, please visit the Military OneSource website www.militaryonesource.mil/.

**Notice of Error or Information Request Address:** You have certain rights under Federal law related to resolving errors in the servicing of your loan and requesting information about your loan. If you want to request information about your loan or if you believe an error has occurred in the servicing of your loan and would like to submit an Error Resolution or Informational Request, please write to us at the following address: Shellpoint Mortgage Servicing P.O. Box 10826 Greenville, SC 29603-0826

The following is a Spanish translation of the information provided above.

**Lea por favor las siguientes avisos importantes que puedan afectar sus derechos.**

Esto es un intento de cobrar una deuda y cualquier información obtenida se utilizará para ello. Esta comunicación es de un cobrador de deudas.

Si usted es un cliente en situación de bancarrota o un cliente que ha recibido una descarga de bancarrota de la deuda: tenga en cuenta que este aviso es para informarle de la situación de su préstamo hipotecario. Este aviso no constituye una exigencia de pago ni un aviso de responsabilidad civil contra ninguno de los destinatarios de la presente notificación, que pudiese haber recibido un descargo de este tipo de deuda de conformidad con la legislación vigente sobre bancarrota o que pudiera ser objeto de suspensión automática en virtud de Sección 362 del Código de Bancarrota de los Estados Unidos. No obstante, puede ser una notificación de una posible aplicación de gravamen sobre la propiedad como garantía, que aún no ha sido descargada en su proceso de bancarrota.

**Atención Miembros del Servicio Militar y Dependientes:** Ley de Amparo Civil para miembros del servicio militar y ciertas leyes estatales proporcionan protecciones importantes para usted, incluyendo protecciones de tasas de interés y prohibiendo la ejecución hipotecaria bajo la mayoría de las circunstancias durante y doce meses después del miembro del servicio militar u otro servicio. Asesoramiento para militares con cobertura está disponible de Military OneSource (800-342-9647) y la Asistencia Legal de las Fuerzas Armadas de Estados Unidos o de otras agencias similares. Para más información por favor visite el sitio web de Military OneSource www.militaryonesource.mil/.

**Aviso de Error o la Dirección de Petición de Información** Usted tiene ciertos derechos en virtud de la ley federal relacionados con la resolución de errores en el servicio de su préstamo y la solicitud de información sobre su préstamo. Si desea solicitar información sobre su préstamo o si usted cree que un error ha ocurrido en el servicio de su préstamo y desea presentar una resolución de errores o solicitud de información, por favor escríbanos a la siguiente dirección: Shellpoint Mortgage Servicing P.O. Box 10826 Greenville, SC 29603-0826

The following is a Chinese translation of the information provided above.

**请阅读以下重要通知，因为它们可能会影响您的权利。**

这是试图进行收债的一种尝试，所取得的任何信息均会用于收债目的。此信函由收债人发出。

如果您是破产客户，或是获得本债务破产免责的客户：请注意，本通知旨在告知您抵押贷款的状态。本通知不构成对此文件的任何接受者，即根据适用的破产法而获得此类债务的免责之人，或可能遭受《美国破产法典》第362章节的自动冻结之人的付款要求或个人责任通知。但是，此通知可能会执行针对抵押财产的留置权，该权利尚未被您的破产所免除。

**各服役人员及其家属，请注意：**联邦《服役人员民事救助法案》及某些州法律会为您提供重要保护，包括在服役人员服役期或其他服务期之内以及十二个月之后在多数情况下的利率保护和禁止丧失抵押品赎回权。Military OneSource (800-342-9647) 和美国武装部队法律援助部门 (United States Armed Forces Legal Assistance) 或其他类似机构会为接受医疗服务的服役人员提供咨询服务。如需更多信息，请访问 Military OneSource 网站：www.militaryonesource.mil/。

**错误或信息请求通知致函** 根据联邦法律，您拥有某些关于解决您的贷款还本付息业务中的错误以及索取有关您贷款信息的权利。如果想索取有关贷款的信息，或者是您认为您的贷款还本付息业务中出现错误，而想要提交"错误决议"或"信息请求"，请写信给我们，地址如下：Shellpoint Mortgage Servicing P.O. Box 10826 Greenville, SC 29603-0826

If you prefer to receive communication in a language other than English, Spanish, or Chinese, please contact us at 800-365-7107 to speak with a translator in your preferred language about the servicing of your loan or a document you received.

# FEE SCHEDULE

The following list provides general information on common non-state specific costs that could be associated with servicing your mortgage loan. It is not a complete list of all costs that could be assessed to such an account. This schedule is provided for informational purposes only.

| Type of Fee | Description | From | To[1] |
|---|---|---|---|
| Late Charge Fee | Assessed for payments received after the due date and expiration of any applicable grace period | Up to 5% | |
| NSF or Returned Check Fee | Fee assessed when a payment is rejected by your bank upon second presentment | $0 | $50[1] |
| Prepayment Fee | A fee that may be required, based on your loan documents, if you prepay the loan | See Loan Documents[2] | |
| Property Valuation Fee | Fee charged if we are required to determine the condition and value of your home; may be in the form of a Broker Price Opinion, appraisal, or other Valuation of Property | $80 | $450 |
| Property Inspection Fee | Fee charged if we are required to determine the condition of your property | $0 | $50 |
| Appraisal Fee | Fee charge to conduct an appraisal of fair market value based on an inspection of the interior and/or exterior of a property. | $95 | $1,000 |
| Property Preservation Fee | If the property is vacant and/or abandoned services may be provided to treat and prevent damages to the property per service needed | $5 | $3,000 |
| Field Visit Fee | Fee charged if we are required to send a field agent to deliver a notice and determine the occupancy status of the property | $40 | $60 |
| Partial Release Fee | Fee charged for preparing the documents to modify the outstanding lien on your property | $0 | $250 |
| Lien Release Fee | Fee charged at payoff for preparing the documents to release the lien on your property | $0 | $100 |
| Recording Fee | Fee charged by the county clerk to record the release or satisfaction of lien at payoff | $0 | $100[3] |
| Subordination Fee | Charge for making a lien on a property subject or junior to a priority lien | $0 | $300 |
| Breach Letter Fees | Fee charged to send letters because of a default on your loan | $0 | $35 |
| Bankruptcy Fees and Costs | Fee charged once a bankruptcy is filed, attorney costs may be incurred as part of the bankruptcy process per action needed | $0 | $2,000 |
| Litigation Fees and Costs | Fee charged as a result of litigating a claim against borrower | $350 | $20,000 |
| Attorney Fees and Costs | Fee charges to compensate attorney for services rendered | $30 | $35,000 |

The frequency of the costs will depend on how often services are requested or required, your payment status, and both investor and legal requirements.

The fees below will be imposed for services you request. You will be asked to agree to pay these charges at the time you request the service.

| Type of Fee | Description | From | To[1] |
|---|---|---|---|
| Convenience Fee | Fee charged for making a payment by phone with an agent or over the internet | $0 | $10 |
| Loan Document Fee | Fee charged for documentation that is an over burdensome volume of document copy request for loan documents. | $0 | $5 per doc |
| Deed of Trust Copy Fee | Fee charged for a copy of the Deed of Trust or Mortgage | $0 | $8 |
| Amortization Schedule | Fee charged for a copy of the Amortization Schedule. (Please note that we are unable to provide an amortization schedule on daily simple interest loans and option ARM loans) | $0 | $10 |
| Recasting Fee | Fee charged for recasting (or re-amortize) the loan after an additional sum of money to substantially reduce the UPB of the loan and lower the monthly payment | $0 | $300 |
| 3rd Party Verification Fee | Fee charged to provide a verification of mortgage to a third party | $0 | $10 |
| Title Search Fee | Fee charged as a result of performing a title search | $125 | $150 |
| Expedited Payoff Fee | An expedited payoff service fee is charged for receiving a written payoff demand by fax or other expedited means, if allowable by state law. Standard payoff statements via USPS standard mail will not incur a fee. | $0 | $60 |
| Expedited Document Fee | Charged when a document is prepared and sent via fax or certified mail to the borrower or an authorized third party. | $0 | $10 |

[1] The maximum fee allowable varies according to state law and will not exceed state allowable limits.

[2] The prepayment fee, if applicable, is dictated by state law, is usually calculated based on a percentage of your loan amount, and can vary widely. Accordingly, a more accurate prepayment fee estimate can be found in your loan documents.

[3] Recording fees vary by state and county. Shellpoint will follow the fee schedule, adopted by the county and state you reside in, which applies to your loan.

Rev. December-2017

| FACTS | **WHAT DOES SHELLPOINT MORTGAGE SERVICING DO WITH YOUR PERSONAL INFORMATION?** |
|---|---|
| **WHY?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **WHAT?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and income<br>• credit history and credit scores<br>• account balances and payment history |
| **HOW?** | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Shellpoint Mortgage Servicing chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Shellpoint Mortgage Servicing share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes -**<br>such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes -**<br>to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | No | We do not share |
| **For our affiliates' everyday business purposes -**<br>information about your transactions and experiences | No | We do not share |
| **For our affiliates' everyday business purposes -**<br>information about your creditworthiness | No | We do not share |
| **For our affiliates to market to you** | No | We do not share |
| **For nonaffiliates to market to you** | No | We do not share |

| Questions? | Call toll-free 800-365-7107 or visit to www.shellpointmtg.com |
|---|---|

029660607S0000

| What we do | |
|---|---|
| **How does Shellpoint Mortgage Servicing protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| **How does Shellpoint Mortgage Servicing collect my personal information?** | We collect your personal information, for example, when you<br>• apply for a loan or give us your income information<br>• provide account information or provide employment information<br>• show your driver's license<br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br>• sharing for affiliates' everyday business purposes - information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies. Our affiliates include:<br>• New Penn Financial, LLC<br>• Shellpoint Partners, LLC<br>• Avenue 365 Lender Services, LLC<br>• Rate 30<br>• eStreet Appraisal Management Company |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>• *We do not share your information with nonaffiliates* |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>• *We do not have any joint marketing agreements with nonaffiliated companies* |

| Other important information |
|---|
| Shellpoint Mortgage Servicing is a division of New Penn Financial, LLC. |

Shellpoint Mortgage Servicing                                      Toll Free Phone:800-365-7107
P.O. Box 10826                                                            Toll Free Fax: 866-467-1137
Greenville, SC 29603-0826                              Contact us online: www.shellpointmtg.com

Main Office NMLS ID#3013                         Hours:  Monday - Friday: 8:00am - 10:00pm  EST
Houston TX Branch Office NMLS                   Hours:  Saturday: 8:00am - 3:00pm  EST
ID#1105392

This privacy notice was provided to our customer with account number 0578273033 on 02/26/2018.

# AUTOMATIC PAYMENT ENROLLMENT FORM

Your monthly payments can be automatically drafted from your checking or savings account. Proof of payment will appear on your bank statement. To take advantage of this offer, visit our website at **www.shellpointmtg.com** and click on *Sign Up for Automatic Payments.* This method is quick, easy, and more secure. You may also complete the form below, attach a voided check, and mail it to our office:



Shellpoint Mortgage Servicing
P.O. Box 10826
Greenville, SC 29603-0826

**Borrower Information**

| | |
|---|---|
| Account Number | 0578273033 |
| Borrower | TROY CANNON |
| Co-Borrower | NICOLE SHEEKY |
| Mailing Street Address | 58 Green Ln |
| Mailing City, State, Zip | Aston PA 19014 |
| Home/Cell Phone Number | |
| Work Phone Number | |
| Email Address | |

**Payment Information**

| | |
|---|---|
| Automatic Draft Start Date (mm/dd/yyyy) | _____/_____/_____ |
| Date of the month on which the draft will occur (must be between the 1st and 15th) | |

| | |
|---|---|
| Current Monthly Payment Amount (Principal, Interest, Taxes and Insurance)* | $1,089.16 |
| Additional Draft Amount** | $ |
| **Total Monthly Draft Amount** | $ |

**Banking Information**

| | |
|---|---|
| ABA Transit Number (Routing Number) | |
| Bank Account Number | |
| Bank Name | |
| Account Type | ☐ CHECKING    ☐ SAVINGS |

\* Your Current Monthly Payment Amount may vary due to interest rate and/or escrow changes, if applicable. You will be notified of any change in payment amount.

\*\* Funds drafted in excess of your regular payment amount will first be used to satisfy amounts that are past due.  If no amounts are past due, excess funds will be posted to reduce your principal balance. Any funds  remaining on your account after loan is paid off will be returned to your bank account.

**Authorization to Begin Automated Payment Option**

I/We authorize Shellpoint Mortgage Servicing ("Shellpoint") to debit my/our account each month. I/We understand that if the drafting day should fall on a non-business day, the draft will take place on the next business day. In order to cancel the draft, I/we must make a request in writing to Shellpoint 14 days in advance of the scheduled drafting date.  Insufficient funds ("NSF") charges will apply to my/our account if the funds are not available at the time of debit. If my/our regularly scheduled draft is returned, a second draft may be attempted.  In the event three of my/our scheduled drafts are returned, the automated payment service will be terminated.  Each NSF transaction will result in an NSF fee. I/We further authorize Shellpoint to adjust the amount debited from my/our account to correspond to periodic changes in my/our payment due each month under the terms of my/our loan.

I/We acknowledge that I/we have read, understand, and agree to the terms set forth for the automated payment service.

Signature: _____        Signature: _____
               **TROY CANNON**                       **NICOLE SHEEKY**

Date: _____        Date: _____

EXHIBIT C



16/2018                    Monthly Account Statement

| Date Posted | Description | Amount |
|---|---|---|
| 01/05/18 | Debit: Preauthorized Payment to KIRKLAND INVEST for PAYMENTS | - $1,099.16 |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS

Statement Month: January 2018

Nicole Cannon
58 Green lane
ASTON, PA 19014

Prepaid Statement    *Kirkland Financial Investors* pg.1 1/26/18 1127.50
pg 5 1/5/18 1099.16

BALANCE ACTIVITY

POSTED TRANSACTIONS

| Date Posted | Description | Amount |
|---|---|---|
| 01/26/18 | Debit: Preauthorized Payment to KIRKLAND INVEST for PAYMENTS | $1,127.50 |

https://www.paypal-prepaid.com/account/statements/AC15856ACBD727600000015821739EEA7C39/false/debit/gpr

1/6

--
Nicole Sheeky-Cannon

EXHIBIT D

P.O. BOX 51850
LIVONIA MI 48151-5850
RETURN SERVICE REQUESTED

 **Shellpoint**
Mortgage Servicing

**Phone Number:** 800-365-7107
**Fax:** 866-467-1137
www.shellpointmtg.com
Mon - Thurs: 8:00AM-10:00PM
Fri: 8:00AM-10:00PM
Sat: 8:00AM-3:00PM

S-SFRECS20 L-0039 R-101
P80RGR00200093 - 540330793 l00370
TROY CANNON
NICOLE SHEEKY
58 GREEN LN
ASTON PA 19014-2003

| Loan Number: | 3033 |
|---|---|
| Principal Balance: | $142,716.12 |
| Deferred Balance: | $0.00 |
| Property: | 58 GREEN LN ASTON, PA 19014 |

## VALIDATION OF DEBT NOTICE

03/02/2018

Dear Mortgagors:

This is a Validation of Debt Notice that is required by the Fair Debt Collection Practices Act.

As of the date of this notice, the total amount of your debt is $146,930.25. This amount consists of the following:

| | | |
|---|---|---|
| Current principal balance (includes any deferred principal balance) | $ | 142,716.12 |
| Current accrued unpaid interest (includes any deferred interest balance) | $ | 882.03 |
| Escrow advances | $ | 3,332.10 |
| Unpaid late fees and other charges | $ | 0.00 |
| Unapplied balance | $ | 0.00 |
| **Total amount of your debt** | $ | 146,930.25 |

Interest and other charges will continue to accrue on your debt, so the total will change after the date of this notice. Please call us at the phone number listed below for an updated total amount of your debt. You also can call us to find out the amount required to bring your debt current.

The name of the creditor to whom this debt is owed is U.S. Bank Trust National Association, as Trustee of CVI LCF Mortgage Loan Trust I.

Unless you, within thirty (30) days after receipt of this notice, dispute the validity of the debt, or any portion thereof, Shellpoint Mortgage Servicing ("Shellpoint") will assume the debt to be valid.

If you notify Shellpoint in writing within thirty (30) days after receipt of this notice that the debt, or any portion thereof, is disputed, Shellpoint will obtain verification of the debt and a copy of such verification will be mailed to you by Shellpoint.

Upon your written request within the thirty (30) day period, Shellpoint will provide you with the name and address of the original creditor, if different from the current creditor.

Send written correspondence to:

Shellpoint Mortgage Servicing
P.O. Box 10826
Greenville, SC 29603-0826

Our phone number is: 800-365-7107

We are available Monday through Thursday 8:00AM-10:00PM, Friday 8:00AM-10:00PM, and Saturday 8:00AM-3:00PM EST.

For your benefit and assistance, there are government approved home ownership counseling agencies designed to help homeowners avoid losing their homes. To obtain a list of approved counseling agencies, please call (800) 569-4287.

**SEE REVERSE SIDE OR ATTACHED FOR AN IMPORTANT STATEMENT OF YOUR RIGHTS.**

EXHIBIT E

# Shellpoint
### Mortgage Servicing

**DO NOT SEND MAIL OR PAYMENTS TO THIS ADDRESS**
P.O. Box 619063 • Dallas, TX 75261-9063

5-811-03483-0012533-001-000-000-000-000

TROY CANNON
NICOLE SHEEKY
58 GREEN LN
ASTON PA 19014-2003

## MORTGAGE STATEMENT
Statement Date: 03/18/2018

| | |
|---|---|
| Account Number | **0578273033** |
| Next Due Date | **04/01/2018** |
| Amount Due | **$3,280.48** |

*If payment is received after 04/16/2018, $28.34 late fee may be assessed.*

| | |
|---|---|
| Phone: | 800-365-7107 |
| Website: | www.shellpointmtg.com |

### Explanation of Amount Due

| | |
|---|---|
| Principal | $133.58 |
| Interest | $433.29 |
| Escrow (Taxes and Insurance) | $522.29 |
| **Regular Monthly Payment** | **$1,089.16** |
| Total Fees and Charges | $13.00 |
| Overdue Payment | $2,178.32 |
| **Total Amount Due** | **$3,280.48** |

### Account Information

| | |
|---|---|
| Outstanding Principal | $142,716.12 |
| Interest Rate (until 11/01/2019) | 3.6500% |
| Prepayment Penalty | None |
| Property Address: | 58 GREEN LN |
| | ASTON PA 19014 |
| Contractual Due Date: | February 1, 2018 |
| Current Escrow Balance: | -$4,639.67 |

### Past Payments Breakdown

| | Paid Last Month | Paid Year to Date |
|---|---|---|
| Principal | $143.28 | $143.28 |
| Interest | $434.53 | $434.53 |
| Escrow | $522.29 | $522.29 |
| Fees/Late Charges | $0.00 | $0.00 |
| Unapplied Partial Payment | -$1,100.10 | $0.00 |
| **Total** | **$0.00** | **$1,100.10** |

### Transaction Activity (02/18/2018 - 03/17/2018)

| Date | Description | Charges | Payments |
|---|---|---|---|
| 02/22/2018 | Partial Payment Unapplied* | $0.00 | -$1,100.10 |
| 02/22/2018 | Regular Payment - (Due 1/1/2018) | $0.00 | $1,089.16 |
| 02/22/2018 | Principal Only Payment | $0.00 | $10.94 |
| 03/09/2018 | County Tax Bill 1 | $583.04 | $0.00 |
| 03/15/2018 | Property Inspection Disbursement | $13.00 | $0.00 |

### Important Messages

***Partial Payments:** Any partial payments that you make are not applied to your mortgage, but instead are held in a separate suspense account according to applicable state law. If you pay the balance of a partial payment, the funds will be applied to your mortgage.*

### Additional Messages

Federal law requires us to tell you how we collect, share, and protect your personal information. Our Privacy Policy has not changed. You can review our policy and practices with respect to your personal information at www.shellpointmtg.com or request a copy to be mailed to you by calling us at 800-365-7107.

005-0814-1100F

**For information about your payments, total amount due, and any additional payment history, see reverse side.**

---

Detach and return with payment.

-- --- -- --- -- --- -- --- -- --- -- --- -- --- -- --- -- --- -- --- -- --- -- --- -- --- -- --- -- --- -- --- -- ---



Loan Number: 0578273033
TROY CANNON

Property Address:
58 GREEN LN
ASTON PA 19014

SHELLPOINT MORTGAGE SERVICING
PO BOX 740039
CINCINNATI OH 45274-0039

### Amount Due

| | |
|---|---|
| Payment Due Date | 04/01/2018 |
| Total Amount Due | $3,280.48 |

*$28.34 late fee will be charged after 04/16/2018*

| | |
|---|---|
| Payment Amount | $ |
| Additional Principal | $ |
| Late / Other Charges | $ |
| Additional Escrow | $ |
| **Total Amount Enclosed**<br>(Please do not send cash) | $ |

**Transaction Activity (02/18/2018 - 03/17/2018) - continued**

| Date | Description | Charges | Payments |
|------|-------------|---------|----------|
| 03/16/2018 | Town Tax Bill 1 | $724.53 | $0.00 |

**Important Notice:** Shellpoint Mortgage Servicing is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

If you are a customer in bankruptcy or a customer who has received a bankruptcy discharge of this debt: please be advised that this notice is to advise you of the status of your mortgage loan. This notice constitutes neither a demand for payment nor a notice of personal liability to any recipient hereof, who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code. However, it may be a notice of possible enforcement of the lien against the collateral property, which has not been discharged in your bankruptcy.

**Notice of Error or Information Request Address**
You have certain rights under Federal law related to resolving errors in the servicing of your loan and requesting information about your loan. If you want to request information about your loan or if you believe an error has occurred in the servicing of your loan and would like to submit an Error Resolution or Informational Request, please write to us at the following address:

Shellpoint Mortgage Servicing
P.O. Box 10826
Greenville, SC 29603

For budget advice and credit counseling assistance please call the U.S. Department of Housing and Urban Development (HUD) at 800-569-4287 or at http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm.

Amounts paid in excess of your payment amount will first be used to satisfy any delinquency. If there are no past due amounts then excess funds paid will be posted to your principal balance. As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

Shellpoint Mortgage Servicing may assess a returned check fee consistent with the laws for your state and your loan documents on all checks returned by your financial institution. Additionally, Shellpoint may charge a fee for processing payoff requests.

Si usted no entiende el contenido de esta carta, por favor contacte a uno de nuestros representantes que hablan espanól al número 800-365-7107.

--- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- ---

## Address, Phone, and Name Changes

**\*\*Please remember:**
Name changes require a signature and a copy of a legal document noting the new name. Examples of legal documents are marriage licenses and divorce decrees.

Type of change (check all that apply)

_____ Address _____Phone _____Name\*\* _____Email Address

Your Account # _____    Social Security Number: _____

Old Borrower Name: _____    New Borrower Name: _____

Old Co-Borrower Name: _____    New Co-Borrower Name: _____

Borrower Signature: _____    Co-Borrower Signature: _____

New Mailing Address: _____

_____

_____

_____

New Phone Number: Day (_ _ _) _ _ _ - _ _ _ _    Evening  (_ _ _) _ _ _ - _ _ _ _    Email Address _____

EXHIBIT F



---------- Forwarded message ---------
From: **Nicole Cannon** <nikshiek@gmail.com>
Date: Fri, Mar 16, 2018, 1:59 PM
Subject: Loan#0578273033
To: deisy.lopez@shellpointmtg.com <deisy.lopez@shellpointmtg.com>


Attn: Deisy
Attached you will find the bank statement you requested showing the two withdraws Kirkland had withdrew for January and February mortgage payments. I will authorize a withdraw by shellpoint this evening when I get done work for march's payment and hopefully this will be cleared up by April's payment.
Have a nice weekend and thank you for your help w/this matter
Nicole Cannon



16/2018                              Monthly Account Statement

| Date Posted | Description | Amount |
|---|---|---|
| 01/05/18 | Debit: Preauthorized Payment to KIRKLAND INVEST for PAYMENTS | - $1,099.16 |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS







3-16-2018

Monthly Account Statement

| Date Posted | Description | Amount |
|---|---|---|
| 01/25/18 | | 00 |
| 01/25/18 | | 4 |
| 01/25/18 | | 31 |
| 01/24/18 | | 1 |
| 01/24/18 | | 6 |
| 01/24/18 | | |
| 01/24/18 | | 0 |
| 01/23/18 | | |
| 01/23/18 | | |
| 01/22/18 | | 7 |
| 01/21/18 | | |
| 01/20/18 | | |
| 01/20/18 | | |
| 01/20/18 | | |
| 01/20/18 | | |
| 01/19/18 | | |
| 01/19/18 | | |
| 01/19/18 | | |
| 01/19/18 | | |
| 01/19/18 | | |

https://www.paypal-prepaid.com/account/statements/AC15856ACBD727600000015821739EEA7C39/false/debit/gpr

2/6



Statement Month: January 2018

Nicole Cannon
58 Green lane
ASTON, PA 19014

Account No. 9828971862131

**Prepaid Statement**   *Kirkland Financial Investors*   pg.1 1/26/18 1127.50
5 1/5/18 1099.16

BALANCE ACTIVITY

| Beginning Balance | $1,125.90 |
|---|---|
| Ending Balance | $884.34 |

POSTED TRANSACTIONS

| Date Posted | Description | Amount |
|---|---|---|
| 01/31/18 | | |
| 01/31/18 | | |
| 01/31/18 | | |
| 01/31/18 | | |
| 01/29/18 | | |
| 01/26/18 | | |
| 01/26/18 | | |
| 01/26/18 | Debit: Preauthorized Payment to KIRKLAND INVEST for PAYMENTS | $1,127.50 |
| 01/25/18 | | |
| 01/25/18 | | |

https://www.paypal-prepaid.com/account/statements/AC15856ACBD727600000015821739EEA7C39/false/debit/gpr    1/6

--
Nicole Sheeky-Cannon

EXHIBIT G

# Shellpoint
## Mortgage Servicing

- Loan ID: 0578273033

- Signed in: NICOLE SHEEKY
  - PREFERENCES
  - CHANGE PASSWORD
  - SECURITY QUESTIONS
  - NOTIFICATION PREFERENCES
  - TERMS & CONDITIONS
  - SIGN OUT
- Last Login: 12/17/2020 12:48 PM

- Loan ID: 0578273033

- Signed in: NICOLE SHEEKY
  - PREFERENCES
  - CHANGE PASSWORD
  - SECURITY QUESTIONS
  - NOTIFICATION PREFERENCES
  - TERMS & CONDITIONS
  - SIGN OUT
- ACTIVITY
  - SUMMARY
  - DETAIL
  - PAYMENT HISTORY
- PAYMENTS
  - SCHEDULE PAYMENT
  - VIEW PENDING PAYMENT
  - SCHEDULE RECURRING PAYMENT
  - REQUEST PAYOFF
- STATEMENTS
  - MONTHLY
  - 1098 - YEARLY
  - TAXES & INSURANCE
- ONLINE SERVICES
  - CONTACT PREFERENCES
  - AVAILABLE DOCUMENTS
  - LOSS MITIGATION DOCUMENTS
  - HOMEOWNER ASSISTANCE SOLUTIONS
  - COVID-19 ASSISTANCE
- HELP
  - FAQS
  - CONTACT US
- MY PROFILE
  - PREFERENCES
  - CHANGE PASSWORD
  - SECURITY QUESTIONS
  - NOTIFICATION PREFERENCES
  - TERMS & CONDITIONS
  - SIGN OUT

# Payment history

| Transaction Date | Due Date | Transaction Amount | Description | Principal Amount | Interest Amount | Escrow Amount | Late Charge Amount | Principal Balance | Escrow Balance |
|---|---|---|---|---|---|---|---|---|---|
| 12/10/2020 | 12/09/2020 | -$2,639.99 | Insurance Premium Disbursement | $0.00 | $0.00 | -$2,639.99 | $0.00 | $142,450.16 | -$25,296.57 |
| 12/03/2020 | 04/01/2018 | -$13.50 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$22,656.58 |
| 11/13/2020 | 04/01/2018 | $0.00 | Inv Loan Purchase | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$22,656.58 |
| 11/13/2020 | 04/01/2018 | $0.00 | Investor Loan Sale | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$22,656.58 |
| 11/09/2020 | 04/01/2018 | -$13.50 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$22,656.58 |
| 10/05/2020 | 04/01/2018 | -$13.50 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$22,656.58 |
| 09/03/2020 | 04/01/2018 | -$13.50 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$22,656.58 |
| 08/12/2020 | 04/01/2018 | -$13.50 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$22,656.58 |
| 08/03/2020 | 08/31/2020 | -$3,189.05 | Tax Bill 1 Disbursement | $0.00 | $0.00 | -$3,189.05 | $0.00 | $142,450.16 | -$22,656.58 |
| 07/13/2020 | 04/01/2018 | -$13.50 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$19,467.53 |
| 06/08/2020 | 04/01/2018 | -$13.50 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$19,467.53 |
| 05/15/2020 | 04/01/2018 | -$840.00 | Legal Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$19,467.53 |
| 05/14/2020 | 04/01/2018 | -$13.50 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$19,467.53 |
| 05/06/2020 | 04/01/2018 | -$258.00 | Legal Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$19,467.53 |
| 04/15/2020 | 04/01/2018 | -$13.50 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$19,467.53 |
| 03/19/2020 | 04/01/2018 | -$13.50 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$19,467.53 |
| 03/06/2020 | 03/31/2020 | -$848.26 | Tax Bill 1 Disbursement | $0.00 | $0.00 | -$848.26 | $0.00 | $142,450.16 | -$19,467.53 |
| 02/25/2020 | 04/01/2020 | -$568.58 | Tax Bill 1 Disbursement | $0.00 | $0.00 | -$568.58 | $0.00 | $142,450.16 | -$18,619.27 |
| 02/13/2020 | 04/01/2018 | -$13.50 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$18,050.69 |
| 01/13/2020 | 04/01/2018 | -$13.50 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$18,050.69 |
| 12/27/2019 | 01/24/2020 | -$3,561.47 | Insurance Premium Disbursement | $0.00 | $0.00 | -$3,561.47 | $0.00 | $142,450.16 | -$18,050.69 |
| 12/17/2019 | 04/01/2018 | -$4,008.33 | Unapplied Payment | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$14,489.22 |
| 12/17/2019 | 04/01/2018 | $566.88 | Unapplied Payment | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$14,489.22 |

| Transaction Date | Due Date | Transaction Amount | Description | Principal Amount | Interest Amount | Escrow Amount | Late Charge Amount | Principal Balance | Escrow Balance |
|---|---|---|---|---|---|---|---|---|---|
| 12/17/2019 | 04/01/2018 | -$566.88 | Regular Payment | -$133.58 | -$433.29 | -$0.01 | $0.00 | $142,450.16 | -$14,489.22 |
| 12/17/2019 | 05/01/2018 | $1,126.56 | Unapplied Payment | $0.00 | $0.00 | $0.00 | $0.00 | $142,316.58 | -$14,489.21 |
| 12/17/2019 | 05/01/2018 | -$1,126.56 | Regular Payment | -$133.99 | -$432.88 | -$559.69 | $0.00 | $142,316.58 | -$14,489.21 |
| 12/17/2019 | 06/01/2018 | $1,126.56 | Unapplied Payment | $0.00 | $0.00 | $0.00 | $0.00 | $142,182.59 | -$13,929.52 |
| 12/17/2019 | 06/01/2018 | -$1,126.56 | Regular Payment | -$134.40 | -$432.47 | -$559.69 | $0.00 | $142,182.59 | -$13,929.52 |
| 12/17/2019 | 07/01/2018 | $1,126.56 | Unapplied Payment | $0.00 | $0.00 | $0.00 | $0.00 | $142,048.19 | -$13,369.83 |
| 12/17/2019 | 07/01/2018 | -$1,126.56 | Regular Payment | -$134.81 | -$432.06 | -$559.69 | $0.00 | $142,048.19 | -$13,369.83 |
| 12/17/2019 | 08/01/2018 | -$13.50 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $141,913.38 | -$12,810.14 |
| 12/07/2019 | 07/01/2018 | $1,126.56 | Regular Payment | $134.81 | $432.06 | $559.69 | $0.00 | $141,913.38 | -$12,810.14 |
| 12/07/2019 | 07/01/2018 | -$1,126.56 | Unapplied Payment | $0.00 | $0.00 | $0.00 | $0.00 | $142,048.19 | -$13,369.83 |
| 12/07/2019 | 06/01/2018 | $1,126.56 | Regular Payment | $134.40 | $432.47 | $559.69 | $0.00 | $142,048.19 | -$13,369.83 |
| 12/07/2019 | 06/01/2018 | -$1,126.56 | Unapplied Payment | $0.00 | $0.00 | $0.00 | $0.00 | $142,182.59 | -$13,929.52 |
| 12/06/2019 | 05/01/2018 | $1,126.56 | Regular Payment | $133.99 | $432.88 | $559.69 | $0.00 | $142,182.59 | -$13,929.52 |
| 12/06/2019 | 05/01/2018 | -$1,126.56 | Unapplied Payment | $0.00 | $0.00 | $0.00 | $0.00 | $142,316.58 | -$14,489.21 |
| 12/06/2019 | 04/01/2018 | $566.88 | Regular Payment | $133.58 | $433.29 | $0.01 | $0.00 | $142,316.58 | -$14,489.21 |
| 12/06/2019 | 04/01/2018 | -$566.88 | Unapplied Payment | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$14,489.22 |
| 12/06/2019 | 04/01/2018 | $4,008.33 | Unapplied Payment | $0.00 | $0.00 | $0.00 | $0.00 | $142,450.16 | -$14,489.22 |
| 12/03/2019 | 03/01/2018 | $566.88 | Regular Payment | $133.18 | $433.69 | $0.01 | $0.00 | $142,450.16 | -$14,489.22 |
| 12/03/2019 | 03/01/2018 | -$566.88 | Unapplied Payment | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 11/22/2019 | 03/01/2018 | -$145.00 | Other Fees Disb | | | | | $142,583.34 | -$14,489.23 |
| 11/07/2019 | 03/01/2018 | -$13.50 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 10/18/2019 | 03/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 10/10/2019 | 03/01/2018 | -$7.75 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 10/10/2019 | 03/01/2018 | -$2.65 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |

| Transaction Date | Due Date | Transaction Amount | Description | Principal Amount | Interest Amount | Escrow Amount | Late Charge Amount | Principal Balance | Escrow Balance |
|---|---|---|---|---|---|---|---|---|---|
| 10/10/2019 | 03/01/2018 | -$2.65 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 10/10/2019 | 03/01/2018 | -$27.30 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 10/10/2019 | 03/01/2018 | -$375.00 | Legal Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 10/10/2019 | 03/01/2018 | -$7.75 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 10/10/2019 | 03/01/2018 | -$2.65 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 10/10/2019 | 03/01/2018 | -$2.65 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 10/10/2019 | 03/01/2018 | -$7.75 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 10/10/2019 | 03/01/2018 | -$7.75 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 10/10/2019 | 03/01/2018 | -$2.65 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 10/10/2019 | 03/01/2018 | -$63.70 | Legal Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 10/10/2019 | 03/01/2018 | -$7.75 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 09/30/2019 | 03/01/2018 | $0.00 | Inv Loan Purchase | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 09/30/2019 | 03/01/2018 | $0.00 | Investor Loan Sale | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 09/13/2019 | 03/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 09/05/2019 | 03/01/2018 | -$560.00 | Legal Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 09/05/2019 | 03/01/2018 | -$1.45 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 09/05/2019 | 03/01/2018 | -$1.45 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 09/05/2019 | 03/01/2018 | -$1.45 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 09/05/2019 | 03/01/2018 | -$42.70 | Legal Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 09/05/2019 | 03/01/2018 | -$1.45 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 09/05/2019 | 03/01/2018 | -$1.45 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 09/05/2019 | 03/01/2018 | -$90.00 | Legal Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 09/05/2019 | 03/01/2018 | -$115.85 | Legal Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |
| 08/13/2019 | 03/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$14,489.23 |

| Transaction Date | Due Date | Transaction Amount | Description | Principal Amount | Interest Amount | Escrow Amount | Late Charge Amount | Principal Balance | Escrow Balance |
|---|---|---|---|---|---|---|---|---|---|
| 08/08/2019 | 08/31/2019 | -$3,090.18 | Tax Bill 1 Disbursement | $0.00 | $0.00 | -$3,090.18 | $0.00 | $142,583.34 | -$14,489.23 |
| 07/30/2019 | 03/01/2018 | $879.02 | Unapplied Payment | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$11,399.05 |
| 07/30/2019 | 03/01/2018 | -$879.02 | Prepetition Unapplied Pmt | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$11,399.05 |
| 07/25/2019 | 03/01/2018 | $879.02 | Prepetition Unapplied Pmt | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$11,399.05 |
| 07/11/2019 | 03/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$11,399.05 |
| 06/11/2019 | 03/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$11,399.05 |
| 05/22/2019 | 03/01/2018 | -$850.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$11,399.05 |
| 05/22/2019 | 03/01/2018 | -$181.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$11,399.05 |
| 05/22/2019 | 03/01/2018 | -$2.20 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$11,399.05 |
| 05/13/2019 | 03/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$11,399.05 |
| 03/09/2019 | 03/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$11,399.05 |
| 03/06/2019 | 04/01/2019 | -$568.58 | Tax Bill 1 Disbursement | $0.00 | $0.00 | -$568.58 | $0.00 | $142,583.34 | -$11,399.05 |
| 03/06/2019 | 03/31/2019 | -$848.26 | Tax Bill 1 Disbursement | $0.00 | $0.00 | -$848.26 | $0.00 | $142,583.34 | -$10,830.47 |
| 02/13/2019 | 03/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$9,982.21 |
| 01/15/2019 | 01/24/2019 | -$3,439.24 | Insurance Premium Disbursement | $0.00 | $0.00 | -$3,439.24 | $0.00 | $142,583.34 | -$9,982.21 |
| 01/14/2019 | 03/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$6,542.97 |
| 12/07/2018 | 03/01/2018 | $13.00 | Other Fee Payment | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$6,542.97 |
| 10/03/2018 | 03/01/2018 | $583.04 | Tax Refund Report | $0.00 | $0.00 | $583.04 | $0.00 | $142,583.34 | -$6,542.97 |
| 09/21/2018 | 03/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$7,126.01 |
| 09/14/2018 | 03/01/2018 | -$0.47 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$7,126.01 |
| 09/14/2018 | 03/01/2018 | -$50.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$7,126.01 |
| 09/14/2018 | 03/01/2018 | -$0.47 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$7,126.01 |

| Transaction Date | Due Date | Transaction Amount | Description | Principal Amount | Interest Amount | Escrow Amount | Late Charge Amount | Principal Balance | Escrow Balance |
|---|---|---|---|---|---|---|---|---|---|
| 09/14/2018 | 03/01/2018 | -$0.47 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$7,126.01 |
| 09/14/2018 | 03/01/2018 | -$0.47 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$7,126.01 |
| 09/13/2018 | 03/01/2018 | -$583.04 | Tax Refund Report | $0.00 | $0.00 | -$583.04 | $0.00 | $142,583.34 | -$7,126.01 |
| 08/22/2018 | 03/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$6,542.97 |
| 08/14/2018 | 03/01/2018 | $583.04 | Tax Refund Report | $0.00 | $0.00 | $583.04 | $0.00 | $142,583.34 | -$6,542.97 |
| 07/31/2018 | 08/31/2018 | -$3,008.63 | Tax Bill 1 Disbursement | $0.00 | $0.00 | -$3,008.63 | $0.00 | $142,583.34 | -$7,126.01 |
| 07/19/2018 | 03/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$4,117.38 |
| 06/17/2018 | 06/01/2018 | -$28.34 | Late Charge Assess | $0.00 | $0.00 | $0.00 | -$28.34 | $142,583.34 | -$4,117.38 |
| 05/30/2018 | 03/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$4,117.38 |
| 05/17/2018 | 05/01/2018 | -$28.34 | Late Charge Assess | $0.00 | $0.00 | $0.00 | -$28.34 | $142,583.34 | -$4,117.38 |
| 05/03/2018 | 03/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,583.34 | -$4,117.38 |
| 05/01/2018 | 04/01/2018 | -$28.34 | Late Charge Assess | $0.00 | $0.00 | $0.00 | -$28.34 | $142,583.34 | -$4,117.38 |
| 03/20/2018 | 02/01/2018 | $1,089.16 | Regular Payment | $132.78 | $434.09 | $522.29 | $0.00 | $142,583.34 | -$4,117.38 |
| 03/16/2018 | 03/31/2018 | -$724.53 | Tax Bill 1 Disbursement | $0.00 | $0.00 | -$724.53 | $0.00 | $142,716.12 | -$4,639.67 |
| 03/15/2018 | 02/01/2018 | -$13.00 | Other Fees Disb | $0.00 | $0.00 | $0.00 | $0.00 | $142,716.12 | -$3,915.14 |
| 03/09/2018 | 04/01/2018 | -$583.04 | Tax Bill 1 Disbursement | $0.00 | $0.00 | -$583.04 | $0.00 | $142,716.12 | -$3,915.14 |
| 02/22/2018 | 01/01/2018 | $10.94 | Principal Only Payment | $10.94 | $0.00 | $0.00 | $0.00 | $142,716.12 | -$3,332.10 |
| 02/22/2018 | 01/01/2018 | $1,089.16 | Regular Payment | $132.34 | $434.53 | $522.29 | $0.00 | $142,727.06 | -$3,332.10 |
| 02/22/2018 | 01/01/2018 | -$1,100.10 | Unapplied Payment | $0.00 | $0.00 | $0.00 | $0.00 | $142,859.40 | -$3,854.39 |

No more to show.

Make a Payment

Loan Details

Mortgage Help

Statements

FAQs

Contact Us

Our commitment

Shellpoint Mortgage Servicing is committed to working with each of our customers to provide the highest level of service possible.

About us

*NewRez LLC*
*dba Shellpoint Mortgage Servicing*
*P.O. Box 10826*
*Greenville, SC 29603-0826*
*Main Office NMLS ID# 1105391*

*NewRez LLC*
*dba Shellpoint Mortgage Servicing*
*Houston, TX*
*Branch Office NMLS ID# 1105392*

Contact us

*Toll-free Phone: +1 (800) 365-7107*
*Toll-free Fax: +1 (866) 467-1137*
*Website: Shellpoint Mortgage Servicing*

*Hours:*
*Monday - Friday: 8am - 10pm EST*
*Saturday: 8am - 3pm EST*

© 2020 Shellpoint Mortgage Servicing   All rights reserved    Legal Disclosures    Mortgage Servicing Fee Schedule
Mortgage Servicing Privacy Notice   Do Not Sell My Personal Information



Loading…

EXHIBIT H

Shellpoint Mortgage Servicing
P.O. Box 619063
Dallas TX  75261-9063
DO NOT SEND MAIL OR PAYMENTS TO THIS ADDRESS




7-811-03494-0000230-001-1-000-000-000-000

TROY CANNON
NICOLE SHEEKY
58 GREEN LN
ASTON PA  19014-2003

# Shellpoint
## Mortgage Servicing

Shellpoint Mortgage Servicing
55 Beattie Place
Suite 110
Greenville, SC  29601
For Inquiries:  (800) 365-7107

| | |
|---|---|
| Analysis Date: | March 20, 2018 |
| Loan: | 0578273033 |

TROY CANNON
NICOLE SHEEKY
58 Green Ln
Aston PA  19014

Property Address:
58 GREEN LN
ASTON, PA  19014



### Annual Escrow Account Disclosure Statement - Account History

The following is an overview of your escrow account with Shellpoint Mortgage Servicing. It contains  the history of escrow payments made on your behalf in the prior year, and a snapshot of the anticipated disbursements for the coming year. Any potential adjustments due to increases or decreases with your escrow items may affect your monthly escrow payment. If your escrow payment increases, your monthly payment will also increase. If the escrow payment decreases, your mortgage payment will decrease.

| Payment Information | Contractual | Effective May 01, 2018 |
|---|---|---|
| P & I Pmt: | $566.87 | $566.87** |
| Escrow Pmt: | $522.29 | $633.90 |
| Other Funds Pmt: | $0.00 | $0.00 |
| Asst. Pmt (-): | $0.00 | $0.00 |
| Reserve Acct Pmt: | $0.00 | $0.00 |
| Total Payment: | $1,089.16 | $1,200.77 |

| Prior Esc Pmt | January 01, 2018 |
|---|---|
| P & I Pmt: | $566.87 |
| Escrow Pmt: | $522.29 |
| Other Funds Pmt: | $0.00 |
| Asst. Pmt (-): | $0.00 |
| Resrv Acct Pmt: | $0.00 |
| Total Payment: | $1,089.16 |

| Escrow Balance Calculation | |
|---|---|
| Due Date: | Mar 01, 2018 |
| Escrow Balance: | ($4,117.38) |
| Anticipated Pmts to Escrow: | $1,044.58 |
| Anticipated Pmts from Escrow (-): | $0.00 |
| Anticipated Escrow Balance: | ($3,072.80) |

| Shortage/Overage Information | Effective May 01, 2018 |
|---|---|
| Upcoming Total Annual Bills | $6,628.90 |
| Required Cushion | $1,104.82 |
| Required Starting Balance | $1,816.47 |
| Escrow Shortage | ($4,889.27) |
| Surplus | $0.00 |

**Cushion Calculation:** Because Shellpoint Mortgage Servicing does not set your tax amounts or insurance premiums, your escrow balance contains a cushion of $1,104.82. A cushion is an additional amount of funds held in your escrow in order to prevent the balance from becoming overdrawn when an increase in the disbursement amount occurs. Your lowest monthly balance should not be below $1,104.82 or 1/6 of the anticipated payment from the account.

** The terms of your loan may result in changes to the monthly principal and interest payments during the year.

This is a statement of actual activity in your escrow account from Aug 2004 to Apr 2018.  Last year's anticipated activity (payments to and from your escrow account) is next to the actual activity.

| | Payments to Escrow | | Payments From Escrow | | | Escrow Balance | |
|---|---|---|---|---|---|---|---|
| Date | Anticipated | Actual | Anticipated | Actual | Description | Required | Actual |
| | | | | | Starting Balance | ($3,854.39) | ($3,854.39) |
| Aug 2004 | $522.29 | | | | * | ($3,332.10) | ($3,854.39) |
| Sep 2004 | $522.29 | | | | * | ($2,809.81) | ($3,854.39) |
| Oct 2004 | $522.29 | | | | * | ($2,287.52) | ($3,854.39) |
| Nov 2004 | $522.29 | | | | * | ($1,765.23) | ($3,854.39) |
| Dec 2004 | $522.29 | | | | * | ($1,242.94) | ($3,854.39) |
| Feb 2005 | $522.29 | | | | * | ($720.65) | ($3,854.39) |
| Mar 2005 | $522.29 | | | | * | ($198.36) | ($3,854.39) |
| Apr 2005 | $522.29 | | | | * | $323.93 | ($3,854.39) |
| May 2005 | $522.29 | | | | * | $846.22 | ($3,854.39) |
| Jun 2005 | $522.29 | | | | * | $1,368.51 | ($3,854.39) |
| Jul 2005 | $522.29 | | | | * | $1,890.80 | ($3,854.39) |
| Feb 2018 | | $522.29 | | | * | $1,890.80 | ($3,332.10) |
| Mar 2018 | | $522.29 | | | * | $1,890.80 | ($2,809.81) |
| Mar 2018 | | | | $583.04 | * County Tax | $1,890.80 | ($3,392.85) |
| Mar 2018 | | | | $724.53 | * Town Tax | $1,890.80 | ($4,117.38) |
| | | | | | Anticipated Transactions | $1,890.80 | ($4,117.38) |
| Mar 2018 | | $522.29 P | | | | | ($3,595.09) |
| Apr 2018 | | $522.29 P | | | | | ($3,072.80) |
| | $5,745.19 | $2,089.16 | $0.00 | $1,307.57 | | | |

**An asterisk (\*) indicates a difference from a previous estimate either in the date or the amount.  If you want a further explanation, please call our toll-free number.**

**P - The letter (P) beside an amount indicates that the payment or disbursement has not yet occurred but is estimated to occur as shown.**

Shellpoint Mortgage Servicing

For Inquiries: (800) 365-7107

Final

Analysis Date:                                                                 March 20, 2018

Loan:        0578273033

## Annual Escrow Account Disclosure Statement - Projections for Coming Year

This is an estimate of activity in your escrow account during the coming year based on payments anticipated to be made to and from your account.

| Date | Anticipated Payments | | Description | Escrow Balance | |
|------|---------|-----------|-------------|-----------|----------|
| | To Escrow | From Escrow | | Anticipated | Required |
| | | | Starting Balance | ($3,072.80) | $1,816.47 |
| May 2018 | $552.41 | | | ($2,520.39) | $2,368.88 |
| Jun 2018 | $552.41 | | | ($1,967.98) | $2,921.29 |
| Jul 2018 | $552.41 | | | ($1,415.57) | $3,473.70 |
| Aug 2018 | $552.41 | $2,921.29 | School Tax | ($3,784.45) | $1,104.82 |
| Sep 2018 | $552.41 | | | ($3,232.04) | $1,657.23 |
| Oct 2018 | $552.41 | | | ($2,679.63) | $2,209.64 |
| Nov 2018 | $552.41 | | | ($2,127.22) | $2,762.05 |
| Dec 2018 | $552.41 | | | ($1,574.81) | $3,314.46 |
| Jan 2019 | $552.41 | $2,400.04 | Hazard | ($3,422.44) | $1,466.83 |
| Feb 2019 | $552.41 | | | ($2,870.03) | $2,019.24 |
| Mar 2019 | $552.41 | $724.53 | Town Tax | ($3,042.15) | $1,847.12 |
| Apr 2019 | $552.41 | $583.04 | County Tax | ($3,072.78) | $1,816.49 |
| | $6,628.92 | $6,628.90 | | | |

(Please keep this statement for comparison with the actual activity in your account at the end of the escrow accounting computation year.)

Your ending balance from the last month of the account history (escrow balance anticipated) is ($3,072.80). Your starting balance (escrow balance required) according to this analysis should be $1,816.47. This means you have a shortage of $4,889.27.

This shortage may be collected from you over a period of 12 months or more unless the shortage is less than 1 month's deposit, in which case we have the additional option of requesting payment within 30 days. We have decided to collect it over 60 months.

We anticipate the total of your coming year bills to be $6,628.90. We divide that amount by the number of payments expected during the coming year to obtain your escrow payment.

| New Escrow Payment Calculation | |
|--------------------------------|--------|
| Unadjusted Escrow Payment | $552.41 |
| Surplus Reduction: | $0.00 |
| Shortage Installment: | $81.49 |
| Rounding Adjustment Amount: | $0.00 |
| Escrow Payment: | $633.90 |

**Paying the shortage**: If your shortage is paid in full, your new monthly payment will be $1,119.28 (calculated by subtracting the Shortage Amount to the left and rounding, if applicable). Paying the shortage does not guarantee that your payment will remain the same, as your tax or insurance bills may have changed.

**TO THE EXTENT YOUR OBLIGATION HAS BEEN DISCHARGED, DISMISSED OR IS SUBJECT TO AN AUTOMATIC STAY OF BANKRUPTCY ORDER UNDER TITLE 11 OF THE UNITED STATES CODE, THIS NOTICE IS FOR COMPLIANCE AND INFORMATION PURPOSES ONLY AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT OR ANY ATTEMPT TO COLLECT ANY SUCH OBLIGATION.**

- - - - - - - - - - Detach Here - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -



Shellpoint Mortgage Servicing

55 Beattie Place

Suite 110

Greenville, SC  29601

(800) 365-7107

**Escrow Shortage Reply (This is not a bill)**

Loan Number:                               0578273033

Full Shortage Amount:                   $4,889.27

Payment Amount:           $ _____

Your escrow shortage has been spread over 60 months, resulting in an additional increase in your monthly payment in the amount of $81.49.

IF YOU CHOOSE to pay your shortage in full, please visit http://www.shellpointmtg.com/ in order to expedite your payment. You can also mail this coupon with your remittance of the full shortage amount to the address to the left

Shellpoint Mortgage Servicing

P.O. Box 740039

Cincinnati, OH 45274-0039

EXHIBIT I

P.O. BOX 51850
LIVONIA MI 48151-5850
RETURN SERVICE REQUESTED





**Shellpoint**
Mortgage Servicing

Phone Number: 866-825-2174
Fax: 866-467-1187
Email: Lossmitigation@shellpointmtg.com
Mon - Thurs: 8:00AM-6:00PM
Fri: 8:00AM-5:00PM



S-SFRECS20 L-1100-C R-106
P66ZRT00200497 - 544125748 I02483
TROY CANNON
58 GREEN LN
ASTON PA 19014-2003

04/16/2018

## NOTICE OF DEFAULT AND INTENT TO ACCELERATE

RE:     Deed of Trust/Mortgage Dated: 06/03/2004
        Loan #: ████████3033
        Property: 58 GREEN LN
                  ASTON, PA 19014

Dear Mortgagor:

Shellpoint Mortgage Servicing ("Shellpoint"), acting as servicer on behalf of U.S. Bank Trust National Association, as Trustee of CVI LCF Mortgage Loan Trust I, the owner and holder of the above referenced loan (the "Loan"), and in accordance with the above referenced Deed of Trust/Mortgage ("Security Instrument") the related promissory note (the "Note"), and applicable state laws, provides you with formal notice of the following:

The loan associated with the referenced Deed of Trust/Mortgage is in default for failure to pay amounts due.

To cure this default, you must pay all amounts due under the terms of the Note and Security Instrument.

As of 04/16/2018, the total amount necessary to bring the Loan current is $2,191.32 (the "Amount Due"). For the exact amount you must pay to bring the Loan current after 04/16/2018, please contact our office at 866-825-2174 as interest, payments, credits, fees and/or other permissible charges can continue to cause your loan balance to vary from day to day.

Payment to bring your loan current should be sent to

Shellpoint Mortgage Servicing
P.O. Box 740039
Cincinnati, OH 45274-0039

You are further informed that despite any departure from the terms of your loan that may have occurred, from this point forward strict compliance with the exact terms of the loan will be required.

If you have not cured the default within forty-five (45) days of this notice, Shellpoint intends to accelerate the sums evidenced by the Note and Security instruments and declare same due and payable in full and to take other legally and contractually permitted action to collect the same, including foreclosure of the lien on the Property and sale of the Property. If such date falls on a Saturday, Sunday or legal holiday then the Due Date shall be the next business day. Any partial payment received by our office on the Loan after the date of this letter may not be applied to the reduction of the Amount Due and may be returned however any such acceptance does not waive the right to proceed with foreclosure and a new demand letter may not be sent

You have the right to reinstate the Loan and the right to bring an action to have the foreclosure action dismissed, claim that your loan is not in default or any other defense to acceleration and sale that you may have including the right in any lawsuit for Foreclosure and Sale to argue that you kept your promises and agreements under the Note and Security Instrument and to present any other defenses that you may have. This notice remains in effect until the default is cured.

**SEE REVERSE SIDE OR ATTACHED FOR AN IMPORTANT STATEMENT OF YOUR RIG...**

**EXHIBIT**
D-2

EXHIBIT J




**Shellpoint**
Mortgage Servicing

P.O. BOX 51850
LIVONIA MI 48151-5850
RETURN SERVICE REQUESTED

Phone Number: 866-825-2174
Fax: 866-467-1187
Email: Lossmitigation@shellpointmtg.com
Mon - Thurs: 8:00AM-10:00PM
Fri: 8:00AM-10:00PM

S-SFRECS20 L-1041 R-205
P8XCQR00200016 - 557338415 I00062
TROY CANNON
NICOLE SHEEKY
58 GREEN LN
ASTON PA 19014-2003

| Loan Number: | 0578273033 |
|---|---|
| Principal Balance: | $142,583.34 |
| Property: | 58 GREEN LN ASTON, PA 19014 |

09/18/2018

Borrowers,

...lpoint Mortgage Servicing ("Shellpoint") has received your request for a short sale or deed-in-lieu of foreclosure ("DIL") of the ...renced property.

...er reviewing the provided documentation, we are unable to approve a short sale or DIL at this time because of the following reason(s):

- Your application for a workout was denied because we were unable to gain access to the subject property in order to complete an ...praisal or other valuation.

...ased on a careful review of the information you provided to us, unfortunately you are not eligible for mortgage payment assistance or ...her alternatives to foreclosure. We recognize that this may be disappointing news for you.

... you have questions about this letter, please contact us at 866-825-2174. If you have questions about the evaluation of your mortgage for ...oreclosure alternatives, then please contact Stephen Shaughness at 866-678-9134.

... your mortgage loan is reinstated and you subsequently experience a financial hardship, you may contact us to request reconsideration ...or mortgage payment assistance or other alternatives to foreclosure.

...incerely,

...ss Mitigation Department
...ellpoint Mortgage Servicing

**SEE REVERSE SIDE OR ATTACHED FOR AN IMPORTANT STATEMENT OF YOUR RIGHTS.**

P I000001 A-0578273033 002426102300456

# EXHIBIT K



Shellpoint Mortgage Servicing
55 Beattie Place
Suite 110
Greenville, SC  29601
For Inquiries:  (800) 365-7107

Final

Analysis Date:                    October 03, 2018
Loan:     0578273033

Property Address:
58 GREEN LN
ASTON, PA  19014

TROY CANNON
NICOLE SHEEKY
58 Green Ln
Aston PA  19014

### Annual Escrow Account Disclosure Statement - Account History

The following is an overview of your escrow account with Shellpoint Mortgage Servicing. It contains  the history of escrow payments made on your behalf in the prior year, and a snapshot of the anticipated disbursements for the coming year. Any potential adjustments due to increases or decreases with your escrow items may affect your monthly escrow payment. If your escrow payment increases, your monthly payment will also increase. If the escrow payment decreases, your mortgage payment will decrease.

| Payment Information | Contractual | Effective Nov 01, 2018 |
|---|---|---|
| P & I Pmt: | $566.87 | $566.87 ** |
| Escrow Pmt: | $0.00 | $559.69 |
| Other Funds Pmt: | $0.00 | $0.00 |
| Asst. Pmt (-): | $0.00 | $0.00 |
| Reserve Acct Pmt: | $0.00 | $0.00 |
| Total Payment: | $1,200.77 | $1,126.56 |

| Prior Esc Pmt | May 01, 2018 |
|---|---|
| P & I Pmt: | $566.87 |
| Escrow Pmt: | $0.00 |
| Other Funds Pmt: | $0.00 |
| Asst. Pmt (-): | $0.00 |
| Resrv Acct Pmt: | $0.00 |
| Total Payment: | $566.87 |

| Escrow Balance Calculation | |
|---|---|
| Due Date: | Mar 01, 2018 |
| Escrow Balance: | $2,238.71 |
| Anticipated Pmts to Escrow: | $0.00 |
| Anticipated Pmts from Escrow (-): | $0.00 |
| Anticipated Escrow Balance: | $2,238.71 |

| Shortage/Overage Information | Effective Nov 01, 2018 |
|---|---|
| Upcoming Total Annual Bills | $6,716.24 |
| Required Cushion | $1,119.37 |
| Required Starting Balance | $2,238.71 |
| Escrow Shortage | $0.00 |
| Surplus | $0.00 |

**Cushion Calculation:** Because Shellpoint Mortgage Servicing does not set your tax amounts or insurance premiums, your escrow balance contains a cushion of $1,119.37. A cushion is an additional amount of funds held in your escrow in order to prevent the balance from becoming overdrawn when an increase in the disbursement amount occurs. Your lowest monthly balance should not be below $1,119.37 or 1/6 of the anticipated payment from the account.

** The terms of your loan may result in changes to the monthly principal and interest payments during the year.

This is a statement of actual activity in your escrow account from Oct 2018 to Oct 2018.  Last year's anticipated activity (payments to and from your escrow account) is next to the actual activity.

| Date | Payments to Escrow Anticipated | Actual | Payments From Escrow Anticipated | Actual | Description | Escrow Balance Required | Actual |
|---|---|---|---|---|---|---|---|
| | | | | | Starting Balance | $2,238.71 | ($6,542.97) |
| | | | | | Anticipated Transactions | $2,238.71 | ($6,542.97) |
| Oct 2018 | | P | | | | | ($6,542.97) |
| | $0.00 | $0.00 | $0.00 | $0.00 | | | |

An asterisk (*) indicates a difference from a previous estimate either in the date or the amount.  If you want a further explanation, please call our toll-free number.
P - The letter (P) beside an amount indicates that the payment or disbursement has not yet occurred but is estimated to occur as shown.

Shellpoint Mortgage Servicing                                            Final
For Inquiries:  (800) 365-7107

|  |  |
|---|---|
| Analysis Date: | October 03, 2018 |
| Loan:    0578273033 | |

## Annual Escrow Account Disclosure Statement - Projections for Coming Year

This is an estimate of activity in your escrow account during the coming year based on payments anticipated to be made to and from your account.

| Date | Anticipated Payments | | Description | Escrow Balance | |
|------|-----------|-------------|-------------|-------------|-----------|
|  | To Escrow | From Escrow | | Anticipated | Required |
|  |  |  | Starting Balance | $2,238.71 | $2,238.71 |
| Nov 2018 | $559.69 |  |  | $2,798.40 | $2,798.40 |
| Dec 2018 | $559.69 |  |  | $3,358.09 | $3,358.09 |
| Jan 2019 | $559.69 | $2,400.04 | Hazard | $1,517.74 | $1,517.74 |
| Feb 2019 | $559.69 |  |  | $2,077.43 | $2,077.43 |
| Mar 2019 | $559.69 | $724.53 | Town Tax | $1,912.59 | $1,912.59 |
| Apr 2019 | $559.69 | $583.04 | County Tax | $1,889.24 | $1,889.24 |
| May 2019 | $559.69 |  |  | $2,448.93 | $2,448.93 |
| Jun 2019 | $559.69 |  |  | $3,008.62 | $3,008.62 |
| Jul 2019 | $559.69 |  |  | $3,568.31 | $3,568.31 |
| Aug 2019 | $559.69 | $3,008.63 | School Tax | $1,119.37 | $1,119.37 |
| Sep 2019 | $559.69 |  |  | $1,679.06 | $1,679.06 |
| Oct 2019 | $559.69 |  |  | $2,238.75 | $2,238.75 |
|  | $6,716.28 | $6,716.24 |  |  |  |

(Please keep this statement for comparison with the actual activity in your account at the end of the escrow accounting computation year.)

Your ending balance from the last month of the account history (escrow balance anticipated) is $2,238.71.  Your starting balance (escrow balance required) according to this analysis should be $2,238.71.  Your Escrow account has neither a shortage or a surplus.

We anticipate the total of your coming year bills to be $6,716.24.  We divide that amount by the number of payments expected during the coming year to obtain your escrow payment.

| New Escrow Payment Calculation | |
|---|---|
| Unadjusted Escrow Payment | $559.69 |
| Surplus Reduction: | $0.00 |
| Shortage Installment: | $0.00 |
| Rounding Adjustment Amount: | $0.00 |
| Escrow Payment: | $559.69 |

**TO THE EXTENT YOUR OBLIGATION HAS BEEN DISCHARGED, DISMISSED OR IS SUBJECT TO AN AUTOMATIC STAY OF BANKRUPTCY ORDER UNDER TITLE 11 OF THE UNITED STATES CODE, NOTICE IS FOR COMPLIANCE AND INFORMATION PURPOSES ONLY AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT OR ANY ATTEMPT TO COLLECT ANY SUCH OBLIGATION.**

EXHIBIT L

Shellpoint Mortgage Servicing
P.O. Box 619063
Dallas TX  75261-9063
DO NOT SEND MAIL OR PAYMENTS TO THIS ADDRESS

7-811-06658-0000104-001-1-000-000-000-000




TROY CANNON
NICOLE SHEEKY
58 GREEN LN
ASTON PA  19014-2003

7-811-06658-0000104-001-2-000-000-000-000

**Shellpoint**
**Mortgage Servicing**

Shellpoint Mortgage Servicing
PO Box 10826
Greenville, SC  29603 0826
For Inquiries:  (800) 365-7107

Final

| Analysis Date: | May 14, 2019 |
|---|---|
| Loan:  0578273033 | |

TROY CANNON
NICOLE SHEEKY
58 Green Ln
Aston PA  19014

Property Address:
58 GREEN LN
ASTON, PA  19014



### Annual Escrow Account Disclosure Statement - Account History

The following is an overview of your escrow account with Shellpoint Mortgage Servicing. It contains  the history of escrow payments made on your behalf in the prior year, and a snapshot of the anticipated disbursements for the coming year. Any potential adjustments due to increases or decreases with your escrow items may affect your monthly escrow payment. If your escrow payment increases, your monthly payment will also increase. If the escrow payment decreases, your mortgage payment will decrease.

| Payment Information | Contractual | Effective Jul 01, 2019 | Prior Esc Pmt | December 01, 2018 | Escrow Balance Calculation | |
|---|---|---|---|---|---|---|
| P & I Pmt: | $566.87 | $566.87** | P & I Pmt: | $566.87 | Due Date: | March 01, 2018 |
| Escrow Pmt: | $0.01 | $1,216.58 | Escrow Pmt: | $559.69 | Escrow Balance: | -$11,399.05 |
| Other Funds Pmt: | $0.00 | $0.00 | Other Funds Pmt: | $0.00 | Anticipated Pmts to Escrow: | $7,835.68 |
| Asst. Pmt (-): | $0.00 | $0.00 | Asst. Pmt (-): | $0.00 | Anticipated Pmts from Escrow (-): | $0.00 |
| Reserve Acct Pmt: | $0.00 | $0.00 | Resrv Acct Pmt: | $0.00 | | |
| Total Payment: | $566.88 | $1,783.45 | Total Payment: | $1,126.56 | Anticipated Escrow Balance: | -$3,563.37 |

| Shortage/Overage Information | Effective Jul 01, 2019 |
|---|---|
| Upcoming Total Annual Bills | $7,864.71 |
| Required Cushion | $1,310.79 |
| Required Starting Balance | $3,170.93 |
| Escrow Shortage | -$6,734.30 |
| Surplus | $0.00 |

**Cushion Calculation:** Because Shellpoint Mortgage Servicing does not set your tax amounts or insurance premiums, your escrow balance contains a cushion of 1,310.79. A cushion is an additional amount of funds held in your escrow in order to prevent the balance from becoming overdrawn when an increase in the disbursement amount occurs. Your lowest monthly balance should not be below 1,310.79 or 1/6 of the anticipated payment from the account.

** The terms of your loan may result in changes to the monthly principal and interest payments during the year.

This is a statement of actual activity in your escrow account from Nov 2018 to June 2019.  Last year's anticipated activity (payments to and from your escrow account) is next to the actual activity.

| Date | Payments to Escrow Anticipated | Actual | Payments From Escrow Anticipated | Actual | Description | Escrow Balance Required | Actual |
|---|---|---|---|---|---|---|---|
| | | | | | Starting Balance | 2,238.71 | (6,542.97) |
| Nov 2018 | 559.69 | | | | * | 2,798.40 | (6,542.97) |
| Dec 2018 | 559.69 | | | | * | 3,358.09 | (6,542.97) |
| Jan 2019 | 559.69 | | 2,400.04 | 3,439.24 | *  Hazard | 1,517.74 | (9,982.21) |
| Feb 2019 | 559.69 | | | | * | 2,077.43 | (9,982.21) |
| Mar 2019 | 559.69 | | 724.53 | 848.26 | *  Town Tax | 1,912.59 | (10,830.47) |
| Mar 2019 | | | | 568.58 | *  County Tax | 1,912.59 | (11,399.05) |
| Apr 2019 | 559.69 | | 583.04 | | *  County Tax | 1,889.24 | (11,399.05) |
| May 2019 | 559.69 | | | | * | 2,448.93 | (11,399.05) |
| Jun 2019 | 559.69 | | | | * | 3,008.62 | (11,399.05) |
| | | | | | Anticipated Transactions | 3,008.62 | (11,399.05) |
| May 2019 | | 7,275.99ᴾ | | | | | (4,123.06) |
| Jun 2019 | | 559.69ᴾ | | | | | (3,563.37) |
| | $4,477.52 | $7,835.68 | $3,707.61 | $4,856.08 | | | |

An asterisk (*) indicates a difference from a previous estimate either in the date or the amount.  If you want a further explanation, please call our toll-free number.

P - The letter (P) beside an amount indicates that the payment or disbursement has not yet occurred but is estimated to occur as shown.

Shellpoint Mortgage Servicing
For Inquiries: (800) 365-7107

Final

| | |
|---|---|
| Analysis Date: | May 14, 2019 |
| Loan: 0578273033 | |

### Annual Escrow Account Disclosure Statement - Projections for Coming Year

This is an estimate of activity in your escrow account during the coming year based on payments anticipated to be made to and from your account.

| Date | Anticipated Payments | | Description | Escrow Balance | |
|---|---|---|---|---|---|
| | To Escrow | From Escrow | | Anticipated | Required |
| | | | Starting Balance | (3,563.37) | 3,170.93 |
| Jul 2019 | 655.39 | | | (2,907.98) | 3,826.32 |
| Aug 2019 | 655.39 | 3,008.63 | School Tax | (5,261.22) | 1,473.08 |
| Sep 2019 | 655.39 | | | (4,605.83) | 2,128.47 |
| Oct 2019 | 655.39 | | | (3,950.44) | 2,783.86 |
| Nov 2019 | 655.39 | | | (3,295.05) | 3,439.25 |
| Dec 2019 | 655.39 | | | (2,639.66) | 4,094.64 |
| Jan 2020 | 655.39 | 3,439.24 | Hazard | (5,423.51) | 1,310.79 |
| Feb 2020 | 655.39 | | | (4,768.12) | 1,966.18 |
| Mar 2020 | 655.39 | 848.26 | Town Tax | (4,960.99) | 1,773.31 |
| Apr 2020 | 655.39 | 568.58 | County Tax | (4,874.18) | 1,860.12 |
| May 2020 | 655.39 | | | (4,218.79) | 2,515.51 |
| Jun 2020 | 655.39 | | | (3,563.40) | 3,170.90 |
| | $7,864.68 | $7,864.71 | | | |

(Please keep this statement for comparison with the actual activity in your account at the end of the escrow accounting computation year.)

Your ending balance from the last month of the account history (escrow balance anticipated) is (3,563.37). Your starting
balance (escrow balance required) according to this analysis should be $3,170.93. This means you have a shortage of 6,734.30.
This shortage may be collected from you over a period of 12 months or more unless the shortage is less than 1 month's
deposit, in which case we have the additional option of requesting payment within 30 days. We have decided to collect it over 12 months.
We anticipate the total of your coming year bills to be 7,864.71. We divide that amount by the number of payments expected during the coming year to
obtain your escrow payment.

| New Escrow Payment Calculation | |
|---|---|
| Unadjusted Escrow Payment | $655.39 |
| Surplus Reduction: | $0.00 |
| Shortage Installment: | $561.19 |
| Rounding Adjustment Amount: | $0.00 |
| Escrow Payment: | $1,216.58 |

**Paying the shortage:** If your shortage is paid in full, your new monthly payment will be $1,222.26 (calculated by subtracting the Shortage Amount to the left and rounding, if applicable). Paying the shortage does not guarantee that your payment will remain the same, as your tax or insurance bills may have changed.

**TO THE EXTENT YOUR OBLIGATION HAS BEEN DISCHARGED, DISMISSED OR IS SUBJECT TO AN AUTOMATIC STAY OF BANKRUPTCY ORDER UNDER TITLE 11 OF THE UNITED STATES CODE, THIS NOTICE IS FOR COMPLIANCE AND INFORMATION PURPOSES ONLY AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT OR ANY ATTEMPT TO COLLECT ANY SUCH OBLIGATION.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 Detach Here


Shellpoint Mortgage Servicing
PO Box 10826

Greenville, SC  29603 0826
(800) 365-7107

**Escrow Shortage Reply (This is not a bill)**

| | |
|---|---|
| Loan Number: | 0578273033 |
| Full Shortage Amount: | $6,734.30 |
| Payment Amount: | $ _____ |

Your escrow shortage has been spread over  12 months, resulting in an additional increase in your monthly payment in the amount of 561.19.

Shellpoint Mortgage Servicing
P.O. Box 740039
Cincinnati, OH 45274-0039

IF YOU CHOOSE to pay your shortage in full, please visit www.ShellpointMtg.com in order to expedite your payment. You can also mail this coupon with your remittance of the full shortage amount to the address to the left

020578273033

EXHIBIT M

Loanhist.rpt

# NewRez LLC DBA Shellpoint Mortgage
## Loan History Summary

11/30/2020   2:58:11PM

| Loan ID | Borrower Name |
|---|---|
| **0579586352** | **ROSS DUTCHER** |

| Trans Date / Eff Date | Due Date | Trans Desc | Rev Code | Flag | Trans Amount | Principal Amount | Principal Balance | Interest Amount | Escrow Amount | Escrow Balance | Late Charge Amount | Late Charge Balance | Unappl. Balance | Money Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/09/20 | 12/01/20 | Property Inspection Pmt | 0 | 0 | (0.01) | | 133,601.55 | | | 179.40 | | 0.00 | $0.00 | None |
| 11/09/20 | 12/01/20 | Property Inspection Pmt | 0 | 0 | 0.01 | | 133,601.55 | | | 179.40 | | 0.00 | $0.00 | None |
| 11/08/20 | 11/01/20 | Regular Payment | 0 | 0 | 1,240.11 | 570.23 | 133,601.55 | 447.24 | 222.64 | 179.40 | | 0.00 | $0.00 | Phone Pay |
| 10/30/20 | 10/01/20 | Lender Placed Hazard Disl | 0 | 0 | (173.31) | | 134,171.78 | | (173.31) | (43.24) | | 0.00 | $0.00 | None |
| | | Payee: Proctor Financial  Batch ID: 494538 | | | | | | | | | | | | |
| 10/27/20 | 11/01/20 | Property Inspection Pmt | 0 | 0 | 13.99 | | 134,171.78 | | | 130.07 | | 0.00 | $0.00 | ACH |
| 10/27/20 | 11/01/20 | NSF Fee Payment | 0 | 0 | 25.00 | | 134,171.78 | | | 130.07 | | 0.00 | $0.00 | ACH |
| 10/27/20 | 11/01/20 | Late Charge Payment | 0 | 0 | 101.74 | | 134,171.78 | | | 130.07 | 101.74 | 0.00 | $0.00 | ACH |
| 10/26/20 | 10/01/20 | Regular Payment | 0 | 0 | 1,240.11 | 568.34 | 134,171.78 | 449.13 | 222.64 | 130.07 | | 101.74 | $0.00 | ACH |
| 10/23/20 | 10/01/20 | NSF Fee Assessment | 0 | 0 | (25.00) | | 134,740.12 | | | (92.57) | | 101.74 | $0.00 | None |
| 10/23/20 | 10/01/20 | Regular Payment | 2 | 0 | (1,240.11) | (568.34) | 134,740.12 | (449.13) | (222.64) | (92.57) | | 101.74 | $0.00 | Phone Pay |
| 10/20/20 | 10/01/20 | Regular Payment | 0 | 2 | 1,240.11 | 568.34 | 134,171.78 | 449.13 | 222.64 | 130.07 | | 101.74 | $0.00 | Phone Pay |
| 10/17/20 | 10/01/20 | Late Charge Assess | 0 | 0 | (50.87) | | 134,740.12 | | | (92.57) | (50.87) | 101.74 | $0.00 | None |
| 09/30/20 | 09/01/20 | Lender Placed Hazard Disl | 0 | 0 | (170.93) | | 134,740.12 | | (170.93) | (92.57) | | 50.87 | $0.00 | None |
| | | Payee: Proctor Financial  Batch ID: 472502 | | | | | | | | | | | | |
| 09/20/20 | 10/01/20 | Property Inspection Pmt | 0 | 0 | 1.00 | | 134,740.12 | | | 78.36 | | 50.87 | $0.00 | Unapplied |
| 09/20/20 | 10/01/20 | Unapplied Payment | 0 | 0 | (1.00) | | 134,740.12 | | | 78.36 | | 50.87 | $0.00 | Unapplied |
| 09/20/20 | 09/01/20 | Regular Payment | 0 | 0 | 1,240.11 | 566.45 | 134,740.12 | 451.02 | 222.64 | 78.36 | | 50.87 | $1.00 | Unapplied |
| 09/20/20 | 09/01/20 | Unapplied Payment | 0 | 0 | (1,240.11) | | 135,306.57 | | | (144.28) | | 50.87 | $1.00 | Unapplied |
| 09/18/20 | 09/01/20 | Unapplied Payment | 0 | 0 | 1,000.00 | | 135,306.57 | | | (144.28) | | 50.87 | $1,241.11 | Lockbox |
| 09/18/20 | 09/01/20 | Unapplied Payment | 0 | 0 | 241.11 | | 135,306.57 | | | (144.28) | | 50.87 | $241.11 | Lockbox |
| 09/17/20 | 09/01/20 | Late Charge Assess | 0 | 0 | (50.87) | | 135,306.57 | | | (144.28) | (50.87) | 50.87 | $0.00 | None |
| 09/01/20 | 08/01/20 | Lender Placed Hazard Disl | 0 | 0 | (173.31) | | 135,306.57 | | (173.31) | (144.28) | | 0.00 | $0.00 | None |
| | | Payee: Proctor Financial  Batch ID: 451680 | | | | | | | | | | | | |
| 08/16/20 | 08/01/20 | Regular Payment | 0 | 0 | 1,240.11 | 564.57 | 135,306.57 | 452.90 | 222.64 | 29.03 | | 0.00 | $0.00 | Phone Pay |
| 07/30/20 | 07/01/20 | Lender Placed Hazard Disl | 0 | 0 | (173.31) | | 135,871.14 | | (173.31) | (193.61) | | 0.00 | $0.00 | None |
| | | Payee: Proctor Financial  Batch ID: 427937 | | | | | | | | | | | | |
| 07/16/20 | 07/01/20 | Regular Payment | 0 | 0 | 1,240.11 | 562.69 | 135,871.14 | 454.78 | 222.64 | (20.30) | | 0.00 | $0.00 | ACH |

Loanhist.rpt

# NewRez LLC DBA Shellpoint Mortgage
## Loan History Summary

11/30/2020   2:58:11PM

**Loan ID**      **Borrower Name**
**0579586352**      **ROSS DUTCHER**

| Trans Date Eff Date | Due Date | Trans Desc | Code | Rev Flag | Trans Amount | Principal Amount | Principal Balance | Interest Amount | Escrow Amount | Escrow Balance | Late Charge Amount | Late Charge Balance | Unappl. Balance | Money Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/20 | 06/01/20 | Lender Placed Hazard Disl | 0 | 0 | (170.93) | | 136,433.83 | | (170.93) | (242.94) | | 0.00 | $0.00 | None |
| | | Payee: Proctor Financial  Batch ID: 407865 | | | | | | | | | | | | |
| 06/16/20 | 06/01/20 | Regular Payment | 0 | 0 | 1,115.14 | 560.82 | 136,433.83 | 456.65 | 97.67 | (72.01) | | 0.00 | $0.00 | ACH |
| 06/01/20 | 05/01/20 | Lender Placed Hazard Disl | 0 | 0 | (173.31) | | 136,994.65 | | (173.31) | (169.68) | | 0.00 | $0.00 | None |
| | | Payee: Proctor Financial  Batch ID: 381859 | | | | | | | | | | | | |
| 05/16/20 | 05/01/20 | Regular Payment | 0 | 0 | 1,115.14 | 558.96 | 136,994.65 | 458.51 | 97.67 | 3.63 | | 0.00 | $0.00 | ACH |
| 04/30/20 | 04/01/20 | Lender Placed Hazard Disl | 0 | 0 | (170.93) | | 137,553.61 | | (170.93) | (94.04) | | 0.00 | $0.00 | None |
| | | Payee: Proctor Financial  Batch ID: 353863 | | | | | | | | | | | | |
| 04/08/20 | 04/01/20 | Regular Payment | 0 | 0 | 1,194.41 | 507.11 | 137,553.61 | 589.63 | 97.67 | 76.89 | | 0.00 | $0.00 | ACH |
| 03/31/20 | 03/01/20 | Lender Placed Hazard Disl | 0 | 0 | (511.85) | | 138,060.72 | | (511.85) | (20.78) | | 0.00 | $0.00 | None |
| | | Payee: Proctor Financial  Batch ID: 330107 | | | | | | | | | | | | |
| 03/16/20 | 03/01/20 | Regular Payment | 0 | 0 | 1,194.41 | 504.95 | 138,060.72 | 591.79 | 97.67 | 491.07 | | 0.00 | $0.00 | ACH |
| 02/12/20 | 02/01/20 | Regular Payment | 0 | 0 | 1,194.41 | 502.80 | 138,565.67 | 593.94 | 97.67 | 393.40 | | 0.00 | $0.00 | ACH |
| 01/14/20 | 01/01/20 | Regular Payment | 0 | 0 | 1,194.41 | 500.66 | 139,068.47 | 596.08 | 97.67 | 295.73 | | 0.00 | $0.00 | ACH |
| 01/13/20 | 01/01/20 | Property Inspection Pmt | 0 | 0 | 30.00 | | 139,569.13 | | | 198.06 | | 0.00 | $0.00 | Lockbox |
| 01/13/20 | 01/01/20 | Prior Servicer Cost Pmt | 0 | 0 | (30.00) | | 139,569.13 | | | 198.06 | | 0.00 | $0.00 | Lockbox |
| 01/05/20 | 01/01/20 | New Loan | 0 | 0 | 0.00 | | 139,569.13 | | | 198.06 | | 0.00 | $0.00 | None |
| 01/02/20 | 01/01/20 | Escrow Only Payment | 0 | 0 | (0.02) | | 139,569.13 | | (0.02) | 198.06 | | 0.00 | $0.00 | PriorServicer |
| 01/02/20 | 01/01/20 | Int on Escrow Pmt | 0 | 0 | 0.02 | | 139,569.13 | | 0.02 | 198.08 | | 0.00 | $0.00 | PriorServicer |
| 12/31/19 | 01/01/20 | Int on Escrow Pmt | 0 | 0 | 2.72 | | 139,569.13 | | 2.72 | 198.06 | | 0.00 | $0.00 | PriorServicer |
| 12/16/19 | 12/01/19 | Regular Payment | 0 | 0 | 1,251.38 | 498.53 | 139,569.13 | 598.21 | 154.64 | 195.34 | | 0.00 | $0.00 | PriorServicer |
| 12/02/19 | 12/01/19 | Hazard Disb | 0 | 0 | (97.67) | | 140,067.66 | | (97.67) | 40.70 | | 0.00 | $0.00 | PriorServicer |
| 11/15/19 | 11/01/19 | Regular Payment | 0 | 0 | 1,251.38 | 496.41 | 140,067.66 | 600.33 | 154.64 | 138.37 | | 0.00 | $0.00 | PriorServicer |
| 11/01/19 | 11/01/19 | Hazard Disb | 0 | 0 | (97.67) | | 140,564.07 | | (97.67) | (16.27) | | 0.00 | $0.00 | PriorServicer |
| 10/18/19 | 10/01/19 | Escrow Only Payment | 0 | 0 | (553.47) | | 140,564.07 | | (553.47) | 81.40 | | 0.00 | $0.00 | PriorServicer |
| 10/14/19 | 10/01/19 | Regular Payment | 0 | 0 | 1,251.38 | 494.30 | 140,564.07 | 602.44 | 154.64 | 634.87 | | 0.00 | $0.00 | PriorServicer |
| 10/10/19 | 10/01/19 | Hazard Disb | 0 | 0 | (97.67) | | 141,058.37 | | (97.67) | 480.23 | | 0.00 | $0.00 | PriorServicer |
| 09/04/19 09/03/19 | 09/01/19 | Regular Payment | 0 | 0 | 1,251.38 | 492.20 | 141,058.37 | 604.54 | 154.64 | 577.90 | | 0.00 | $0.00 | PriorServicer |
| 09/02/19 | 09/01/19 | Hazard Disb | 0 | 0 | (97.63) | | 141,550.57 | | (97.63) | 423.26 | | 0.00 | $0.00 | PriorServicer |

Loanhist.rpt

# NewRez LLC DBA Shellpoint Mortgage

11/30/2020   2:58:11PM

## Loan History Summary

Page #3

| Loan ID | Borrower Name |
|---|---|
| 0579586352 | ROSS DUTCHER |

| Trans Date Eff Date | Due Date | Trans Desc | Code | Rev Flag | Trans Amount | Principal Amount | Balance | Interest Amount | Escrow Amount | Balance | Late Charge Amount | Balance | Unappl. Balance | Money Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/12/19 | 08/01/19 | Regular Payment | 0 | 0 | 1,251.38 | 490.11 | 141,550.57 | 606.63 | 154.64 | 520.89 | | 0.00 | $0.00 | PriorServicer |
| 08/02/19 | 08/01/19 | Hazard Disb | 0 | 0 | (97.67) | | 142,040.68 | | (97.67) | 366.25 | | 0.00 | $0.00 | PriorServicer |
| 07/29/19 | 08/01/19 | Prior Servicer Cost Assess | 0 | 0 | 30.00 | | 142,040.68 | | | 463.92 | | 0.00 | $0.00 | PriorServicer |
| 07/29/19 | 08/01/19 | Escrow Only Payment | 0 | 0 | 667.42 | | 142,040.68 | | 667.42 | 463.92 | | 0.00 | $0.00 | PriorServicer |
| 07/29/19 | 08/01/19 | Late Charge Payment | 0 | 0 | 164.52 | | 142,040.68 | | | (203.50) | 164.52 | 0.00 | $0.00 | PriorServicer |
| 07/29/19 | 07/01/19 | Regular Payment | 0 | 0 | 1,251.38 | 488.02 | 142,040.68 | 608.72 | 154.64 | (203.50) | | 164.52 | $0.00 | PriorServicer |
| 07/29/19 | 06/01/19 | Regular Payment | 0 | 0 | 1,251.38 | 485.95 | 142,528.70 | 610.79 | 154.64 | (358.14) | | 164.52 | $0.00 | PriorServicer |
| 07/17/19 | 05/01/19 | Unapplied Payment | 0 | 0 | (561.58) | | 143,014.65 | | | (512.78) | | 164.52 | $0.00 | PriorServicer |
| 07/17/19 | 05/01/19 | Regular Payment | 0 | 0 | 1,251.38 | 483.88 | 143,014.65 | 612.86 | 154.64 | (512.78) | | 164.52 | $561.58 | PriorServicer |
| 07/16/19 | 05/01/19 | Late Charge Assess | 0 | 0 | (54.84) | | 143,498.53 | | | (667.42) | (54.84) | 164.52 | $561.58 | PriorServicer |
| 07/12/19 | 07/01/19 | Property Inspection Assess | 0 | 0 | (15.00) | | 143,498.53 | | | (667.42) | | 109.68 | $561.58 | PriorServicer |
| 07/05/19 | 07/01/19 | Hazard Disb | 0 | 0 | (97.67) | | 143,498.53 | | (97.67) | (667.42) | | 109.68 | $561.58 | PriorServicer |
| 06/17/19 | 05/01/19 | Late Charge Assess | 0 | 0 | (54.84) | | 143,498.53 | | | (569.75) | (54.84) | 109.68 | $561.58 | PriorServicer |
| 06/04/19 | 06/01/19 | Hazard Disb | 0 | 0 | (97.67) | | 143,498.53 | | (97.67) | (569.75) | | 54.84 | $561.58 | PriorServicer |
| 05/20/19 | 04/01/19 | Regular Payment | 0 | 0 | 1,213.74 | 504.09 | 143,498.53 | 555.01 | 154.64 | (472.08) | | 54.84 | $561.58 | PriorServicer |
| 05/20/19 | 04/01/19 | Unapplied Payment | 0 | 0 | (1,213.74) | | 144,002.62 | | | (626.72) | | 54.84 | $561.58 | PriorServicer |
| 05/20/19 | 04/01/19 | Unapplied Payment | 0 | 0 | 681.00 | | 144,002.62 | | | (626.72) | | 54.84 | $1,775.32 | PriorServicer |
| 05/16/19 | 04/01/19 | Late Charge Assess | 0 | 0 | (54.84) | | 144,002.62 | | | (626.72) | (54.84) | 54.84 | $1,094.32 | PriorServicer |
| 05/10/19 | 04/01/19 | Late Charge Payment | 0 | 0 | 211.84 | | 144,002.62 | | | (626.72) | 211.84 | 0.00 | $1,094.32 | PriorServicer |
| 05/08/19 | 05/01/19 | Property Inspection Assess | 0 | 0 | (15.00) | | 144,002.62 | | | (626.72) | | 211.84 | $1,094.32 | PriorServicer |
| 05/02/19 | 05/01/19 | Hazard Disb | 0 | 0 | (97.67) | | 144,002.62 | | (97.67) | (626.72) | | 211.84 | $1,094.32 | PriorServicer |
| 04/18/19 | 03/01/19 | Unapplied Payment | 0 | 0 | 136.86 | | 144,002.62 | | | (529.05) | | 211.84 | $1,094.32 | PriorServicer |
| 04/18/19 | 03/01/19 | Regular Payment | 0 | 0 | 1,213.74 | 502.15 | 144,002.62 | 556.95 | 154.64 | (529.05) | | 211.84 | $957.46 | PriorServicer |
| 04/16/19 | 03/01/19 | Late Charge Assess | 0 | 0 | (52.96) | | 144,504.77 | | | (683.69) | (52.96) | 211.84 | $957.46 | PriorServicer |
| 04/08/19 | 04/01/19 | Property Inspection Assess | 0 | 0 | (15.00) | | 144,504.77 | | | (683.69) | | 158.88 | $957.46 | PriorServicer |
| 04/04/19 | 04/01/19 | Hazard Disb | 0 | 0 | (97.67) | | 144,504.77 | | (97.67) | (683.69) | | 158.88 | $957.46 | PriorServicer |
| 03/18/19 | 02/01/19 | Unapplied Payment | 0 | 0 | 291.50 | | 144,504.77 | | | (586.02) | | 158.88 | $957.46 | PriorServicer |
| 03/18/19 | 02/01/19 | Regular Payment | 0 | 0 | 1,059.10 | 500.23 | 144,504.77 | 558.87 | | (586.02) | | 158.88 | $665.96 | PriorServicer |
| 03/04/19 | 03/01/19 | Hazard Disb | 0 | 0 | (97.67) | | 145,005.00 | | (97.67) | (586.02) | | 158.88 | $665.96 | PriorServicer |
| 02/18/19 | 01/01/19 | Unapplied Payment | 0 | 0 | 291.50 | | 145,005.00 | | | (488.35) | | 158.88 | $665.96 | PriorServicer |
| 02/18/19 | 01/01/19 | Regular Payment | 0 | 0 | 1,059.10 | 498.31 | 145,005.00 | 560.79 | | (488.35) | | 158.88 | $374.46 | PriorServicer |

Loanhist.rpt

**NewRez LLC DBA Shellpoint Mortgage**

11/30/2020   2:58:11PM

**Loan History Summary**

Page #4

| Loan ID | Borrower Name |
|---------|---------------|
| **0579586352** | **ROSS DUTCHER** |

| Trans Date Eff Date | Due Date | Trans Desc | Rev Code | Flag | Trans Amount | Principal Amount | Balance | Interest Amount | Escrow Amount | Balance | Late Charge Amount | Balance | Unappl. Balance | Money Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 02/04/19 | 02/01/19 | Hazard Disb | 0 | 0 | (97.67) | | 145,503.31 | | (97.67) | (488.35) | | 158.88 | $374.46 | PriorServicer |
| 01/18/19 | 12/01/18 | Unapplied Payment | 0 | 0 | 291.50 | | 145,503.31 | | | (390.68) | | 158.88 | $374.46 | PriorServicer |
| 01/18/19 | 12/01/18 | Regular Payment | 0 | 0 | 1,059.10 | 496.39 | 145,503.31 | 562.71 | | (390.68) | | 158.88 | $82.96 | PriorServicer |
| 01/16/19 | 12/01/18 | Late Charge Assess | 0 | 0 | (52.96) | | 145,999.70 | | | (390.68) | (52.96) | 158.88 | $82.96 | PriorServicer |
| 01/04/19 | 01/01/19 | Hazard Disb | 0 | 0 | (97.67) | | 145,999.70 | | (97.67) | (390.68) | | 105.92 | $82.96 | PriorServicer |
| 12/19/18 | 11/01/18 | Regular Payment | 0 | 0 | 1,059.10 | 494.49 | 145,999.70 | 564.61 | | (293.01) | | 105.92 | $82.96 | PriorServicer |
| 12/17/18 | 11/01/18 | Late Charge Assess | 0 | 0 | (52.96) | | 146,494.19 | | | (293.01) | (52.96) | 105.92 | $82.96 | PriorServicer |
| 12/15/18 | 11/01/18 | Unapplied Payment | 0 | 0 | 82.96 | | 146,494.19 | | | (293.01) | | 52.96 | $82.96 | PriorServicer |
| 12/07/18 | 11/01/18 | Regular Payment | 7 | 0 | (1,059.10) | (494.49) | 146,494.19 | (564.61) | | (293.01) | | 52.96 | $0.00 | PriorServicer |
| 12/05/18 | 12/01/18 | Hazard Disb | 0 | 0 | (293.01) | | 145,999.70 | | (293.01) | (293.01) | | 52.96 | $0.00 | PriorServicer |
| 12/04/18 | 11/01/18 | Regular Payment | 0 | 7 | 1,059.10 | 494.49 | 145,999.70 | 564.61 | | | | 52.96 | $0.00 | PriorServicer |
| 11/05/18 | 10/01/18 | Regular Payment | 0 | 0 | 1,059.10 | 492.59 | 146,494.19 | 566.51 | | | | 52.96 | $0.00 | PriorServicer |
| 10/16/18 | 10/01/18 | Late Charge Assess | 0 | 0 | (52.96) | | 146,986.78 | | | | (52.96) | 52.96 | $0.00 | PriorServicer |
| 10/11/18 | 10/01/18 | Regular Payment | 7 | 0 | (1,059.10) | (492.59) | 146,986.78 | (566.51) | | | | 0.00 | $0.00 | PriorServicer |
| 10/04/18 | 10/01/18 | Regular Payment | 0 | 7 | 1,059.10 | 492.59 | 146,494.19 | 566.51 | | | | 0.00 | $0.00 | PriorServicer |
| 09/04/18 | 09/01/18 | Regular Payment | 0 | 0 | 1,059.10 | 490.70 | 146,986.78 | 568.40 | | | | 0.00 | $0.00 | PriorServicer |
| 08/04/18 | 08/01/18 | Regular Payment | 0 | 0 | 1,059.10 | 488.81 | 147,477.48 | 570.29 | | | | 0.00 | $0.00 | PriorServicer |
| 07/05/18 | 07/01/18 | Regular Payment | 0 | 0 | 1,059.10 | 486.94 | 147,966.29 | 572.16 | | | | 0.00 | $0.00 | PriorServicer |
| 06/04/18 | 06/01/18 | Regular Payment | 0 | 0 | 1,059.10 | 485.07 | 148,453.23 | 574.03 | | | | 0.00 | $0.00 | PriorServicer |
| 05/04/18 | 05/01/18 | Regular Payment | 0 | 0 | 1,059.10 | 483.20 | 148,938.30 | 575.90 | | | | 0.00 | $0.00 | PriorServicer |
| 04/04/18 | 04/01/18 | Regular Payment | 0 | 0 | 1,010.68 | 510.91 | 149,421.50 | 499.77 | | | | 0.00 | $0.00 | PriorServicer |
| 03/05/18 | 03/01/18 | Regular Payment | 0 | 0 | 1,010.68 | 509.21 | 149,932.41 | 501.47 | | | | 0.00 | $0.00 | PriorServicer |
| 02/05/18 | 02/01/18 | Regular Payment | 0 | 0 | 1,010.68 | 507.52 | 150,441.62 | 503.16 | | | | 0.00 | $0.00 | PriorServicer |
| 01/04/18 | 01/01/18 | Regular Payment | 0 | 0 | 1,010.68 | 505.83 | 150,949.14 | 504.85 | | | | 0.00 | $0.00 | PriorServicer |
| 12/04/17 | 12/01/17 | Regular Payment | 0 | 0 | 1,010.68 | 504.15 | 151,454.97 | 506.53 | | | | 0.00 | $0.00 | PriorServicer |
| 11/04/17 | 11/01/17 | Regular Payment | 0 | 0 | 1,010.68 | 502.47 | 151,959.12 | 508.21 | | | | 0.00 | $0.00 | PriorServicer |
| 10/04/17 | 10/01/17 | Regular Payment | 0 | 0 | 1,010.68 | 500.81 | 152,461.59 | 509.87 | | | | 0.00 | $0.00 | PriorServicer |
| 09/04/17 | 09/01/17 | Regular Payment | 0 | 0 | 1,010.68 | 499.14 | 152,962.40 | 511.54 | | | | 0.00 | $0.00 | PriorServicer |
| 08/01/17 | 08/01/17 | Regular Payment | 0 | 0 | 1,010.68 | 497.48 | 153,461.54 | 513.20 | | | | 0.00 | $0.00 | PriorServicer |
| 07/01/17 | 07/01/17 | Regular Payment | 0 | 0 | 1,010.68 | 495.83 | 153,959.02 | 514.85 | | | | 0.00 | $0.00 | PriorServicer |
| 06/01/17 | 06/01/17 | Regular Payment | 0 | 0 | 1,010.68 | 494.18 | 154,454.85 | 516.50 | | | | 0.00 | $0.00 | PriorServicer |

Loanhist.rpt

**NewRez LLC DBA Shellpoint Mortgage**

11/30/2020   2:58:11PM

**Loan History Summary**

Page #5

<u>**Loan ID**</u>          <u>**Borrower Name**</u>

**0579586352**    **ROSS DUTCHER**

| Trans Date Eff Date | Due Date | Trans Desc | Rev Code | Flag | Trans Amount | Principal Amount | Principal Balance | Interest Amount | Escrow Amount | Escrow Balance | Late Charge Amount | Late Charge Balance | Unappl. Balance | Money Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05/01/17 | 05/01/17 | Regular Payment | 0 | 0 | 1,010.68 | 492.54 | 154,949.03 | 518.14 | | | | 0.00 | $0.00 | PriorServicer |
| 04/01/17 | 04/01/17 | Regular Payment | 0 | 0 | 961.20 | 522.55 | 155,441.57 | 438.65 | | | | 0.00 | $0.00 | PriorServicer |
| 03/01/17 | 03/01/17 | Regular Payment | 0 | 0 | 961.20 | 521.09 | 155,964.12 | 440.11 | | | | 0.00 | $0.00 | PriorServicer |
| 02/01/17 | 02/01/17 | Regular Payment | 0 | 0 | 961.20 | 519.62 | 156,485.21 | 441.58 | | | | 0.00 | $0.00 | PriorServicer |
| 01/03/17 | 01/01/17 | Regular Payment | 0 | 0 | 961.20 | 518.17 | 157,004.83 | 443.03 | | | | 0.00 | $0.00 | PriorServicer |
| 12/01/16 | 12/01/16 | Regular Payment | 0 | 0 | 961.20 | 516.71 | 157,523.00 | 444.49 | | | | 0.00 | $0.00 | PriorServicer |
| 11/01/16 | 11/01/16 | Regular Payment | 0 | 0 | 961.20 | 515.26 | 158,039.71 | 445.94 | | | | 0.00 | $0.00 | PriorServicer |
| 10/01/16 | 10/01/16 | Regular Payment | 0 | 0 | 961.20 | 513.82 | 158,554.97 | 447.38 | | | | 0.00 | $0.00 | PriorServicer |
| 09/01/16 | 09/01/16 | Regular Payment | 0 | 0 | 961.20 | 512.38 | 159,068.79 | 448.82 | | | | 0.00 | $0.00 | PriorServicer |
| 08/01/16 | 08/01/16 | Regular Payment | 0 | 0 | 961.20 | 510.94 | 159,581.17 | 450.26 | | | | 0.00 | $0.00 | PriorServicer |
| 07/02/16 | 07/01/16 | Regular Payment | 0 | 0 | 961.20 | 509.51 | 160,092.11 | 451.69 | | | | 0.00 | $0.00 | PriorServicer |
| 06/01/16 | 06/01/16 | Regular Payment | 0 | 0 | 961.20 | 508.08 | 160,601.62 | 453.12 | | | | 0.00 | $0.00 | PriorServicer |
| 05/02/16 | 05/01/16 | Regular Payment | 0 | 0 | 961.20 | 506.65 | 161,109.70 | 454.55 | | | | 0.00 | $0.00 | PriorServicer |
| 04/06/16 04/01/16 | 04/01/16 | Regular Payment | 0 | 0 | 920.81 | 532.33 | 161,616.35 | 388.48 | | | | 0.00 | $0.00 | PriorServicer |
| 04/05/16 | 04/01/16 | Appraisal Cost Assess | 0 | 0 | (5.50) | | 162,148.68 | | | | | 0.00 | $0.00 | PriorServicer |
| 04/05/16 | 04/01/16 | Appraisal Cost Assess | 0 | 0 | (6.50) | | 162,148.68 | | | | | 0.00 | $0.00 | PriorServicer |
| 04/04/16 | 04/01/16 | Regular Payment | 0 | 0 | 2,762.43 | 1,589.37 | 162,148.68 | 1,173.06 | | | | 0.00 | $0.00 | PriorServicer |
| 03/01/16 | 03/01/16 | Regular Payment | 0 | 0 | 920.81 | 531.06 | 163,738.05 | 389.75 | | | | 0.00 | $0.00 | PriorServicer |
| 02/16/16 | 02/01/16 | Regular Payment | 0 | 0 | 9,209.31 | | 164,269.11 | 9,209.31 | | | | 0.00 | $0.00 | PriorServicer |
| 02/01/16 | 02/01/16 | Regular Payment | 0 | 0 | 920.81 | 529.79 | 164,269.11 | 391.02 | | | | 0.00 | $0.00 | PriorServicer |
| 01/04/16 | 01/01/16 | Regular Payment | 0 | 0 | 920.81 | 528.52 | 164,798.90 | 392.29 | | | | 0.00 | $0.00 | PriorServicer |
| 12/01/15 | 12/01/15 | Regular Payment | 0 | 0 | 920.81 | 527.26 | 165,327.42 | 393.55 | | | | 0.00 | $0.00 | PriorServicer |
| 11/02/15 | 11/01/15 | Regular Payment | 0 | 0 | 920.81 | 526.00 | 165,854.68 | 394.81 | | | | 0.00 | $0.00 | PriorServicer |
| | | | | | | $32,779.13 | | $41,372.40 | $179.40 | | | | | |

Case 1:20-cv-10853-KPF    Document 1    Filed 12/22/20    Page 125 of 146

**NewRez LLC DBA Shellpoint Mortgage**

**Loan History Summary**

EXHIBIT N

Representation of Printed Document

 **NewRez**

**MORTGAGE STATEMENT**

Statement Date: 01/16/2020

**DO NOT SEND MAIL OR PAYMENTS TO THIS ADDRESS**
P.O. Box 619060 • Dallas, TX 75261-9063

9-811-09064-0091778-010-100-010-000-000

ROSS DUTCHER
LYNDA R DUTCHER
7932 CAPISTRANO AVE
WEST HILLS CA 91304-4603

| | |
|---|---|
| **Account Number** | **0579586352** |
| **Next Due Date** | **02/01/2020** |
| **Amount Due** | **$1,209.41** |
| *If payment is received after 02/16/2020, $54.84 late fee may be assessed.* | |

| | |
|---|---|
| Phone: | 866-317-2347 |
| Website: | www.newrez.com |

### Explanation of Amount Due

| | |
|---|---|
| Principal | $502.80 |
| Interest | $593.94 |
| Escrow (Taxes and Insurance) | $97.67 |
| **Regular Monthly Payment** | **$1,194.41** |
| Total Fees and Charges | $0.00 |
| Overdue Payment | $15.00 |
| **Total Amount Due** | **$1,209.41** |

### Account Information

| | |
|---|---|
| Outstanding Principal | $139,068.47 |
| Interest Rate (until 04/01/2020) | 5.1250% |
| Prepayment Penalty | None |
| Property Address: | 7932 CAPISTRANO AVE |
| | LOS ANGELES CA 91304 |
| Contractual Due Date: | February 1, 2020 |
| Current Escrow Balance: | $295.73 |

### Past Payments Breakdown

| | Paid Last Month | Paid Year to Date |
|---|---|---|
| Principal | $0.00 | $500.66 |
| Interest | $0.00 | $596.08 |
| Escrow | $0.00 | $97.67 |
| Fees/Late Charges | $0.00 | $0.00 |
| **Total** | **$0.00** | **$1,194.41** |

### Transaction Activity (01/18/2020 - 01/15/2020)

| Date | Description | Charges | Payments |
|---|---|---|---|
| | *No transaction activity during this period.* | | |

### Important Messages

**Partial Payments:** Any partial payments that you make are not applied to your mortgage, but instead are held in a separate suspense account according to applicable state law. If you pay the balance of a partial payment, the funds will be applied to your mortgage.

### Additional Messages

Federal law requires us to tell you how we collect, share, and protect your personal information. Our Privacy Policy has not changed. You can review our policy and practices with respect to your personal information at www.newrez.com or request a copy to be mailed to you by calling us at 866-317-2347.

**For questions regarding the servicing of your loan, please contact customer care at 866-317-2347.**

**For information about your payments, total amount due, and any additional payment history, see reverse side.**

005-0814-1100F

---

Detach and return with payment.

**NewRez**

Loan Number:   0579586352
ROSS DUTCHER

Property Address:
7932 CAPISTRANO AVE
LOS ANGELES CA 91304

NewRez LLC
c/o SHELLPOINT MORTGAGE SERVICING
PO BOX 740039
CINCINNATI OH 45274-0039

### Amount Due

| | |
|---|---|
| Payment Due Date | 02/01/2020 |
| Total Amount Due | $1,209.41 |
| *$54.84 late fee may be charged after 02/16/2020* | |

Please write clearly inside space provided

| | |
|---|---|
| Payment Amount | $ |
| Additional Principal | $ |
| Late / Other Charges | $ |
| Additional Escrow | $ |
| **Total Amount Enclosed** (Please do not send cash) | $ |

INTERNET REPRINT

Please note that we operate as NewRez Mortgage LLC dba Shellpoint Mortgage Servicing in Arkansas and Texas.

**Important Notice:** NewRez LLC dba Shellpoint Mortgage Servicing is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose. NewRez LLC dba Shellpoint Mortgage Servicing's NMLS ID is 3013.

If you are a customer in bankruptcy or a customer who has received a bankruptcy discharge of this debt: please be advised that this notice is to advise you of the status of your mortgage loan. This notice constitutes neither a demand for payment nor a notice of personal liability to any recipient hereof, who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code. However, it may be a notice of possible enforcement of the lien against the collateral property, which has not been discharged in your bankruptcy.

**Notice of Error or Information Request Address**
You have certain rights under Federal law related to resolving errors in the servicing of your loan and requesting information about your loan. If you want to request information about your loan or if you believe an error has occurred in the servicing of your loan and would like to submit an Error Resolution or Informational Request, please write to us at the following address:

NewRez LLC
P.O. Box 10826
Greenville, SC 29603

For budget advice and credit counseling assistance please call the U.S. Department of Housing and Urban Development (HUD) at 800-569-4287 or at http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm.

Amounts paid in excess of your payment amount will first be used to satisfy any delinquency. If there are no past due amounts then excess funds paid will be posted to your principal balance. As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

NewRez LLC may assess a returned check fee consistent with the laws for your state and your loan documents on all checks returned by your financial institution. Additionally, NewRez LLC may charge a fee for processing payoff requests.

Si usted no entiende el contenido de esta carta, por favor contacte a uno de nuestros representantes que hablan Español al número 866-317-2347.

If you prefer to receive communication in a language other than English, please contact us at 866-317-2347 to speak with a translator in your preferred language about the servicing of your loan or a document you received.

A successor in interest is someone who acquires an ownership interest in a property secured by a mortgage loan by transfer upon the death of a relative, as a result of a divorce or legal separation, through certain trusts, between spouses, from a parent to a child, or when a borrower who is a joint tenant or tenant by the entirety dies. If you are a successor in interest, or you think you might be, please contact by phone, mail or email to start the confirmation process.

--- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- ---

## Address, Phone, and Name Changes

**\*\*Please remember:**
Name changes require a signature and a copy of a legal document noting the new name. Examples of legal documents are marriage licenses and divorce decrees.

Type of change (check all that apply)

_____ Address _____Phone _____Name** _____Email Address

Your Account # _____     Social Security Number: _____

Old Borrower Name: _____     New Borrower Name: _____

Old Co-Borrower Name: _____     New Co-Borrower Name: _____

Borrower Signature: _____     Co-Borrower Signature: _____

New Mailing Address: _____

_____

_____

_____

New Phone Number: Day ( _ _ _ ) _ _ _ - _ _ _ _     Evening ( _ _ _ ) _ _ _ - _ _ _ _     Email Address _____

INTERNET REPRINT

**Shellpoint**
Mortgage Servicing

## FEE SCHEDULE

The following list provides general information on common non-state specific costs that could be associated with servicing your mortgage loan. It is not a complete list of all costs that could be assessed to such an account. This schedule is provided for informational purposes only.

| Type of Fee | Description | From | To[1] |
|---|---|---|---|
| Late Charge Fee | Assessed for payments received after the due date and expiration of any applicable grace period | Up to 5%[1] | |
| NSF or Returned Check Fee | Fee assessed when a payment is rejected by your bank upon second presentment | $0 | $50[1] |
| Prepayment Fee | A fee that may be required, based on your loan documents, if you prepay the loan | See Loan Documents[2] | |
| Property Valuation Fee | Fee charged if we are required to determine the condition and value of your home; may be in the form of a Broker Price Opinion, appraisal, or other Valuation of Property | $80 | $450 |
| Property Inspection Fee | Fee charged if we are required to determine the condition of your property | $0 | $50 |
| Appraisal Fee | Fee charge to conduct an appraisal of fair market value based on an inspection of the interior and/or exterior of a property. | $95 | $1,000 |
| Property Preservation Fee | If the property is vacant and/or abandoned services may be provided to treat and prevent damages to the property per service needed | $5 | $3,000 |
| Field Visit Fee | Fee charged if we are required to send a field agent to deliver a notice and determine the occupancy status of the property | $40 | $60 |
| Partial Release Fee | Fee charged for preparing the documents to modify the outstanding lien on your property | $0 | $250 |
| Lien Release Fee | Fee charged at payoff for preparing the documents to release the lien on your property | $0 | $100 |
| Recording Fee | Fee charged by the county clerk to record the release or satisfaction of lien at payoff | $0 | $100[3] |
| Subordination Fee | Charge for making a lien on a property subject or junior to a priority lien | $0 | $300 |
| Breach Letter Fees | Fee charged to send letters because of a default on your loan | $0 | $35 |
| Bankruptcy Fees and Costs | Fee charged once a bankruptcy is filed, attorney costs may be incurred as part of the bankruptcy process per action needed | $0 | $2,000 |
| Litigation Fees and Costs | Fee charged as a result of litigating a claim against borrower | $350 | $20,000 |
| Attorney Fees and Costs | Fee charges to compensate attorney for services rendered | $30 | $35,000 |

The frequency of the costs will depend on how often services are requested or required, your payment status, and both investor and legal requirements.

The fees below will be imposed for services you request. You will be asked to agree to pay these charges at the time you request the service.

| Type of Fee | Description | From | To[1] |
|---|---|---|---|
| Convenience Fee | Fee charged for making a payment by phone with an agent or over the internet | $0 | $20 |
| Loan Document Fee | Fee charged for documentation that is an over burdensome volume of document copy request for loan documents. | $0 | $5 per doc |
| Deed of Trust Copy Fee | Fee charged for a copy of the Deed of Trust or Mortgage | $0 | $8 |
| Amortization Schedule | Fee charged for a copy of the Amortization Schedule. (Please note that we are unable to provide an amortization schedule on daily simple interest loans and option ARM loans) | $0 | $10 |
| Recasting Fee | Fee charged for recasting (or re-amortize) the loan after an additional sum of money to substantially reduce the UPB of the loan and lower the monthly payment | $0 | $300 |
| 3rd Party Verification Fee | Fee charged to provide a verification of mortgage to a third party | $0 | $10 |
| Title Search Fee | Fee charged as a result of performing a title search | $125 | $150 |
| Expedited Payoff Fee (Does not apply to Hawaii) | An expedited payoff service fee is charged for receiving a written payoff demand by fax or other expedited means, if allowable by state law. Standard payoff statements via USPS standard mail will not incur a fee. | $0 | $60 |
| Expedited Payoff Fee (Hawaii only) | Payoff requests of any type will not incur a fee. | $0 | $0 |
| Expedited Document Fee | Charged when a document is prepared and sent via fax or certified mail to the borrower or an authorized third party. | $0 | $10 |
| Assumption Fee | Fee charged for processing of a loan assumption. | $0 | $2,000 |

[1] The maximum fee allowable varies according to state law and will not exceed state allowable rates.
[2] The prepayment fee, if applicable, is dictated by state law, is usually calculated based on a percentage of your loan amount, and can vary widely. Accordingly, a more accurate prepayment fee estimate can be found in your loan documents.
[3] Recording fees vary by state and county. Current Servicer will follow the fee schedule, adopted by the county and state you reside in, which applies to your loan.

If you are a customer in bankruptcy or a customer who has received a bankruptcy discharge of this debt: please be advised that this notice is for informational purposes only. This notice constitutes neither a demand for payment nor a notice of personal liability to any recipient hereof, who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code.

811-4026-0519F

**Please read the following important notices as they may affect your rights.**

This is an attempt to collect a debt and any information obtained will be used for that purpose. This communication is from a debt collector.

If you are a customer in bankruptcy or a customer who has received a bankruptcy discharge of this debt: please be advised that this notice is to advise you of the status of your mortgage loan. This notice constitutes neither a demand for payment nor a notice of personal liability to any recipient hereof, who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code. However, it may be a notice of possible enforcement of the lien against the collateral property, which has not been discharged in your bankruptcy.

**Attention Servicemembers and Dependents:** The federal Servicemembers Civil Relief Act and certain state laws provide important protections for you, including interest rate protections and prohibiting foreclosure under most circumstances during and twelve months after the servicemember's military or other service.  Counseling for covered servicemembers is available from Military OneSource and the United States Armed Forces Legal Assistance or other similar agencies.

The following is a Spanish translation of the information previously provided:

**Lea por favor las siguientes avisos importantes que puedan afectar sus derechos.**

Esto es un intento de cobrar una deuda y cualquier información obtenida se utilizará para ello. Esta comunicación es de un cobrador de deudas.
Si usted es un cliente en situación de bancarrota o un cliente que ha recibido una descarga de bancarrota de la deuda: tenga en cuenta que este aviso es para informarle de la situación de su préstamo hipotecario. Este aviso no constituye una exigencia de pago ni un aviso de responsabilidad civil contra ninguno de los destinatarios de la presente notificación, que pudiese haber recibido un descargo de este tipo de deuda de conformidad con la legislación vigente sobre bancarrota o que pudiera ser objeto de suspensión automática en virtud de  Sección 362 del Código de Bancarrota de los Estados Unidos. No obstante, puede ser una notificación de una posible aplicación de gravamen sobre la propiedad como garantía, que aún no ha sido descargada en su proceso de bancarrota.

**Atención Miembros del Servicio Militar y Dependientes**: La Ley de Amparo Civil para miembros del servicio militar y ciertas leyes estatales proporcionan protecciones importantes para usted, incluyendo protecciones de tasas de interés y prohibiendo la ejecución hipotecaria bajo la mayoría de las circunstancias durante y doce meses después del miembro del servicio militar u otro servicio.  Asesoramiento para militares con cobertura está disponible de Military OneSource (800-342-9647) y la Asistencia Legal de las Fuerzas Armadas de Estados Unidos o de otras agencias similares. Para más información por favor visite el sitio web de Military OneSource www.militaryonesource.mil/.

811-4027-0519B

EXHIBIT O

After Recording Return To:

_____
_____
_____
_____

_____ **[Space Above This Line For Recording Data]** _____

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)  "Security Instrument"** means this document, which is dated _____, _____, together with all Riders to this document.
**(B)  "Borrower"** is _____. Borrower is the trustor under this Security Instrument.
**(C)  "Lender"** is _____. Lender is a _____ organized and existing under the laws of _____ _____. Lender's address is _____. Lender is the beneficiary under this Security Instrument.
**(D)  "Trustee"** is _____.
**(E)  "Note"** means the promissory note signed by Borrower and dated _____, \_\_\_\_\_. The Note states that Borrower owes Lender _____ Dollars (U.S. $_____) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than _____.
**(F)  "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G)  "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H)   "Riders"** means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

☐  Adjustable Rate Rider    ☐  Condominium Rider    ☐  Second Home Rider
☐  Balloon Rider            ☐  Planned Unit Development Rider    ☐  Other(s) [specify] _____
☐  1-4 Family Rider         ☐  Biweekly Payment Rider

**CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          Form 3005  1/01  *(page 1 of 16 pages)*

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii)the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably

grants and conveys to Trustee, in trust, with power of sale, the following described property located in the _____ of _____:

[Type of Recording Jurisdiction]        [Name of Recording Jurisdiction]

which currently has the address of _____

[Street]

_____, California _____ ("Property Address"):

[City]                                        [Zip Code]

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

     THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

     UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

     **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is

pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.  Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees,

and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan

balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.  Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date

of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.  Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its

condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.  Borrower's Loan Application.**   Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.   Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b)** Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11.  Assignment of Miscellaneous Proceeds; Forfeiture.**  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any,  paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount

necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured

by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

   **19.  Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b ) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument.  Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 18.

   **20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.**  As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials;  (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge,  (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.   Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but**

not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold.  Trustee shall cause this notice to be recorded in each county in which any part of the Property is located.  Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law.  After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines.  Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale.  Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied.  The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein.  Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.**  Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee.  Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it.  Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.  If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.**  Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located.  The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and

duties conferred upon the Trustee herein and by Applicable Law.  This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

    **25.  Statement of Obligation Fee.**  Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

    BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____(Seal)
                                                                      - Borrower

_____(Seal)
    - Borrower

_____  **[Space Below This Line for Acknowledgment]** _____